IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
FILED: AUGUST 13, 2008
08CV4596
JUDGE GETTLEMAN
MAGISTRATE JUDGE KEYS
```

| | | |
|---|---|---|
| ALLEN & COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. PH_____ |
| | ) | |
| SANFORD USD MEDICAL CENTER | ) | |
| formerly known as SIOUX VALLEY | ) | |
| HOSPITAL and USD MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

<u>NOTICE OF REMOVAL</u>

Defendant Sanford Medical Center d/b/a Sanford USD Medical Center ("Sanford") by its attorneys, Rachlis Durham Duff & Adler, LLC, files this notice to remove this action from the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois, Chancery Division, in which it is now pending, to the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §§ 1441 and 1332, and on the grounds of diversity citizenship, and in support thereof, states as follows:

1.      Sanford is the only defendant named in this action, which plaintiff Allen & Company, LLC commenced on July 11, 2008 by filing a Complaint In Chancery in the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois. This action was captioned *Allen & Company, LLC v. Sanford USD Medical Center formerly known as Sioux Valley Hospital and USD Medical Center*, No. 2008 MR 001107. Accurate copies of the Summons and Complaint are attached hereto as Exhibit 1.

2.      Sanford was served with the Summons and Compliant on or about July 15, 2008.

3.      This Notice of Removal is timely because it is filed within thirty days of July 15,

2008, the date that Sanford first received through service or otherwise the Summons and Complaint in this action.

4.     There is a complete diversity of citizenship between the plaintiff and defendant in this action. Plaintiff Allen & Company, LLC is a limited liability corporation whose members, on information and belief, are citizens of Illinois and are not citizens of South Dakota.[1] Defendant Sanford is a South Dakota not-for-profit charitable organization, with its principal place of business located in Sioux Falls, South Dakota.

5.     This action is removable from State Court to this Court pursuant to 28 U.S.C. § 1441(b) because the matter of controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.  Specifically, the Complaint alleges damages in the amount of $111,641.99.  Accordingly, the claim in the Complaint is within the original jurisdiction conferred on the District Courts of the United States by 28 U.S.C. § 1332.

6.     Sanford removes this action without waiver of any defenses, procedural or substantive, that may be available and without waiver of any claims that Sanford may have with respect to the matters alleged in the complaint.

---

[1] Prior to filing this Notice of Removal, counsel for Sanford attempted on two separate occasions to obtain information about the citizenship of the members of Allen & Company, LLC from counsel for Allen & Company, LLC.  As of the date of the filing of this Notice of Removal, counsel for Allen & Company, LLC has not provided the requested information.  Thus, Sanford requests the assistance of the Court to enable it to determine the citizenship of the members of Allen & Company, LLC, so that any question over the Court's jurisdiction over this matter can be addressed.

WHEREFORE, Defendant Sanford USD Medical Center respectfully requests that the above-referenced action now pending in DuPage County be removed to this Court.

Dated: August 13, 2008

SANFORD MEDICAL CENTER

By: /s/ Kevin B. Duff
    One of its attorneys

    Kevin B. Duff
    Michael Rachlis
    Darnella J. Ward
    Rachlis Durham Duff & Adler, LLC
    542 South Dearborn Street, Suite 900
    Chicago, Illinois 60605
    phone: 312-733-3950
    fax:    312-733-3952

```
08CV4596
JUDGE GETTLEMAN
MAGISTRATE JUDGE KEYS

PH
```

# EXHIBIT 1

IN THE CIRCUIT COURT OF DUPAGE COUNTY, ILLINOIS
CHANCERY DIVISION, EIGHTEENTH DISTRICT

2008MR001107

ALLEN & COMPANY, LLC

      Plaintiff,

v.

SANFORD USD MEDICAL CENTER
formerly known as SIOUX VALLEY
HOSPITAL and USD MEDICAL CENTER,

      Defendant.

Status Date: 11/07/08
Assigned To: 2005

    Case No.

)
)
)
)
)
)
)
)
)
)

**FILED**
Jul 11 2008 - 10:05 AM

*Chris Kachiroubas*

CLERK OF THE
18TH JUDICIAL CIRCUIT
DU PAGE COUNTY ILLINOIS

## COMPLAINT IN CHANCERY

NOW COMES the Plaintiff, ALLEN & COMPANY, LLC (hereinafter, "Plaintiff") by and through its attorneys, MOMKUS McCLUSKEY, LLC, and in support of its Complaint in Chancery against Defendant, SANFORD USD MEDICAL CENTER, formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, (hereinafter, "Sanford"), states as follows:

## COUNT I – DECLARATORY JUDGMENT

1.    At all times mentioned, Plaintiff was an Illinois corporation in goodstanding, with its office in Oak Brook, Illinois.

2.    Upon information and belief, Sanford is a hospital located and doing business in Sioux Falls, Minnehaha County, South Dakota.

3.    On August 30, 2004, Sanford and BioSafe Medical Technologies, Inc. (hereinafter, "BioSafe") entered into a valid and enforceable lease agreement (hereinafter, "Sanford - BioSafe Lease Agreement") in which BioSafe leased to Sanford various cholesterol testing equipment and/or cholesterol testing procedures and methodologies. In return, Sanford agreed to pay to BioSafe a monthly license fee of $1,250 per month for the first year of the

1

Agreement, and then a monthly license fee of $6,250 per month for the remaining term of the Agreement.

4.    Following the execution of the Lease Agreement, the right to the payments pursuant to the Sanford-BioSafe Lease Agreement was transferred to First Commercial Capital Corporation (hereinafter, "First Commercial"). Sanford executed a Lease Agreement with First Commercial (hereinafter, "Sanford - First Commercial Lease Agreement) granting First Commercial the right to twelve (12) monthly payments of $1,000 each, followed by forty-eight (48) monthly payments of $6,250 each. (Sanford – First Commercial Lease Agreement Equipment Schedule). (*Exhibit "A"*).

5.    On August 30, 2004, First Commercial executed a valid and enforceable Non-Recourse Installment Note with Plaintiff, (hereinafter, the "Installment Note"), granting First Commercial's right to payment under the Lease Agreement to Plaintiff in return for value received. (*Exhibit "B"*).

6.    On February 22, 2008, Sanford filed a complaint against BioSafe, First Commercial, and Delphi Energy Fund, Inc. as defendants in the Second Judicial Circuit, Minnehaha County, South Dakota (hereinafter, "South Dakota suit"). *Sanford USD Medical Center formerly known as Sioux Valley Hospital and USD Medical Center v. BioSafe Medical Technologies, Inc., Delphi Energy Fund, Inc., and First Commercial Capital Corp.* (*Exhibit "C"*). Not all of the entities concerned in the matter were included in the South Dakota suit, as Plaintiff was not named as a party.

7.    In its South Dakota suit, Sanford pled two counts, the first for breach of contract, claiming that BioSafe breached its contract with Sanford by failing to pay monies that it owed under its contract with Sanford, (¶33), and the second seeking a declaratory judgment that

Sanford owes no duty to pay any further fees to any of the defendants in the South Dakota action. (¶41).

8.     Pursuant to the Sanford – First Commercial Lease Agreement, Sanford has waived its rights to seek venue in any jurisdiction other than that of the State of Illinois or the Federal Courts.

> LESSEE [Sanford] WAIVES TRIAL BY JURY AND SUBMITS TO THE JURISDICTION OF THE FEDERAL DISTRICT COURTS OF COMPETENT JURISDICTION OR ANY STATE COURT WITHIN THE STATE OF ILLINOIS AND WAIVES ANY RIGHT TO ASSERT THAT ANY ACTION INSTITUTED BY LESSOR IN ANY SUCH COURT IS IN THE IMPROPER VENUE OR SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM."

(Sanford – First Commercial Lease Agreement, ¶16) (Emphasis in original).

9.     A controversy now exists over whether Sanford can proceed with its South Dakota action, which may affect the rights of Plaintiff, when Sanford has signed a Lease Agreement specifying that it would submit any controversies arising out of the agreement to the jurisdiction of Illinois. (Sanford – First Commercial Lease Agreement, ¶16).

10.     Any controversy concerning Sanford's right to initiate litigation outside of the jurisdiction of Illinois that might affect Plaintiff's rights under the Sanford – First Commercial Lease Agreement and the Installment Note is a controversy ripe for declaratory judgment under 735 ILCS 5/2-701.

WHEREFORE, Plaintiff, ALLEN & COMPANY, LLC, seeks a declaratory judgment by this Honorable Court that all disputes affecting Plaintiff's rights under and any controversies concerning the lease agreements and installment note be submitted to the jurisdiction of Illinois; for reasonable attorney's fees and costs; and for any further remedy deemed just and proper by this Honorable Court.

## COUNT II – BREACH OF CONTRACT

11.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 10 of this Complaint as if fully set forth herein.

12.     Pursuant to the Installment Note, Plaintiff is entitled to receive from Sanford twelve (12) monthly payments of $1,000 each and forty-eight (48) monthly installments of $6,250 each, together with an interest rate of 7.5 percent per year to be increased by two (2) percent at the date of the maturity of each installment. Without the calculation of the increased interest rate to be applied to late installments, Plaintiff was owed $251,394.62 under the Installment Note.

13.     The last payment made by Sanford pursuant to its Lease Agreement was on February 11, 2008. As of that date, the balance of the money Sanford owed under the Lease Agreement was $111,641.99. Sanford has not made any payments since that time and is now in default in excess of thirty (30) days.

14.     Jurisdiction in Illinois is proper as Sanford has submitted to the jurisdiction of any Illinois state court, pursuant to Paragraph 16 of the Sanford – First Commercial Lease Agreement.

15.     Plaintiff has performed all of its duties under the Installment Note.

16.     Sanford has ceased performing under its Lease Agreement, and as a result, Plaintiff has been damaged by an amount no less than $111,641.99.

4

WHEREFORE, Plaintiff, ALLEN & COMPANY, LLC, respectfully moves this Honorable Court to enter an order in its favor and against Defendant, SANFORD USD MEDICAL CENTER, formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, for monies in excess of $111,641.99 plus interest, for attorney's fees and costs, and for any further remedy deemed by the Honorable Court to be just and proper.

Respectfully Submitted

MOMKUS McCLUSKEY, LLC

By: _____

One of its Attorneys

James McCluskey
Lauryn Parks
MOMKUS McCLUSKEY, LLC
3051 Oak Grove Road
Downers Grove, Illinois 60515
630-434-0400
Attorneys for Plaintiff
Attorney no.: 20508
W:\21_25\2123.080168\Pleadings\Complaint.doc

Our Downers Grove Office is moving
As of July 25, 2008.
Please send all payments and correspondence to
Momkus McCluskey LLC
1001 Warrenville Road, Suite 500
Lisle, IL 60532
Our phone and fax numbers will not change

First Commercial Capital Corp.
**MASTER LEASE AGREEMENT**

First Commercial Capital Corp.
601 S. LaSalle St., Suite 600
Chicago, Illinois 60605
(312) 566-0608

Lessee:  Sioux Valley Hospital USD Medical Center
Address:  1305 W. 18th St.
Sioux Falls, SD 57105

Master Lease Agreement No. 2658-01
Date:  *August 30, 2004*

First Commercial Capital Corp. ("Lessor") hereby leases to Lessee and Lessee leases from Lessor, in accordance with the terms and conditions hereinafter set forth, the equipment and property together with all replacements, substitutions, additions, accessories, alterations and repairs incorporated therein or now or hereafter affixed thereto (herein collectively referred to as the "Equipment" described in each Equipment Schedule which may be executed by Lessor and Lessee from time to time (individually a "Schedule" and collectively, the "Schedules"), each of which is made a part hereof.  For all purposes of this Master Lease Agreement ("Lease"), each Schedule relating to one or more items of Equipment shall be deemed a separate lease incorporating all of the terms and provisions of this Lease.  In the event of a conflict between the terms of this Lease and the terms and conditions of a Schedule, the terms and conditions of the Schedule shall govern and control that Schedule.

The person executing this Lease for and on behalf of Lessee warrants and represents, which warranty and representation shall survive the expiration or termination of this Lease, that this Lease and the execution hereof has been duly and validly authorized by Lessee, constitutes a valid and binding obligation of Lessee and that he has authority to make such execution for and on behalf of Lessee.

IN WITNESS WHEREOF, this Lease has been executed by Lessee this 30th day of *August*, 20 04.

Sioux Valley Hospital USD Medical Center

By: *Rosemary Brua*

Title: *VP, ER/Trauma/Surgery*

ACCEPTED AT CHICAGO, ILLINOIS
First Commercial Capital Corp. (Lessor)

By: *[signature]*

Title: *President*

1. **Term and Rental.**  The term of this Lease (the "Minimum Lease Term") for any item of Equipment shall be set forth in the Schedule relating to such item of Equipment and shall commence (the "Commencement Date") on the acceptance Date ("Acceptance Date"); which shall be the applicable of:  (1) the date of delivery of the Equipment to Lessee; (2) in the case of Equipment which is the subject of a sale and leaseback between Lessor and Lessee, the date upon which Lessor purchases such Equipment from Lessee; or (3) in the case of Equipment requiring installation, the date  of installation of the Equipment.  If the Acceptance Date is other than the first day of a calendar month, then the Commencement Date of the Minimum Lease Term set forth in any Schedule shall be the first day of the calendar month following the month which includes the Acceptance Date and Lessee shall pay to Lessor, in addition to all other sums due hereunder, an amount equal to one-thirtieth of the amount of the average monthly rental payment due or to become due hereunder multiplied by the number of days from and including the Acceptance Date to the Commencement Date of the Minimum Lease Term set forth in the Schedule.  Lessee agrees to pay the total rental for the entire term hereof, which shall be the total amount of all rental payments set forth in the Schedule, plus such additional amounts as may become due hereunder or pursuant to any written modification hereof or additional written agreement hereto.  Except as otherwise specified in the Schedule, rental payments hereunder shall be monthly and shall be payable in advance on the first day of each month during the term of this Lease beginning with the Commencement Date of the Minimum

Page 1 of 10

EXHIBIT

A

Lease Term and shall be sent to the address of the Lessor specified in this Lease or in the Schedule or as otherwise directed by the Lessor in writing. Time is of the essence. Rental payments or any other payments due hereunder not made on or before the due date shall be overdue and shall be subject to a service charge in an amount equal to two percent (2%) per month of the overdue payments or the maximum rate permitted by law whichever is less (the "Service Charge Rate"). If Lessor shall at any time accept a rental payment after it shall become due, such acceptance shall not constitute or be construed as a waiver of any or all of Lessor's rights hereunder, including without limitation those rights of Lessor set forth in Sections 12 and 13 hereof.

2. **Title.** This is an agreement of lease only. Lessee shall have no right, title or interest in or to the Equipment leased hereunder, except as to the use thereof subject to the terms and conditions of this Lease. All of the Equipment shall remain personal property (whether or not the Equipment may at any time become attached or affixed to real property). The Equipment is and shall remain the sole and exclusive property of Lessor or its assignees. All replacements, substitutions, modifications, repairs, alterations, additions and accessories incorporated in or affixed to the Equipment (herein collectively called "additions" and included in the definition of "Equipment"), whether before or after the Commencement Date, shall become the property of Lessor upon being so incorporated or affixed and shall be returned to Lessor as provided in Section 3. Upon the request of Lessor, Lessee will affix to the Equipment labels or other markings supplied by Lessor indicating its ownership of the Equipment and shall keep the same affixed for the entire term of this Lease. Lessee agrees to promptly execute and deliver or cause to be executed and delivered to Lessor and Lessor is hereby authorized to record or file, any statement and/or instrument requested by Lessor for the purpose of showing Lessor's interest in the Equipment, including without limitation, financing statements, security agreements, and waivers with respect to rights in the Equipment from any owners or mortgagees of any real estate where the Equipment may be located. In the event that Lessee fails or refuses to execute and/or file Uniform Commercial Code financing statements or other instruments or recordings which Lessor or its assignee reasonably deems necessary to perfect or maintain perfection of Lessor's or its assignee's interests hereunder, Lessee hereby appoints Lessor as Lessee's limited attorney-in-fact to execute and record all documents necessary to perfect or maintain the perfection of Lessor's interests hereunder. Lessee shall pay Lessor for any costs and fees relating to any filings hereunder including, but not limited to, costs, fees, searches, document preparation, documentary stamps, privilege taxes and reasonable attorneys' fees. If any item of Equipment includes computer software, Lessee shall execute and deliver and shall cause Seller (as hereinafter defined) to deliver all such documents as are necessary to effectuate assignment of all applicable software licenses to Lessor. Lessee shall at its expense: (i) indemnify, protect and defend Lessor's title to the Equipment from and against all persons claiming against or through Lessee; (ii) at all times keep the Equipment free from any and all liens, encumbrances, attachments, levies, executions, burdens, charges or legal process of any and every type whatsoever; (iii) give Lessor immediate written notice of any breach of this Lease described in clause (ii); and (iv) indemnify, protect and save Lessor harmless from any loss, cost or expense (including reasonable attorneys' fees) caused by the Lessee's breach of any of the provisions of this Lease, whether incurred by Lessor in pursuing its rights against Lessee or defending against any claims or defenses asserted by or through Lessee. In the event that this transaction is not deemed to be a lease governed by Article 2A of the UCC, as security for the full and prompt payment and performance of all present and future liabilities and obligations of Lessee to Lessor under the Lease, Lessee grants to Lessor a security interest in all Lessee's rights and interest in the Equipment and all accessions and modifications thereto and all proceeds and products of the foregoing.

3. **Acceptance and Return of Equipment.** Lessor shall, at any time prior to unconditional acceptance of all Equipment by Lessee, have the right to cancel this Lease with respect to such Equipment (and if the Equipment or any portion thereof has not previously been delivered, Lessor may refuse to pay for the Equipment or any portion thereof or refuse to cause the same to be delivered) if: (a) the Acceptance Date with respect to any item of Equipment to be leased pursuant to any Schedule has not occurred within sixty (60) days of the estimated Acceptance Date set forth in such Schedule or (b) there shall be, in the reasonable judgment of Lessor, a material adverse change in the financial condition or credit standing of Lessee or of any guarantor of Lessee's performance under this Lease since the date of the most recent financial statements of Lessee or of such

guarantor submitted to Lessor. Upon any cancellation by Lessor pursuant to this Section or the provisions of any Schedule, Lessee shall forthwith reimburse to Lessor all sums paid by Lessor with respect to such Equipment plus all costs and expenses of Lessor incurred in connection with such Equipment and any interest or rentals due hereunder in connection with such Equipment and shall pay to Lessor all other sums then due hereunder, whereupon if Lessee is not then in default and has fully performed all of its obligations hereunder, Lessor will, upon request of Lessee, transfer to Lessee without warranty or recourse any rights that Lessor may then have with respect to such Equipment. Lessee agrees to promptly execute and deliver to Lessor (in no event later than 15 days after the Acceptance Date) a confirmation by Lessee of unconditional acceptance of the Equipment in the form supplied by Lessor (the "Equipment Acceptance"). Lessee agrees, before execution of the aforesaid Equipment Acceptance, to inform Lessor in writing of any defects in the Equipment, or in the installation thereof, which have come to the attention of Lessee or its agents and which might give rise to a claim by Lessee against the Seller or any other person. If Lessee fails to give notice to Lessor of any such defects or fails to deliver to Lessor the Equipment Acceptance as provided herein, it shall be deemed an acknowledgment by Lessee (for purposes of this Lease only) that no such defects in the Equipment or its installation exist and it shall be conclusively presumed, solely as between Lessor and its assignees and Lessee, that such Equipment has been unconditionally accepted by Lessee for lease hereunder. Except as otherwise provided in any Schedule, Lessee shall provide Lessor ninety (90) days prior written notice by registered or certified mail of its intention to return the Equipment upon expiration of the Minimum Lease Term. Upon expiration or the cancellation or termination of the Lease with respect to any Equipment, Lessee shall, at its own expense, assemble, crate, insure and deliver all of the Equipment and all of the service records and all software and software documentation subject to this Lease and any Schedules hereto to Lessor in the same good condition and repair as when received, reasonable wear and tear resulting only from proper use thereof excepted, to such reasonable destination within the continental United States as Lessor shall designate. Lessee shall, immediately prior to such return of each item of Equipment, provide to Lessor a letter from the manufacturer of the Equipment or another service organization reasonably acceptable to Lessor certifying that said item is in good working order, reasonable wear and tear resulting only from proper use thereof excepted, that such item is eligible for a maintenance agreement by such manufacturer and all software is included thereon. If any computer software requires relicensing when removed from Lessee's premises, Lessee shall bear all costs of such relicensing. If Lessee fails for any reason to provide the notice set forth above or to re-deliver the Equipment back to Lessor in accordance with the terms set forth above, Lessee shall pay to Lessor, at Lessor's election, an amount equal to the highest monthly payment set forth in the Schedule for a period of not less than three (3) months ("Holdover Period") and at the end of such Holdover Period, Lessee shall return the Equipment to Lessor as provided herein. If Lessee fails or refuses to return the Equipment as provided herein at the end of any Holdover Period, the term of such Schedule shall be deemed to have been automatically renewed for successive Holdover Periods until Lessee returns the Equipment in accordance with the terms set forth above and during which time, Lessee shall pay to Lessor, at Lessor's option, an amount equal to one hundred percent (100%) of the highest monthly payment set forth in the Schedule or the highest rate permitted by law, whichever is less, for each month or portion thereof, until Lessee so returns the Equipment to Lessor.

4. **Disclaimer of Warranties.** LESSEE HAS EXCLUSIVELY SELECTED AND CHOSEN THE TYPE, DESIGN, CONFIGURATION, SPECIFICATION AND QUALITY OF THE EQUIPMENT HEREIN LEASED AND THE VENDOR, DEALER, SELLER, MANUFACTURER OR SUPPLIER THEREOF (HEREIN COLLECTIVELY CALLED "SELLER"), AS SET FORTH IN THE SCHEDULES. LESSOR MAKES NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS, ADAPTABILITY, ANY IMPLIED WARRANTY OF QUIET ENJOYMENT OR NON-INTERFERENCE OR SUITABILITY FOR ANY PARTICULAR PURPOSE, AND, LESSEE LEASES, HIRES AND RENTS THE EQUIPMENT "AS IS." Lessee understands and agrees that neither Seller, nor any agent of Seller, is an agent of Lessor or is in any manner authorized to waive or alter any term or condition of this Lease. Lessor shall not

be liable for any loss or damage suffered by Lessee or by any other person or entity, direct or indirect or consequential, including, but not limited to, business interruption and injury to persons or property, resulting from non-delivery or late delivery, installation, failure or faulty operation, condition, suitability or use of the Equipment leased by Lessee hereunder, or for any failure of any representations, warranties or covenants made by the Seller. Any claims of Lessee shall not be made against Lessor but shall be made, if at all, solely and exclusively against Seller, or any persons other than the Lessor. Lessor hereby authorizes Lessee to enforce during the term of this Lease, in its name, but at Lessee's sole effort and expense, all warranties, agreements or representations, if any, which may have been made by Seller to Lessor or to Lessee, and Lessor hereby assigns to Lessee solely for the limited purpose of making and prosecuting any such claim, all rights which Lessor may have against Seller for breach of warranty or other representation respecting the Equipment.

5. **Care, Transfer and Use of Equipment.** Lessee, at its own expense, shall maintain the Equipment in good operating condition, repair and appearance in accordance with Seller's specifications and in compliance with all applicable laws and regulations and shall protect the Equipment from deterioration except for reasonable wear and tear resulting only from proper use thereof. When generally offered, Lessee shall, at its expense, keep a maintenance contract in full force and effect, throughout the term of this Lease and any Schedule hereto. The disrepair or inoperability of the Equipment regardless of the cause thereof shall not relieve Lessee of the obligation to pay rental hereunder. Lessee shall not make any modification, alteration or addition to the Equipment (other than normal operating accessories or controls). Lessee will not, and will not permit anyone other than the authorized field engineering representatives of Seller or other maintenance organization reasonably acceptable to Lessor to effect any inspection, adjustment, preventative or remedial maintenance or repair to the Equipment. Lessee may not (a) relocate or operate the Equipment at locations other than the premises of Lessee specified in the applicable Schedule (the "Premises"), except with Lessor's prior written consent, which shall not be unreasonably withheld if such other location is within the continental United States, or (b) **SELL, CONVEY, TRANSFER, ENCUMBER, PART WITH POSSESSION OF, OR ASSIGN ANY ITEM OF EQUIPMENT OR ANY OF ITS RIGHTS HEREUNDER, AND ANY SUCH PURPORTED TRANSACTION SHALL BE NULL AND VOID AND OF NO FORCE OR EFFECT.** In the event of a relocation of the Equipment or any item thereof to which Lessor consents, all costs (including any additional property taxes or other taxes and any additional expense of insurance coverage) resulting from any such relocation, shall be promptly paid by Lessee upon presentation to Lessee of evidence supporting such cost. Lessor shall have the right during normal hours upon reasonable notice to Lessee, subject to applicable laws and regulations, to enter Lessee's Premises in order to inspect, observe, affix labels or other markings, or to exhibit the Equipment to prospective purchasers or future lessees thereof, or to otherwise protect Lessor's interest therein.

6. **Net Lease.** **THIS LEASE AND ANY SCHEDULE HERETO IS A NET LEASE, AND ALL PAYMENTS HEREUNDER ARE NET TO LESSOR.** All taxes, assessments, licenses, and other charges (including, without limitation personal property taxes and sales, use and leasing taxes and penalties and interest on such taxes) imposed, levied or assessed on the ownership, possession, rental or use of the Equipment after delivery of the Equipment to Lessee and thereafter during the term of this Lease and any Schedule hereto (except for Lessor's federal or state net income taxes) shall be paid by Lessee when due and before the same shall become delinquent, whether such taxes are assessed or would ordinarily be assessed against Lessor or Lessee. To the extent possible under applicable law, for personal property or advalorem tax return purposes only, Lessee shall include the Equipment on such returns as may be required, which returns shall be timely filed by it. In any event, Lessee shall file all tax returns required for itself or Lessor and Lessor hereby appoints Lessee as its attorney-in-fact for such purpose. In case of failure by Lessee to so pay said taxes, assessments, licenses or other charges, Lessor may pay all or any part of such items, in which event the amount so paid by Lessor including any interest or penalties thereon and reasonable attorneys' fees incurred by Lessor in pursuing its rights against Lessee or defending against any claims or defenses asserted by or through Lessee shall be immediately paid by Lessee to Lessor as additional rental hereunder. Lessee shall promptly pay all costs, expenses and obligations of every kind and nature incurred in connection with the use or operation of the

Equipment which may arise or become due during the term of this Lease and any Schedule hereto, whether or not specifically mentioned herein. In case of failure by Lessee to comply with any provision of this Lease and any Schedule hereto, Lessor shall have the right, but not the obligation, to effect such compliance on behalf of Lessee. In such event, all costs and expenses incurred by Lessor in effecting such compliance shall be immediately paid by Lessee to Lessor as additional rental hereunder.

7. **Indemnity.** Lessee shall and does hereby agree to indemnify, defend and hold Lessor and its assigns harmless from and against any and all taxes described in Section 6 above, liability, loss, costs, injury, damage, penalties, suits, judgements, demands, claims, expenses and disbursements (including without limitation, reasonable attorneys' fees incurred by Lessor in pursuing its rights against Lessee or defending against any claims or defenses asserted by or through Lessee) of any kind whatsoever arising out of, on account of, or in connection with this Lease and the Equipment leased hereunder, including, without limitation, its manufacture, selection, purchase, delivery, rejection, installation, ownership, possession, leasing, renting, operation, control, use, maintenance and the return thereof. This indemnity shall survive the Minimum Lease Term or earlier cancellation or termination of this Lease and any Schedule hereto.

8. **Insurance.** Commencing on the date that risk of loss or damage passes to Lessor from the Seller and continuing until Lessee has re-delivered possession of the Equipment to Lessor, Lessee shall, at its own expense, keep the Equipment (including all additions thereto) insured against all risks of loss or damage from every and any cause whatsoever in such amounts (but in no event less than the greater of the replacement value thereof or the amount set forth in the applicable Casualty Schedule, whichever is higher), with such deductibles and exclusions as approved by Lessor and in such form as is satisfactory to Lessor. All such insurance policies shall protect Lessor and Lessor's assignee(s) as loss payees as their interests may appear. Lessee shall also, at its own expense, carry public liability insurance, with Lessor and Lessor's assignee(s) as an additional insured, in such amounts with such companies and in such form as is satisfactory to Lessor, with respect to injury to person or property resulting from or based in any way upon or in any way connected with or relating to the installation, use or alleged use, or operation of any or all of the Equipment, or its location or condition. Not less than ten days prior to the Acceptance Date, Lessee shall deliver to Lessor satisfactory evidence of such insurance and shall further deliver evidence of renewal of each such policy not less than thirty (30) days prior to expiration thereof. Each such policy shall contain an endorsement providing that the insurer will give Lessor not less than thirty (30) days prior written notice of the effective date of any alteration, change, cancellation, or modification of such policy or the failure by Lessee to timely pay all required premiums, costs or charges with respect thereto. Upon Lessor's request, Lessee shall cause its insurance agent(s) to execute and deliver to Lessor Loss Payable Clause Endorsement and Additional Insured Endorsement (bodily injury and property damage liability insurance) forms provided to Lessee by Lessor. In case of the failure to procure or maintain such insurance, Lessor shall have the right, but not the obligation, to obtain such insurance and any premium paid by Lessor shall be immediately due and payable by Lessee to Lessor as additional rent hereunder. The maintenance of any policy or policies of insurance pursuant to this Section shall not limit any obligation or liability of Lessee pursuant to Sections 7 or 9 or any other provision of this Lease and any Schedule hereto.

9. **Risk of Loss.** Until such time as the Equipment is returned and delivered to and accepted by Lessor, pursuant to the terms of this Lease and any Schedule hereto, Lessee hereby assumes and shall bear the entire risk of loss, damage, theft and destruction of the Equipment, or any portion thereof, from any cause whatsoever ("Equipment Loss"). Without limitation of the foregoing, no Equipment Loss shall relieve Lessee in any way from its obligations hereunder. Lessee shall promptly notify Lessor in writing of any Equipment Loss. In the event of any such Equipment Loss , Lessee shall: (a) in the event Lessor determines such Equipment to be repairable, promptly place, at Lessee's expense, the Equipment in good repair, condition and working order in accordance with Seller's specifications and to the satisfaction of Lessor; or (b) in the event of an actual or constructive total loss of any item of Equipment, at Lessor's option: (i) promptly replace, at Lessee's expense, the Equipment with like equipment of the same or a later model with the same additions as the Equipment, and in good repair, condition and working order in accordance with the Seller's specifications and to the satisfaction of Lessor; or (ii) immediately pay to Lessor the amount obtained by multiplying the Actual Equipment Cost as

specified in the applicable Schedule by the percentage contained in the applicable Casualty Schedule for the date of such Equipment Loss plus, any unpaid rentals or any amounts due hereunder or, if no Casualty Schedule has been made a part of any applicable Schedule, an amount equal to the present value of the total amount of unpaid rentals and all other amounts due and to become due under any applicable Schedule during the term thereof as of the date of any payment, discounted at a rate equal to the discount rate of the Federal Reserve Bank of Chicago as of the Commencement Date of the Lease with respect to each applicable Schedule, plus an additional amount equal to the fair market value of the Equipment immediately prior to the loss, theft, damage, or destruction, but in no event shall the amount of such fair market value be less than twenty percent (20%) of the actual cost of the Equipment. In the event Lessee is required to repair or replace any such item of Equipment pursuant to Subsections (a) or (b)(i) of the preceding sentence, the insurance proceeds received by Lessor, if any, pursuant to Section 8, after the use of such funds to pay any unpaid amounts then due hereunder, shall be paid to Lessee or, if applicable, to a third party repairing or replacing the Equipment upon Lessee's furnishing proof satisfactory to Lessor that such repair or replacement has been completed in a satisfactory manner. In the event Lessor elects option (b)(ii), Lessee shall be entitled to a credit against the payment required by said Subsection in an amount equal to such insurance proceeds actually received by Lessor pursuant to Section 8 on account of such Equipment, and, upon payment by Lessee to Lessor of all of the sums required pursuant to Subsection (b)(ii), the applicable Schedule shall terminate with respect to such item of Equipment and Lessee shall be entitled to whatever interest Lessor may have in such item "as is, where is" and "with all faults" in its then condition and location without warranties of any type whatsoever, express or implied.

10. **Covenants of Lessee.** Lessee agrees that its obligations under this Lease and any Schedule hereto, including without limitation, the obligation to pay rental, are irrevocable and absolute, shall not abate for any reason whatsoever (including any claims against Lessor), and shall continue in full force and effect regardless of any inability of Lessee to use the Equipment or any part thereof for any reason whatsoever including, without limitation, war, act of God, storms, governmental regulations, strike or other labor troubles, loss, damage, destruction, disrepair, obsolescence, failure of or delay in delivery of the Equipment, or failure of the Equipment to properly operate for any cause. In the event of any alleged claim (including a claim which would otherwise be in the nature of a set-off) against Lessor, Lessee shall fully perform and pay its obligations hereunder (including all rents, without set-off or defense of any kind) and its only and exclusive recourse against Lessor shall be by a separate action. Lessee agrees to furnish promptly to Lessor the annual financial statements of Lessee (and of any guarantors of Lessee's performance under this Lease and any Schedule hereto), prepared in accordance with generally accepted accounting principles and certified by independent certified public accountants, and such interim financial statements of Lessee as Lessor may require during the entire term of this Lease and any Schedule hereto. Lessee, if requested, shall provide at Lessee's expense an opinion of its counsel acceptable to Lessor affirming the covenants, representations and warranties of Lessee under this Lease and any Schedule hereto.

11. **Representations and Warranties.** In order to induce Lessor to enter into this Lease and any Schedule hereto and to lease the Equipment to Lessee hereunder, Lessee represents and warrants that: (a) **Financial Statements.** (i) applications, financial statements, and reports which have been submitted by Lessee and any Obligors (as hereinafter defined) to Lessor are, and all information hereafter furnished by Lessee and Obligors to Lessor will be, true and correct in all material respects as of the date submitted; (ii) as of the date hereof, the date of any Schedule and any Acceptance Date, there has been no material adverse change in any matter stated in such applications, financial statements and reports; and, (iii) none of the foregoing omit or omitted to state any material fact. (b) **Organization.** Lessee is an organizational entity described on the signature page hereof and is duly organized, validly existing and is duly qualified to do business and is in good standing in each State in which the Equipment will be located. (c) **Authority.** Lessee has full power, authority and right to execute, deliver and perform this Lease and any Schedule hereto, and the execution, delivery and performance hereof has been authorized by all necessary action of Lessee. (d) **Enforceability.** This Lease and any Schedule or other document executed in connection therewith has been duly executed and delivered by Lessee and any Obligor and constitutes a legal, valid and binding obligation of Lessee and any Obligor enforceable in accordance with their

its terms. **(c) Consents.** The execution, delivery and performance of this Lease and any Schedule hereto does not require any approval or consent of any stockholders, partners or proprietors or of any trustee or holders of any indebtedness or obligations of Lessee, and will not contravene any law, regulation, judgment or decree applicable to Lessee, or the certificate of incorporation, partnership agreement, by-laws or other governing documents of Lessee, or contravene the provisions of, or constitute a default under, or result in the creation of any lien upon any property of Lessee under any mortgage, instrument or other agreement to which Lessee is a party. or by which Lessee or its assets may be bound or affected. Except as disclosed, no authorization, approval, license, filing or registration with any court or governmental agency or instrumentality is necessary in connection with the execution, delivery, performance, validity and enforceability of this Lease and any Schedule hereto. · **(f) Title.** On each Commencement Date, Lessor shall have good and marketable title to the items of Equipment which is subject to this Lease and any Schedule hereto on such date, free and clear of all liens, except the lien of Seller which will be released upon receipt of payment. Lessee warrants that no party has a security interest in the Equipment which will not be released on or before payment by Lessor to Seller of the Equipment and that the Equipment is and shall at all times remain personal property regardless of how it may be affixed to any real property. **(g) Litigation.** There is no action, suit, investigation or proceeding by or before any court, arbitrator, agency or governmental authority pending or threatened against or affecting Lessee: (i) which involves the Equipment or the transactions contemplated by this Lease and any Schedule hereto; or (ii) which, if adversely determined, could have a material adverse effect on the financial condition, business or operation of Lessee.

**12. Events of Default.** An event of default ("Event of Default") shall occur hereunder if Lessee or any Obligor ("Obligor" shall include any guarantor or surety of any obligations of Lessee to Lessor under this Lease and any Schedule hereto): **(i)** fails to pay any installment of rent or other payment required hereunder when due; or **(ii)** attempts to or does remove from the Premises (except a relocation with Lessor's consent as provided in Section 5), sell, transfer, encumber, part with possession of, or sublet any item of the Equipment; or **(iii)** shall suffer or have suffered, in the reasonable judgment of Lessor, a material adverse change in its financial condition since the date of the last financial statements submitted to Lessor, and as a result thereof Lessor deems itself to be insecure, or any of the statements or other documents or information submitted at any time heretofore or hereafter by Lessee or Obligor to Lessor has misstated or shall misstate or has failed or shall fail to state a material fact; or **(iv)** breaches or shall have breached any representation or warranty made or given by Lessee or Obligor in this Lease or in any other document furnished to Lessor in connection herewith, or any such representation or warranty shall be untrue or, by reason of failure to state a material fact or otherwise, shall be misleading; or **(v)** fails to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder, and such failure or breach shall continue unremedied for a period of ten days after the earlier of (a) the date on which Lessee obtains, or should have obtained knowledge of such failure or breach, or (b) the date on which notice thereof shall be given by Lessor to Lessee; or **(vi)** shall become insolvent or bankrupt or make an assignment for the benefit of creditors or consent to the appointment of a trustee or receiver, or a trustee or receiver shall be appointed for a substantial part of its property without its consent, or bankruptcy or reorganization or insolvency proceeding shall be instituted by or against Lessee or Obligor; or **(vii)** conveys, sells, transfers or assigns substantially all of Lessee's or Obligor's assets or ceases doing business as a going concern, or, if a corporation, ceases to be in good standing or files a statement of intent to dissolve, or abandons any or all of the Equipment; or **(viii)** shall be in breach of or default under any lease or other agreement at any time executed with Lessor or any other lessor or with any lender to Lessee or Obligor.

**13. Remedies.** Upon the occurrence of an Event of Default (the "Default Date") set forth in Section 12 and at any time thereafter, Lessor may, in its sole and absolute discretion, do any one or more of the following: (a) upon notice to Lessee cancel all or any portion of this Lease and some or all Schedules executed pursuant thereto; (b) enter Lessee's Premises and without removal of the Equipment, render the Equipment unusable or, require Lessee to assemble the Equipment and make it available to Lessor at a place designated by Lessor, and/or dispose of the Equipment by sale or otherwise (all of which determinations may be made by Lessor in its sole and absolute discretion) without any duty to account for such action or inaction or for any proceeds or

profits with respect thereto; (c) declare immediately due and payable all sums due and to become due hereunder for the full term of the Lease (including any renewal or purchase obligations which Lessee has contracted to pay); (d) with or without canceling this Lease, recover from Lessee damages, in an amount equal to the sum of: (i) all unpaid rent and other amounts that became due and payable on, or prior to, the Default Date, (ii) the present value of all future rentals and other amounts described in the Lease and not included in (i) above discounted to the Default Date at a rate equal to the discount rate of the Federal Reserve Bank of Chicago as of the Commencement Date of the Lease with respect to each Schedule (which discount rate, Lessee agrees is a commercially reasonable rate which takes into account the facts and circumstances at the time such Schedule commenced), (iii) all commercially reasonable costs and expenses incurred by Lessor in enforcing Lessor's rights under this Lease or defending against any claims or defenses asserted by or through Lessee, including but not limited to, costs of repossession, recovery, storage, repair, sale, re-lease and reasonable attorneys' fees, (iv) the estimated residual value of the Equipment as of the expiration of the Lease, (v) any indemnity amount payable to Lessor; and (vi) interest on all of the foregoing from the Default Date until the date payment is received by Lessor at 2 1/2% in excess of the Prime Rate (or its equivalent) per annum in effect on the date of such payment at the First National Bank of Chicago) or the highest rate permitted by law, whichever is less; (e) exercise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law. Lessor reserves the right, in its sole and absolute discretion, to release or sell any or all of the Equipment at a public auction or in a private sale, at such time, on such terms and with such notice as Lessor shall in its sole and absolute discretion deem reasonable. In such event, without any duty on Lessor's part to effect any such re-lease or sale of the Equipment, Lessor will credit the present value of any proceeds from such sale or re-lease actually received and retainable by it (net of any and all costs or expenses) discounted from the date of Lessor's receipt thereof to the Default Date at 2 1/2% in excess of the Prime Rate (or its equivalent) per annum in effect on the date of such payment at the First National Bank of Chicago, or the highest rate permitted by law, whichever is less to the amounts due to Lessor from Lessee under the provisions of (c), (d) and/or (e) above. A cancellation of this Lease shall occur only upon notice by Lessor and only as to such items of Equipment as Lessor specifically elects to cancel and this Lease shall continue in full force and effect as to the remaining items of Equipment, if any. If this Lease and/or any Schedule is deemed at any time to be one intended as security, Lessee agrees that the Equipment shall secure, in addition to the indebtedness set forth herein, any other indebtedness at any time owing by Lessee to Lessor. No remedy referred to in this Section is intended to be exclusive, but shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity. No express or implied waiver by Lessor of any default shall constitute a waiver of any other default by Lessee or a waiver of any of Lessor's rights.

14. Assignment by Lessor. LESSOR MAY (WITH OR WITHOUT NOTICE TO LESSEE) SELL, TRANSFER, ASSIGN OR GRANT A SECURITY INTEREST IN ALL OR ANY PART OF ITS INTEREST IN THIS LEASE, ANY SCHEDULE, ANY ITEMS OF EQUIPMENT OR ANY AMOUNT PAYABLE HEREUNDER. In such an event, Lessee shall, upon receipt of notice, acknowledge any such sale, transfer, assignment or grant of a security interest and shall pay its obligations hereunder or amounts equal thereto to the respective transferee, assignee or secured party in the manner specified in any instructions received from Lessor. Notwithstanding any such sale, transfer, assignment or grant of a security interest by Lessor and so long as no event of default shall have occurred hereunder, neither Lessor nor any transferee, assignee or secured party shall interfere with Lessee's right of use or quiet enjoyment of the Equipment. In the event of such sale, transfer, assignment or grant of a security interest in all or any part of this Lease and any Schedule hereto, or in the Equipment or in sums payable hereunder, as aforesaid, Lessee agrees to execute such documents as may be reasonably necessary to evidence, secure and complete such sale, transfer, assignment or grant of a security interest and to perfect the transferee's, assignee's or secured party's interest therein and Lessee further agrees that the rights of any transferee, assignee or secured party shall not be subject to any defense, set-off or counterclaim that Lessee may have against Lessor or any other party, including the Seller, which defenses, set-offs and counterclaims shall be asserted only against such party, and that any such transferee, assignee or secured party shall have all of Lessor's rights hereunder, but shall assume none of Lessor's

obligations hereunder.  Lessee acknowledges that any assignment or transfer by Lessor shall not materially change Lessee's duties or obligations under this Lease nor materially increase the burdens and risks imposed on Lessee.  Lessee agrees that Lessor may assign or transfer this Lease or Lessor's interest in the Equipment even if said assignment or transfer could be deemed to materially affect the interests of Lessee.  Nothing in the preceding sentence shall affect or impair the provisions of Section 4, Section 10 or any other provision of this Lease.

15.  Amendments.  This Lease and any Schedule hereto contain the entire agreement between the parties with respect to the Equipment, this Lease and any Schedule hereto and there is no agreement or understanding, oral or written, which is not set forth herein.  This Lease and any Schedule hereto may not be altered, modified, terminated or discharged except by a writing signed by the party against whom such alteration, modification, termination or discharge is sought.  Lessee's Initials _RB_

16.  Law.  This Lease and any Schedule hereto shall be binding only when accepted by Lessor at its corporate headquarters in Illinois and shall in all respects be governed and construed, and the rights and the liabilities of the parties hereto determined, except for local filing requirements, in accordance with the laws of the State of Illinois.  **LESSEE WAIVES TRIAL BY JURY AND SUBMITS TO THE JURISDICTION OF THE FEDERAL DISTRICT COURTS OF COMPETENT JURISDICTION OR ANY STATE COURT WITHIN THE STATE OF ILLINOIS AND WAIVES ANY RIGHT TO ASSERT THAT ANY ACTION INSTITUTED BY LESSOR IN ANY SUCH COURT IS IN THE IMPROPER VENUE OR SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM.**

17.  Invalidity.  In the event that any provision of this Lease and any Schedule hereto shall be unenforceable in whole or in part, such provision shall be limited to the extent necessary to render the same valid, or shall be excised from this Lease or any Schedule hereto, as circumstances may require, and this Lease and the applicable Schedule shall be construed as if said provision had been incorporated herein as so limited, or as if said provision had not been included herein, as the case may be without invalidating any of the remaining provisions hereof.

18.  Security Interest.  As security for the full and prompt payment and performance of all present and future liabilities and obligations of Lessee to Lessor under this Agreement and the Lease, Lessee grants to Lessor a security interest in all Lessee's rights and interest in the Equipment and all proceeds and products thereof.

19.  Miscellaneous.  All notices and demands relating hereto shall be in writing and mailed by certified mail, return receipt requested, to Lessor or Lessee at their respective addresses above or shown in the Schedule, or at any other address designated by notice served in accordance herewith.  Notice shall become effective when deposited in the United States mail, with proper postage prepaid, addressed to the party intended to be served at the address designated herein.  All obligations of Lessee shall survive the termination or expiration of this Lease and any Schedule hereto.  Should Lessor permit use by Lessee of any Equipment beyond the Minimum Lease Term, or, if applicable, any exercised extension or renewal term, the lease obligations of Lessee shall continue and such permissive use shall not be construed as a renewal of the term thereof, or as a waiver of any right or continuation of any obligation of Lessor hereunder, and Lessor may take possession of any such Equipment at any time upon demand.  If more than one Lessee is named in this Lease, the liability of each shall be joint and several.  Lessee shall, upon request of Lessor from time to time, perform all acts and execute and deliver to Lessor all documents which Lessor deems reasonably necessary to implement this Lease and any Schedule hereto, including, without limitation, certificates addressed to such persons as Lessor may direct stating that this Lease and the Schedule hereto is in full force and effect, that there are no amendments or modifications thereto, that Lessor is not in default hereof or breach hereunder, setting forth the date to which rentals due hereunder have been paid, and stating such other matters as Lessor may request.  This Lease and any Schedule hereto shall be binding upon the parties and their successors, legal representatives and assigns.  Lessee's successors and assigns shall include, without limitation, a receiver, debtor-in-possession, or trustee of or for Lessee.  If any person, firm, corporation or other entity shall guarantee this Lease and the performance by Lessee of its obligations hereunder, all of the terms and provisions hereof shall be duly applicable to such Obligor.  Lessee shall, at its expense and upon Lessor's demand, promptly execute, acknowledge, deliver, file, register and record

Page 9 of 10

any and all further documents and take any and all other action reasonably requested by Lessor from time to time, for the purpose of fully effectuating the intent and purposes of each Lease Schedule, and to protect the interests of Lessor, its successors and assigns. Lessor may file a copy of this Lease Agreement in lieu of a financing statement.

**20. Lessee's Waivers.** To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by Article 2A of the Uniform Commercial Code as adopted in any jurisdiction, including but not limited to Lessee's rights to: (i) cancel this Lease; (ii) repudiate this Lease; (iii) reject the Equipment; (iv) revoke acceptance of the Equipment; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim a security interest in the Equipment in Lessee's possession or control for any reason (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under this Lease; (viii) accept partial delivery of the Equipment (ix) "cover" by making any purchase or lease of or contract to purchase or lease Equipment in substitution for those due from Lessor; (x) recover any general, special, incidental, or consequential damages for any reason whatsoever; and (xi) specific performance, replevin, detinue, sequestration, claim, and delivery of the like for any Equipment identified to this Lease. To the extent permitted by applicable law, Lessee also hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Equipment in mitigation of Lessor's damages as set forth in Paragraph 13 or which may otherwise limit or modify any of Lessor's rights or remedies under Paragraph 13. Any action by Lessee against Lessor for any default by Lessor under this Lease, including breach of warranty or indemnity, shall be commenced within one (1) year after any such cause of action accrues.

**21. Counterparts.** This Lease may be executed in any number of counterparts, each of which shall be deemed an original. Each Schedule shall be executed in three (3) serially numbered counterparts each of which shall be deemed an original but only counterpart number 1 shall constitute "chattel paper" or "collateral" within the meaning of the Uniform Commercial Code in any jurisdiction.

**22. Addendum.** ("X" if applicable)  [___]  See Addendum (s) attached hereto and made a part hereof.

**FIRST COMMERCIAL CAPITAL CORP. EQUIPMENT SCHEDULE**

First Commercial Capital Corp.
601 S. LaSalle St., Ste. 600
Chicago, Illinois 60605
(312) 566-0608

Equipment Location:

1305 W. 18th St.
Sioux Falls, SD 57105

Master Lease Agreement No. 2658-01
Schedule No. 001
Acceptance Date: 8/30/2004

Equipment Description:

1    Biosafe Cholesterol Panel System

---

TERM AND RENTAL:

Rental Payments to be made: __X__ monthly; ___ quarterly; other: _____

Minimum Lease Term: _60_ months

Security Deposit: $ 0.00

Expected Acceptance Date: 8/30/2004

*Rental Payments:
$1000.00 rental payment for the first 12 payments
Followed by:
$6250.00 per rental payment for the next 48 rental payments

Initial Payment of $0.00 the first monthly rental payment.  Lessee shall make an initial payment as indicated in this Schedule upon execution of this Schedule. Any initial payment paid by Lessee may be used by Lessor to cure any default of Lessee, in which event Lessee shall promptly restore the initial payment to their full amounts as set forth in this Schedule.  If all the terms and conditions herein to be performed by Lessee are fully performed and all of Lessee's obligations hereunder are fully complied with, that portion of any security deposit not so applied shall be refunded to Lessee at the termination or expiration of this Lease. *Plus, if applicable, freight, taxes, insurance and maintenance which shall be paid by Lessee in accordance with the terms of the Lease and this Schedule.

---

First Commercial Capital Corp. (Lessor) hereby agrees to lease to the Lessee named below, and Lessee hereby agrees to lease and rent from Lessor the Equipment listed above, for the term and at the rental payments specified herein, all subject to the terms and conditions set forth herein and on the reverse side hereof and in the referenced Master Lease Agreement except as the same may be varied by the terms of this Schedule.

Addendum ("X" if applicable) [ ]

ACCEPTED AT CHICAGO, ILLINOIS

Sioux Valley Hospital USD Medical Center
Lessee

By: _Rosemary Roux_
Title: _VP, ER / Trauma / Surgery_
Date: _August 30, 2004_

FIRST COMMERCIAL CAPITAL CORP.
Lessor

By: _Brian Lamb_
Title: _President_
Date: _8/30/2004_

**FIRST COMMERCIAL CAPITAL CORP. EQUIPMENT ACCEPTANCE**

First Commercial Capital Corp.
601 S. LaSalle St., Suite 600
Chicago, Illinois 60605
(312) 566-0608

Master Lease Agreement No.  2658-01
Schedule No. 001

Equipment Description:

1        Biosafe Cholesterol Panel System

Gentlemen:

The undersigned, being duly authorized, hereby (i) certifies that all of the above-referenced Equipment (the "Equipment") has been delivered and inspected, is of an acceptable size, design, capacity and manufacture, is in good working order, repair and condition, and has been installed to the satisfaction of Lessee; and (ii) unconditionally accepts the Equipment for all purposes of the Lease.

It is understood and agreed that First Commercial Capital Corp. in no way or manner assumes any responsibility, either now or hereafter, for the use, performance, functioning, maintenance or service of the Equipment, or for its suitability or adaptability for any particular purpose.

Lessee: Sioux Valley Hospital USD Medical Center

By: _Rosemary Bork_

Title: _VP, ER / Trauma / Surgery_

Acceptance Date* as of:

_August 30, 2004_

* as defined in Section 1 of the Lease

## NON RECOURSE INSTALLMENT NOTE

__$251,394.62__                                     Equipment Lease # 2658-01

RE: **Sioux Valley Hospital USD Medical Center**      Date: August 30, 2004
     **1305 W. 18ᵗʰ St.**
     **Sioux Falls, SD 57105**


FOR VALUE RECEIVED, the undersigned promises to pay to the order of **ALLEN AND COMPANY** ("the bank") the principal sum of $ 251,394.62 together with the interest at the rate of 7.5 per annum from the date hereof to the maturity date of each installment on the principal balance from time to time in 12 monthly installments of $1000.00 followed by 48 monthly installments of $6250.00 each payable on 9/30/04 and including 8/30/09 with all such installments to be applied first to interest and the balance to the principal. After the maturity of any installment, the principal thereof shall bear interest until paid at a rate which shall be 2% higher than would otherwise be payable on this Note. Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

This note is secured by an Assignment and Security Agreement dated August 30, 2004 between the undersigned and the Bank to which reference is made to for a description of the collateral for this Note.

If any one of the said installments shall not have been paid and 90 days shall have elapsed after it was due, or if an Event of Default shall have occurred and be continuing as defined in any said Security Agreement, such holder may declare this Note to be due and payable, whereupon all unpaid principal and accrued interest shall become immediately due and payable.

This Note may be prepaid in whole or in part without premium or penalty. Partial prepayments shall be applied to installments of principal in the inverse order of maturity, and all prepayments shall first be applied to interest on the principal being paid to the date of prepayment.

The undersigned for itself and on behalf of any endorser or guarantor waives presentment, protest, notice or dishonor, and notice of any kind in respect to the Note or said endorsement or guaranty.

By acceptance of this Note the Bank and any subsequent holder of this Note agrees, that, except as otherwise provided in the Security Agreement, the undersigned does not have, nor shall it have, any liability or obligation with respect to the payment of this Note, and that except as otherwise provided on the Security Agreement, this Note is payable solely from proceeds received by the Bank from the Bank's interest in said collateral.


EXHIBIT
B

This Note and all rights hereunder shall be governed by the laws of the State of Illinois.

First Commercial Capital Corp.

President

Buy Rate: ___ 7.5

Discount: **12 payments of $1000.00 followed by 48 payments of $6250.00**

**@ 7.5 = ___ $ 251,394.62**

## ASSIGNMENT AND SECURITY AGREEMENT

Without recourse (or evaluation of financial ability of Lessee to pay Lease described below) the undersigned as Lessor under the said lease does hereby assign, transfer, and set-over to ALLEN AND COMPANY (the bank") of all of its right, title and interest in and to all rents and other payments, including without limitation, the proceeds of insurance and condemnation awards, due and to become due to the undersigned as said Lessor pursuant to or by reason of that certain said lease described as follows (the "Lease"), the original of which is attached hereto:

| | |
|---|---|
| LESSOR: | First Commercial Capital Corp. |
| LESSEE: | Sioux Valley Hospital USD Medical Center |
| | 1305 W. 18th St. |
| | Sioux Falls, SD 57105 |

Original Term in Months: 60

Equipment Lease #2658-01

Type of Equipment Being Leased:  Biosafe Cholesterol Panel System

Monthly Rental Payment:  12 Payments of $1000.00 followed by 48 Payments of $6250.00

Total Rent Owing on Date of this Agreement:   $ 312,000.00

Notwithstanding anything herein contained to the contrary, the Bank shall not hereby assume nor be obligated to perform any acts, duties, or responsibilities under or in connection with the Lease, and the undersigned promises to perform all of its obligations as Lessor thereunder.

The undersigned hereby grants to the Bank as its attorney-in-fact the power and authority to do any and all acts under the Lease which the undersigned could do save for this assignment, either in the name of the Bank or in the name of the undersigned, including without limitation the power to repossess  the leased equipment when entitled under the Lease, and to sell, lease, or otherwise dispose of the same in accordance with the terms of the Lease. In furtherance thereof and without limiting the foregoing, the Undersigned expressively grants to the Bank the power and authority to receipt for sums due and to become due the Lessor; to compromise, settle and or adjust all claims in respect to the Lease or any insurance on the property under the Lease; or institute suit or any proceeding either in its name or in the name of the undersigned in order to enforce any rights obtained by virtue of this Agreement; to grant extensions of time of payment to said Lessee or to any other person obligated on the Lease on or any accompanying guaranty; or to agree to the substitution of a Lessee without notice to the undersigned.

As collateral security for all payments hereby assigned as well as the performance of all provisions under the Lease, and subject always to the rights of the Lessee under the Lease, the undersigned does hereby hypothecate, pledge, and grant a security interest in all of the undersigned's right, title, and interest in and to the said leased equipment to the Bank. In the event there is a default under the terms of the Lease, the Bank shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of Illinois.

The undersigned warrants, as of this date and to the best of it's knowledge, that: it is the owner of the lease equipment free from all liens and encumbrances except the Lease; the Lease and any accompanying guarantees, waivers and/or other instruments are genuine and enforceable; the Lease is the only lease of the leased equipment and is and will continue to be free from all defenses, set-off and counterclaims; all signatures, names, addresses, amounts, and other statements and facts contained in the Lease are true and correct; the aggregate unpaid rentals shown above is correct; the leased equipment has been delivered to the Lessee in satisfactory condition and has been accepted by the Lessee; the lease transaction conforms to all applicable laws and regulations; and if any filing or recording is permitted or required to perfect or give notice of the respective interest of the undersigned and the Lessee in the leased equipment, then such filing or recording has been accomplished. If the undersigned breaches any of the foregoing warranties, it will be upon the Bank's request, promptly repurchase the remaining interest hereby assigned to the Bank for an amount equal to the unpaid rentals, and other payments due, and all expenses paid or incurred by the Bank less any unearned charges. Knowledge by the Bank of a breach of any of said warranties shall not constitute a waiver thereof by the Bank.

The undersigned hereby subordinates all rights to monies payable by said Lessee to the undersigned to all payments due or to become due under or arising out of the Lease from the Lessee to the Bank.

Without the Bank's prior written consent, the undersigned will not accept rent or other collections, repossess or consent to the return of the leased equipment, nor amend or modify the Lease. Any payments inadvertently so received shall be held in trust and promptly remitted to the Bank.

Dated this 30th day of August 2004.

LESSOR:　　First Commercial Capital Corp.

BY:

ITS:　　President

STATE OF SOUTH DAKOTA    )                    IN CIRCUIT COURT
                          : SS
COUNTY OF MINNEHAHA       )                    SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SANFORD USD MEDICAL CENTER              \*
formerly known as SIOUX VALLEY          \*
HOSPITAL and USD MEDICAL CENTER,        \*              CIV.
                                        \*
            Plaintiff,                  \*
                                        \*
      vs.                               \*              S U M M O N S
                                        \*
BIOSAFE MEDICAL TECHNOLOGIES, INC.,     \*
DELPHI ENERGY FUND, INC., and           \*
FIRST COMMERCIAL CAPITAL CORP.,         \*
                                        \*
            Defendants.                 \*
                                        \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THE STATE OF SOUTH DAKOTA TO THE ABOVE-NAMED DEFENDANTS,
GREETINGS:

        You, and each of you, are hereby summoned and required to answer the Complaint of the

Plaintiff in the above entitled action, a copy of which said Complaint is hereunto annexed and

herewith served upon you, and to serve a copy of your Answer to said Complaint upon the

subscribers, Davenport, Evans, Hurwitz & Smith, L.L.P., at their office at P.O. Box 1030, 206

West 14th Street, in the City of Sioux Falls, Minnehaha County, South Dakota, within thirty (30)

days after the service of this Summons upon you, exclusive of the day of such service, and each

of you, will hereby take notice that in case of your failure to answer said Complaint, judgment by

default may be rendered against you as requested in the said Complaint.



Dated at Sioux Falls, South Dakota, this ___ day of February, 2008.

DAVENPORT, EVANS, HURWITZ &
SMITH, L.L.P.

ROBERTO A. LANGE
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiffs*

2

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | : SS | |
| COUNTY OF MINNEHAHA | ) | SECOND JUDICIAL CIRCUIT |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| SANFORD USD MEDICAL CENTER formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, | * * * * | |
| | * | CIV. |
| Plaintiff, | * * | |
| vs. | * * | COMPLAINT |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., DELPHI ENERGY FUND, INC., and FIRST COMMERCIAL CAPITAL CORP., | * * * * | |
| Defendants. | * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff Sanford USD Medical Center formerly known as Sioux Valley Hospital and

USD Medical Center, for its Complaint, states and alleges as follows:

## PARTIES

1.

Sanford USD Medical Center was formerly known as Sioux Valley Hospital and USD

Medical Center, and is referred to in this Complaint as "Sanford."

2.

Sanford is a not-for-profit charitable organization that is headquartered and provides

services from Sioux Falls, Minnehaha County, South Dakota.

3.

Defendant BioSafe Medical Technologies, Inc. ("BioSafe") is an Illinois corporation with

its corporate offices at 100 Field Drive, Suite 240, Lake Forest, Illinois.

4.

Defendant Delphi Energy Fund, Inc. ("Delphi Energy") is a corporation with its corporate office at 29 South LaSalle Street, Suite 828, Chicago, Illinois, 60603.

5.

Defendant First Commercial Capital Corp. ("First Commercial") has its corporate office at 601 South LaSalle, Suite, Suite 600, Chicago, Illinois, 60605.

6.

Defendants Delphi Energy and First Commercial are named in this lawsuit for purposes of Count Two of the Complaint seeking a declaratory judgment that Sanford no longer has responsibility to pay either of them certain "license fees" or lease payments, which arose under Section 9 of the Agreement between Sanford and BioSafe, which fees BioSafe factored to First Commercial, who in turn assigned its right to Delphi Energy.

### ALLEGATIONS COMMON TO COUNTS

7.

Sanford and Defendant BioSafe entered into an Agreement dated August 30, 2004. A true and correct copy of this Agreement is attached as Exhibit A hereto and is incorporated by reference herein.

8.

BioSafe initiated contact with Sanford after Sanford acquired certain cholesterol testing equipment as a part of the acquisition of Central Plains Clinic, Ltd.

2

9.

BioSafe sought out the relationship with Sanford in Sioux Falls, sent letters to and

communicated by phone with Sanford in Sioux Falls, and sought an Agreement to refer to

Sanford in Sioux Falls certain blood or other samples for cholesterol testing in Sioux Falls.

10.

BioSafe wrote the Agreement that is attached as Exhibit A.

11.

Sanford acquired no equipment from BioSafe, but rather used equipment already owned

by Sanford to conduct the cholesterol tests on samples referred by BioSafe.

12.

Sanford used methodologies and procedures from BioSafe to perform the cholesterol

testing for BioSafe, but continued to use a separate methodology and procedure on Sanford's

own cholesterol testing.  As a means of compensating BioSafe for the cholesterol testing sent to

Sanford and for the methodologies and procedures, Sanford agreed to pay a monthly fee under

section 9 of the Agreement that BioSafe characterized as a "license fee."

13.

Under section 9 of the Agreement, Sanford agreed to a monthly license fee of $1,250.00

per month for the first year of the Agreement, and for a monthly license fee of $6,250.00 per

month for the remaining term, with BioSafe representing that there could be as many as 60,000

cholesterol tests referred by BioSafe to Sanford per year.

14.

Sanford and BioSafe executed Addendum I and Addendum II to the Agreement, which

are included in Exhibit A hereto.

3

15.

Under Addendum I, BioSafe agreed to guarantee revenue to Sanford from the cholesterol determinations of $22,500.00 in the first year of the Agreement and of $27,000.00 for each calendar quarter from and after September 1, 2005.

16.

Although the term of the Agreement began on August 30, 2004, Sanford and BioSafe executed the Agreement, Addendum I and Addendum II as of June 1, 2004.

17.

On June 15, 2004, BioSafe notified Sanford that, as a part of a strategic alliance between BioSafe and First Commercial, BioSafe was assigning to First Commercial the right to monthly fees called for under Section 9 of the Agreement. First Commercial knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota.

18.

On September 20, 2004, Delphi Energy notified Sanford Hospital that it was the new assignee of the payments originally called for under section 9 of the Agreement between BioSafe and Sanford. Delphi Energy knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota.

19.

Sanford has paid license fees from the inception of the Agreement until a check issued on January 25, 2008, paying license fees through January 31, 2008. Sanford paid the license fee

initially in the sum of $1,250.00 per month, and subsequent to September 1, 2005, in the amount of $6,250.00 per month.

20.

Under Addendum I to the Agreement, BioSafe was to make an initial annual payment of up to $22,500.00 to Sanford if the volume of cholesterol determinations during the first year of the Agreement did not result in that level of revenue to Sanford.

21.

During the first year of the Agreement, BioSafe referred no cholesterol determinations to Sanford.

22.

On October 27, 2005, Sanford, through the letter attached as Exhibit B hereto, requested BioSafe to pay the $22,500.00 that BioSafe owed for the first year of the contract.

23.

BioSafe has failed to pay the amount owed for the first year of the contract.

24.

After the first year of the contract, BioSafe was responsible to ensure a revenue stream of at least $27,000.00 per quarter to Sanford under Addendum I to the Agreement.

25.

On February 6, 2006, Sanford notified BioSafe that it had received no referrals for determination from BioSafe during the one quarter period of September 1, 2005, through November 30, 2005. A true and correct copy of the letter from Sanford to BioSafe dated February 6, 2006, is attached as Exhibit C hereto.

26.

In the quarter beginning March of 2006, some samples for cholesterol testing were referred from BioSafe to Sanford. The volume of testing referred to Sanford, however, was far below the volumes anticipated and revenue guaranteed by BioSafe at the time of the contract under Addendum I to the Agreement.

27.

On October 19, 2007, Sanford notified BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreements. A true and correct copy of the letter dated October 18, 2007 and enclosed accounting is Exhibit D hereto. As of September 1, 2007, BioSafe owed to Sanford a total of $214,938.99 for shortfalls on the guaranteed contract revenue.

28.

BioSafe's responses to the Sanford letters were to pledge repeatedly to make up for the shortfalls, to promise to refer additional cholesterol testing to Sanford in the future, and to blame the absence of payment on BioSafe's own cash flow difficulties.

29.

Sanford has continued until January 25, 2008, to pay the "license fees" under section nine of the Agreement with BioSafe, notwithstanding BioSafe's failure to ever pay the contractual guaranteed sum under Addendum I.

30.

As of January 31, 2008, BioSafe owes a total of $259,938.99 (plus interest) to Sanford, as set forth in the spreadsheet attached as Exhibit E hereto and incorporated by reference herein.

## COUNT ONE – BREACH OF CONTRACT

### 31.

Sanford incorporates by reference the allegations of paragraphs 1 through 30, as if fully set forth herein.

### 32.

Sanford and Defendant BioSafe entered into a contract, a true and correct copy of which is attached as Exhibit A hereto.  Under Addendum I to the contract, included in Exhibit A hereto, BioSafe agreed to certain volume levels and guaranteed certain revenue levels to Sanford.

### 33.

BioSafe has breached the Agreement by failing to pay monies that is owes under the Agreement to Sanford.

### 34.

Sanford has suffered loss and injury as a result of BioSafe's breach of contract, including the past due and owing amount of $259,938.99 as of January 31, 2008, plus interest, costs and attorneys fees recoverable under Section 10.11 against BioSafe.

## COUNT TWO – DECLARATORY JUDGMENT

### 35.

Sanford incorporates by reference the allegations of paragraphs 1 through 35 of this Complaint, as if fully set forth herein.

### 36.

BioSafe assigned to First Commercial its right to "license fees" under section 9 of the Agreement.  First Commercial later assigned its rights to collect those "license fees" to Delphi Energy.

7

37.

Sanford has paid the license fees under Section 9 of the Agreement to First Commercial and then to Delphi Energy through January 31, 2008.

38.

The obligation to pay the license fees arises under section nine of the Agreement.

39.

The license fees, although sometimes referred to as equipment leases by the Defendants, are not for the lease of any equipment whatsoever, because Sanford uses equipment that it owns to perform the cholesterol testing for BioSafe. The license fees, rather, are to compensate BioSafe and for processes and methods prescribed by BioSafe on the cholesterol testing that Sanford does for BioSafe.

40.

Sanford is ceasing its payments of the so-called license fees effective February 1, 2008.

41.

A controversy now exists, or may exist, over whether Sanford can cease payment to Delphi Energy, the assignee of First Commercial which in turn was the assignee of BioSafe, on any further license fees or equipment lease payments, because of BioSafe's non-performance and prior material breaches of the Agreement.

42.

Any controversy, if any, concerning Sanford's decision and right to cease any further payments of license fees is a controversy ripe for a declaratory judgment under SDCL 21-24.

WHEREFORE, Plaintiff Sanford USD Medical Center, f/k/a Sioux Valley Hospital and USD Medical Center, hereby prays for relief as follows:

8

A.     That Sanford have and recovery a judgment against Defendant BioSafe Medical

Technologies, Inc., in the principal amount of $259,988.99 owed as of January 31,

2008, plus pre-judgment interest thereon;

B.     That Sanford have and recover its costs, interest, expenses, disbursements and

attorneys fees under Section 10.11 of the Agreement against BioSafe;

C.     That Sanford receive a declaratory judgment that it bears no responsibility to pay

any further license fees or claimed equipment lease fees to any of the Defendants;

and

D.     That Sanford have and recover such other and further relief as deemed just and

equitable by the Court.

Dated at Sioux Falls, South Dakota, this 22nd day of February, 2008.

DAVENPORT, EVANS, HURWITZ &
SMITH, L.L.P.

ROBERTO A. LANGE
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiffs*

9

*overnite delivery : 8p/o6*
*with ?*

# AGREEMENT

This Agreement is made and entered into as of the 1st day of January, 2004 ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, IL 60045, and its Affiliates, (collectively, "BioSafe") and Company, whose name and address is set forth on the signature page hereof, and its Affiliates (collectively, "Company").

WHEREAS, BioSafe is in the business of developing and selling diagnostic screens and tests using micro-samples of human blood, including its Cholesterol Panel;

WHEREAS, on the terms and conditions hereinafter set forth, Company desires (i) to market and sell in the Territory a cholesterol screening kit containing the same components as the BioSafe Cholesterol Panel and (ii) to perform in its laboratory the analysis of such test using BioSafe's proprietary methods, techniques and processes under a non-transferable and non-assignable revocable license; and,

WHEREAS, on the terms and conditions hereinafter set forth, BioSafe is willing to grant Company a non-transferable and non-assignable revocable right to use BioSafe's proprietary methods, techniques and processes to perform the laboratory analysis of such test.

NOW, THEREFORE, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived herefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1. **Definitions.** The following terms when used in this Agreement, including the preamble and recitals, shall have the following meanings:

1.1 "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

1.2 "Agreement" means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

1.3 "BioSafe" is defined in the preamble to this Agreement.

1.4 "BioSafe Indemnified Parties" is defined in Section 8.

1.5 "BioSafe Marks" means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the term of this Agreement, by or on behalf of BioSafe.

1.6 "BioSafe Patent Rights" means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

1.7 "BioSafe Technology" means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

1.8 "BioSafe Technology Rights" means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including (i) medical, chemical and other scientific data and (ii) processes and methodology used in the development, testing and analysis of the Cholesterol Panel.

1.9 "Cholesterol Panel" means BioSafe's kit containing all of the components required for an individual to participate in the capillary collection of blood using BioSafe's collection kit which, through laboratory analysis using BioSafe's proprietary methods, techniques and processes, measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.10 "Collection Card" means the BioSafe proprietary self-collection card on which specimens of blood are deposited and from which the laboratory analysis is performed to measure the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.11 "Company" is defined in the preamble to this Agreement.

1.12 "Company Test" means a self-collection blood screen kit, the components of which are the same as those contained in the Cholesterol Panel (although such components, except for the Collection Card, may be purchased from sources other than those used by BioSafe), which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

EXHIBIT

A

1.13 "Determination" means the result obtained from the analysis of human blood and its components.

1.14 "Effective Date" is defined in the preamble to this Agreement.

1.15 "Field" means the collection, transportation, testing and analysis of human blood and its components, and the reporting of the results thereof.

1.16 "Governmental Body" means any court, government (federal, state, local or foreign), department, commission, board, agency, official or other regulatory, administrative or governmental authority.

1.17 "HDL" means high density lipoprotein.

1.18 "LDL" means low density lipoprotein.

1.19 "Party" means BioSafe or Company; "Parties" means BioSafe and Company.

1.20 "Person" means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

1.21 "Territory" means the United States.

2.   License.

2.1   Grant.  BioSafe hereby grants to Company, and Company hereby unconditionally and irrevocably accepts, a non-exclusive, non-transferable and non-assignable revocable license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology solely in the Field exclusively in the Territory for the purpose of processing, and making Determinations from, the Company Test.  The grant of the license is subject to Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do analysis of total cholesterol, HDL, LDL and triglycerides screens using BioSafe's proprietary methods, techniques and processes, and to the continued fulfillment of all of the other terms and conditions of this Agreement.  In addition, the license has been granted solely, and is valid only, for the number of Determinations set forth in Section 9.  Determinations in excess of such annual number shall be in violation of the license and shall be subject to additional charges in accordance with BioSafe's policies and procedures.  In consideration of the license granted herein to Company, beginning with the Effective Date, Company shall pay to BioSafe the monthly license fee set forth in Section 9.  Such license fee shall be due and payable by the Company on the first day of each month.  If the Effective Date does not fall on the first day of the month, the first payment shall be a pro-rata portion of the monthly license fee, calculated on a 30-day basis, due and payable on the Effective Date.  In connection with the license, BioSafe: (i) will provide training to Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes; (ii) will provide Company with a list of all components used in the Cholesterol Panel to enable Company to assemble a self-collection blood screen kit substantially identical to the Cholesterol Panel; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Cholesterol Panel, and (iv) will make Collection Cards available for purchase at an initial cost of $1.25 each, subject to change upon 90 days prior written notice.

2.2   Non-exclusive.  Company understands and acknowledges that, since the license herein granted is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses or the right to distribute or manufacture the Cholesterol Panel or any similar type product during the term of this Agreement, in each case without breaching this Agreement; provided, however, that notwithstanding the foregoing to the contrary, during the term of this Agreement, Company shall be the exclusive licensee within the State of South Dakota of BioSafe Technology for the Company Test.

2.3   Sale Outside the Territory.  Company shall not market, sell or offer for sale the Company Test outside of the Territory.  Accordingly, Company shall limit its sales activities with respect to the Company Test to customers located in the Territory.  Company shall refer to BioSafe all orders and inquiries relating to a cholesterol screen originating from within or outside the Territory to the extent such orders or inquiries relate to such screens destined for use outside the Territory.

2.4   Competing Activities.  During the term of this Agreement and for a period of one year following its termination, Company will not, without BioSafe's prior written consent: (i) make, use, license, sublicense, assign, sell, offer for sale or otherwise transfer the Company Test for or to, or enter any agreement or authorize any third party to do any of the foregoing with, (a) any Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides, (b) any Affiliates or agents of a Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides or (c) any Person that Company, its Affiliates or agents knows or believes will manufacture, distribute, sell or otherwise transfer, or has manufactured, distributed, sold or otherwise transferred, the Company Test or the Cholesterol Panel to, on behalf of, or under any agreement with, a party identified in the immediately preceding clauses (a) and (b); or (ii) sell or distribute the

2

Company Test or the Cholesterol Panel as a consumer product through mass merchandisers, drug stores or other retail stores.

2.5 Non-assignable. Neither the license granted to Company, nor any of the rights, technology and trademarks included in the license, are assignable or transferable in any manner or way whatsoever by Company, including the right of Company to grant any sub-licenses.

2.6 Reverse Engineering. Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

2.7 Advertising and Publications. Company will not use on a web site or in any other manner or way any material of any kind or nature in any form or medium that refers, in any manner or way, to the BioSafe Technology, the BioSafe Patent Rights, the BioSafe Technology Rights, the Cholesterol Panel, BioSafe or any other BioSafe intellectual property without BioSafe having first reviewed the proposed use and approved it in writing. Company will not publish outcome or evidence-based data obtained using the Company Test without BioSafe's prior written approval.

2.8 No Challenge. At no time, either during or following the expiration of the term of this Agreement, will Company challenge or assist any other Person in challenging the BioSafe Marks, the BioSafe Patents Rights or the registration thereof.

2.9 No Registration of Similar Marks. At no time, either during or following the expiration of the term of this Agreement, will Company attempt to register any trademarks, service marks, marks, names or trade names confusingly similar to or closely resembling any of the BioSafe Marks.

2.10 No Similar Methods. At no time, either during or following the expiration of the term of this Agreement, will Company use or attempt to use any method, technique or process similar to the BioSafe Technology to analyze or make Determinations which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

2.11 Proprietary Rights. Title and full ownership of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology Rights, the BioSafe Marks shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to Company any right of ownership or any other right of any kind or nature whatsoever in or to such rights, technology, marks and other BioSafe intellectual property, other than the right to use such rights, technology and marks in accordance with the terms and provisions of this Agreement.

2.12 Cessation of Use. At the expiration of the term, or the termination of Company's right to use the license granted herein, any and all rights and licenses that Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's intellectual property shall immediately terminate and Company shall immediately cease using them in any manner or way whatsoever. Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of its other intellectual property. Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other intellectual property subsequent to the expiration or termination of this Agreement and the termination of the license granted hereby.

2.13 Independent Contractor Status. The relationship of BioSafe and Company established by this Agreement is that of independent contractors, and no other relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner which expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between Company and its customers are Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3. Company's Obligations. During the Term of this Agreement, Company will: (i) pay to BioSafe, its agent or assignee a monthly license fee in accordance with the terms of this Agreement; (ii) assemble the Company Test only with the components set forth on the list of components provided by BioSafe (including the Collection Card), or those deemed by BioSafe to be substantially identical, purchase from BioSafe all Collection Cards included in the Company Test, and procure from BioSafe or independently from BioSafe all other components in the Company Test; (iii) sell the Company Test in accordance with all applicable laws, rules and regulations, including the Health Insurance Portability

and Accountability Act of 1996, and the privacy regulations created as a result of such act, and all of the terms and provisions of this Agreement; (iv) conduct its business of selling the Company Test solely in its name, at its sole cost and expense; (v) avoid deceptive, misleading or unethical practices or making any false or misleading representations with respect to the Company Test; (vi) maintain competent, well-trained personnel of its own selection who shall engage in the sale and the laboratory analysis of the Company Test; (vii) obtain all licenses, permits, registrations and approvals, governmental or otherwise, and pay all duties, taxes, excises and payments, that are required for Company to sell the Company Test and to perform the laboratory analysis; (viii) be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Company Test in the Territory; (ix) be solely responsible for all costs and expenses of any kind or nature related in any manner or way to the assembling, sale and analysis of the Company Test, including any required translations; (x) maintain its certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the term of this Agreement; (xi) ensure appropriate hazardous and non-hazardous waste disposal in accordance with all applicable rules and regulations; (xii) ensure it has adequate and legally compliant laboratory information systems and laboratory report-generating systems, including security of the data base related to patient confidentiality, accuracy of laboratory reports and transmission of related data, appearance of laboratory reports and secured back-up storage of relevant records; (xiii) maintain at its cost and expense the laboratory facility and equipment, including a Roche P-Modular analyzer and/or any other equipment specified by BioSafe, to test, analyze and make Determinations from the Company Test using BioSafe proprietary methods, techniques and processes; (xiv) be responsible for all of its own expenses, including providing such office space, facilities and personnel as are required to perform its obligations under this Agreement and all costs and expenses related to the advertising, marketing, promotion and sale of the Company Test, and the analysis thereof, in the Territory; (xv) not incur any expense chargeable to BioSafe except as may specifically be authorized in advance in writing by BioSafe; (xvi) maintain in effect during the term of this Agreement and for a period of five years thereafter appropriate liability insurance policies, copies of which shall be delivered to BioSafe, covering the sale and laboratory analysis of the Company Test with a recognized insurance carrier on such terms as are acceptable to BioSafe, which must include BioSafe as an additional named insured for the same limits of liability as are provided for Company, but in no event less than two million dollars, a waiver of subrogation rights against BioSafe and the requirement that BioSafe receive not less than sixty days prior written notice of any modification or termination of coverage; (xvii) observe and adhere to the provisions of any confidentiality agreement between BioSafe and Company; (xviii) indemnify BioSafe in accordance with the provisions of this Agreement; and (xix) prominently display on the front of the packaging of the Company Test, in a place approved by BioSafe, the BioSafe logo, "Science by BioSafe", the form of which will be furnished by BioSafe to Company.

4.    Term. S ubject to e arlier t ermination o f Company's right t o u se the l icense, u pon the o ccurrence o f any e vent specified below, the term of this Agreement shall be for a 60-month period commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such 60-month period.

4.1    BioSafe's Right to Terminate. Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate Company's license and the use of all rights, technology and processes related thereto prior to the expiration of the term immediately upon the occurrence of any of the following events: (i) any law, rule or regulation is adopted or is in effect in the Territory, or elsewhere, that would restrict any of BioSafe's rights hereunder, otherwise invalidates any provision hereof or materially affects BioSafe's or Company's ability to perform its obligations under this Agreement; (ii) if Company makes any false or untrue statement or representation herein or in the performance of its obligations hereunder; (iii) if Company, in BioSafe's sole opinion, engages in any fraudulent or dishonest activity; (iv) if Company breaches any of the provisions of Sections 2.3 through 2.10, Section 6 or Company attempts to assign this Agreement, or any of its rights and obligations herein.; (v) if Company fails to become accredited or fails any BioSafe laboratory proficiency testing or fails to correct deficiencies within the specified period to maintain its certification to use BioSafe's proprietary methods, techniques and processes; (vi) as set forth in Section 5; (vii) Company exceeds the annual number of Determinations for which the license has been granted; (viii) Company fails to make timely payment of any monthly license fee due hereunder; (ix) Company breaches or is in default of a material obligation under this Agreement (other than t he payment o f the payment o f the monthly license fee) and the default or breach is not cured to B ioSafe's satisfaction within ten days after Company's receipt of written notice stating the nature of the default; (x) Company becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up, liquidated its business, stopped doing business as a going concern, merges or consolidates its business or transfers all or substantially of its assets, voluntarily or otherwise; or (xi) an order

4

or notice shall be published by any government or Governmental Body requiring the cessation of activities by Company or BioSafe.

4.2 Rights Upon Termination or Expiration. Upon expiration of the term of this Agreement, or termination of Company's right to use the license prior thereto, in accordance with the provisions of this Agreement, all rights, privileges and licenses granted in this Agreement to Company shall immediately cease and terminate. Accordingly: (i) Company shall immediately cease using any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of BioSafe's intellectual property, and shall certify in writing to BioSafe that it has completely terminated its use thereof; (ii) Company shall immediately cease all sales and other activities with respect to the Company Test, and Company shall take all action required to terminate Company's registration, if any was required, as a seller of the Company Test and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required; (iii) Company shall immediately cease using and return to BioSafe all of BioSafe's confidential information; (iv) all indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived; and (v) BioSafe shall not have any obligation to repurchase or to credit Company for its inventory of Collection Cards or Company Tests at the time of termination of Company's right to use the license, or expiration of the term, of this Agreement.

4.3 Survival of Prior Obligations. Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the term or otherwise: (i) shall not relieve Company of any obligation incurred prior to such termination; and (ii) the obligation of Company under the provisions of any confidentiality agreement between BioSafe and Company with respect to the protection and non-disclosure of Confidential Information, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

5. Patents. Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third party of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks. BioSafe shall have the right, but not the obligation, (and Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of Company, if necessary, anywhere in the world against a third party at its own expense. Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BioSafe's expense. If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without Company's prior consent. BioSafe shall not be liable to Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for alleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other intellectual property of BioSafe infringes any patent, copyright or trademark or other intellectual property right of such third party. BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding. BioSafe will pay any final judgment entered against Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, BioSafe shall be relieved of any obligation to defend or pay for such defense unless Company notifies BioSafe in writing of such claim, suit, action or proceeding within five business days after becoming aware of it and Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding. If it is finally determined by a court of competent jurisdiction, or if BioSafe in its sole discretion determines, that any of BioSafe's intellectual property infringes any copyright, trademark or any other intellectual right of a third party, then BioSafe may, in its sole discretion and expense, take any action. Notwithstanding any other provision herein contained to the contrary, BioSafe shall not have any liability for any infringement which results from any act of Company, including Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other intellectual property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, method or process or Company's modifications of BioSafe's rights, technology or property.

6.    Company's Representations and Warranties.  Company represents and warrants that each of the following shall survive the execution and delivery of this Agreement, are true and correct now and will be throughout the entire term of Agreement: (i) Company is an entity duly organized, existing and in good standing under the laws of the state of its incorporation or organization set forth on the signature page hereof, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities and to incur the obligations herein contained; (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, does not require the approval or consent of any third Person, does not and will not conflict with, violate or breach Company's articles of incorporation or organization, any agreement to which it is a party or any law, rule or regulation or court decree or order; (iii) this Agreement is the legal, valid and binding obligation of Company, enforceable in accordance with its terms at all times; (iv) Company will comply with all applicable laws, consent decrees and regulations of any federal, state or Governmental Body wherever located; (v) Company owns, holds or possesses all Governmental Body and private licenses, franchises, permits, privileges, approvals and other authorizations which are necessary for it to carry on and conduct its business, to sell the Company Test and to make Determinations; (vi) there is no action, suit or proceeding pending or, to the best knowledge of Company, threatened, which questions the legality or propriety of the transaction contemplated by this Agreement or which, if decided adversely against Company, would prevent Company from fulfilling all of its obligations under this Agreement; and (vii) Company has no expectation and has received no assurance or guarantee of any kind or nature it will obtain any anticipated amount of profits or revenue as a result of Company selling the Company Test or making Determinations.

7.    Disclaimer of Warrant and Limitation of Liability.

7.1    Disclaimer of Warranty.  Section 7.1 has been deleted in its entirety.  There is no Section 7.1 of the Agreement.

7.2    Limitation of Liability.  In no event shall BioSafe be liable under any legal or equitable theory, and Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential or punitive damages of any kind or nature whatsoever, however caused, suffered by Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.

8.    Indemnification.  Company shall indemnify and hold BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a BioSafe Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any BioSafe Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by Company of, or any failure by Company to perform, any of its covenants, agreements or obligations in the Agreement, or (ii)  any negligent act or omission to act by Company.

BioSafe shall indemnify and hold Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation  (irrespective of whether a Company Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any Company Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in the Agreement, or (ii)  any negligent act or omission to act by BioSafe.

9.    Determinations and Monthly License Fee.  In consideration of the license granted herein to Company, beginning with the Effective Date and until ~~December 31, 2004~~, Company will pay to BioSafe a monthly license fee of one thousand two hundred and fifty dollars ($1,250) per month and commencing ~~January 1,~~ 2005 and for the remainder of the Term, Company will pay a monthly license fee of six thousand two hundred and fifty dollars ($6,250) for the right to process up to sixty thousand (60,000) Determinations per year.  Each such payment shall be due and payable by the Company on the first day of each month.  If the Effective Date does not fall on the first day of the month, the first and last payment shall be a pro-rata portion of the amount payable.

During normal business hours and upon reasonable notice, BioSafe shall have the right to inspect and audit Company's books and records to confirm the number of annual Determinations performed by Company.  All costs and expenses of such inspection and audit shall be paid by BioSafe unless it is determined that the number of annual Determinations performed by Company exceeded the annual number of Determinations indicated above, in which case Company shall be responsible for such costs and expenses.

6

10.  Miscellaneous Provisions.

10.1 Amendments And Waiver.  The Parties, by mutual agreement in writing, may amend, modify or supplement this Agreement. Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof. The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof. Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

10.2 Assignment.  This Agreement is personal to Company; therefore, Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe. No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of Company. BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company or notice.

10.3 Benefit of Agreement.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties. Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims Company may have against BioSafe. Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto and their successors and permitted assigns and the BioSafe Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

10.4 Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the original or the same counterpart. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterpart.

10.5 Governing Law.  The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States. EACH OF THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION.

10.6 Headings.  The Section headings contained in this Agreement are for convenience only and shall not serve to modify, interpret or affect the meaning of the Sections at the beginning of which they appear.

10.7 Section 10.7 has been deleted in its entirety. There is no section 10.7 of the Agreement.

10.8 No Drafting Presumption.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

10.9 Severability.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement. The Parties shall endeavor in good faith negotiations to replace the invalid, inoperative, illegal or unenforceable provision with a valid and enforceable one, the economic effect of which comes as close as possible to that of the invalid provision.

10.10 Notices.  All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (i) when delivered, if delivered personally, (ii) four days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid, (iii) the next business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service, and (iv) on the date of delivery if delivered by facsimile transmission, receipt confirmed, provided that a confirmation copy is sent on the next business day by registered or certified mail, return receipt requested and postage prepaid, in each case addressed as follows:

    If to BioSafe, to:

<div align="center">

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, Illinois USA 60045
Attention: President
Facsimile: 847.234.8222
Confirmation Phone No.: 847.234.8111

</div>

If to Company, to the address set forth on the signature page hereof,
or to such other address as the recipient Party may indicate by a notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such notice).

10.11    Attorneys' Fees and Costs.  In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

10.12    Announcements.  Neither Party shall issue any press release or other publicity materials with respect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party.  This restriction shall not apply to disclosures required by law or regulation.

10.13    Cumulative Remedies.  If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

10.14    Extension of Term.  Upon sixty (60) days written notice given prior to the end of the term of this Agreement, Company shall have the right to extend this Agreement for an additional five (5) year period provided that BioSafe and the Company can agree to terms and conditions acceptable to both of the Parties for such additional five (5) year term.

10.15    Further Assurances.  Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonable deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

10.16    Interpretation.  Whenever used in this Agreement, (i) the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders, and (ii) "including" shall be deemed to mean "including not limited to".

10.17    Interest.  Any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.

10.18    Entire Agreement.  This Agreement constitutes the entire agreements and understandings between the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

THE REMAINDER OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK.  THE NEXT PAGE IS THE SIGNATURE PAGE.

8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE MEDICAL TECHNOLOGIES, INC.

By: _[signature]_

David C. Fleisner, President

COMPANY

_Sioux Valley Hospital USD Medical Center_
(Print Company name and state of incorporation or organization)

By: _[signature]_
(Signature of authorized party)

_Rosemary Bour   VP ER/Trauma/Surgery_
(Print name and title of person signing)

_1305 W 18th St, Sioux Falls, SD 57105_
(Print address of Company)

_605 - 333 - 6422_
(Print Company telephone number)

_605 - 333 - 1531_
(Print Company facsimile number)

Addendum I

For the one-year period from ~~January~~ June 1, 2004 through ~~December~~ September 31, ~~2004~~ August 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 Cholesterol Determinations for such year at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Company for such calendar year provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

For each calendar quarter from and after ~~January~~ September 1, 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 Cholesterol Determinations per quarter at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Company for such calendar quarter provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

~~Notwithstanding anything in this Agreement to the contrary, Company shall have the right to suspend this Agreement upon written notice to BioSafe given within the sixty (60) day period following the end of any calendar year in the term of this Agreement with respect to which the Company's annual gross revenue in such calendar year from Cholesterol Determinations referred to it by BioSafe or from any other source, including but not limited to Cholesterol Determinations performed on tests sold by Company, is less than the amount set forth below for the Anticipated Gross Revenue for such year (provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim).~~

For purposes of this Agreement, Anticipated Gross Revenue for the first calendar year in the term of this Agreement is twenty-two thousand five hundred dollars ($22,500), and the Anticipated Gross Revenue for each of the second, third, fourth and fifth calendar years in the term of this Agreement is one hundred eight thousand dollars ($108,000).

Notwithstanding the foregoing provisions to the contrary, if any year in the term of this Agreement is less than a full calendar year, Anticipated Gross Revenue for such period shall be determined by multiplying the Anticipated Gross Revenue for such year (set forth above) by a fraction, the numerator of which shall be the actual number of days in the year in question, and the denominator of which shall be three hundred and sixty-five (365).

Dated: 6/1/04

BioSafe Medical Technologies, Inc.
By: [signature]

COMPANY
By: Rosemary Bore [signature]

06/08/2006 10:16 FAX 605 325 6434        CLM CLIENT SUPPORT                    ⊠002
06/08/2006  08:52        847-234-6422            BIO SAFE

ADDENDUM II

Notwithstanding anything to the contrary contained in this Agreement, at any time during the term of this Agreement, BioSafe may grant licenses of the BioSafe Technology for the Company Test for use within the State of South Dakota to laboratories with facilities in more than one state, including South Dakota, and such grant shall not be deemed to be a breach of this Agreement.

Dated: 6/1/04

BioSafe Medical Technologies, Inc.                    Company

By: _____          By: _____

                                        Kay W Reinartz
                                     General Manager



C! Kay Reinarts



## Sioux Valley Hospital
## USD Medical Center

COPY

1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD  57117-5039
Phone (605) 333-1000
www.siouxvalley.org

October 27, 2005

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Since Sioux Valley Hospital has been referred zero (ø) determinations from Biosafe or any other source pursuant to this agreement and zero (ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of September 1, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by November 10, 2005.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

EXHIBIT
_A_





## Sioux Valley Hospital
## USD Medical Center

1305 W. 18th Street
PO Box 5039
Sioux Falls, South Dakota 57117-5039
(605) 333-1000
www.siouxvalley.org

February 6, 2006

**COPY**

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The one-quarter period (September 1, 2005 through November 30, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

Since Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any other source pursuant to this agreement and zero (Ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-seven thousand dollars ($27,000) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of November 30, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by February 20, 2006.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

EXHIBIT
1

Accredited by the Joint Commission on Accreditation of Healthcare Organizations



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.sanfordhealth.org

October 18, 2007

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) and eight (8) subsequent calendar quarters (September 2005 through August 31, 2007) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital have been completed.

According to Addendum I of the agreement; for the one-year period from September 1, 2004 through August 31, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Furthermore, according to Addendum I of the agreement; for each calendar quarter from and after September 1, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

In the first one-year period, Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any other source and zero (Ø) revenue. Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the first one-year period of the agreement.

In the subsequent eight (8) calendar quarters, Sioux Valley Hospital has been referred Three thousand eight hundred twenty one (3,821) determinations from Biosafe or any other source pursuant to this agreement and thirty-four thousand three hundred eighty-nine dollars ($34,389) billed revenue ($23,561.01 paid on account as of 9/30/2007). Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of one hundred ninety-two

EXHIBIT
_D_

thousand four hundred thirty eight dollars and ninety-nine cents ($192,438.99) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the eight calendar quarter periods from September 1, 2005 through August 31, 2007 of the agreement.

This letter is to inform you that total payment of two hundred fourteen thousand nine hundred thirty eight dollars and ninety-nine cents ($214,938.99) is due and payment is expected by November 16. A worksheet summary of charges, payments received, and balance due is attached to this letter.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

## BioSafe Contract: Contract vs Actual
### Term of Contract: September 1, 2004 thru August 31, 2009
### 5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| | | | | | | |
| Total To Date | 26,500 | $238,500.00 | 3,821 | $ 34,389 | (22,679) | $(204,111.00) |
| Payments Received | | $(23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $214,938.99 | | | | |

# BioSafe Contract: Contract vs Actual
### Term of Contract: September 1, 2004 thru August 31, 2009
### 5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| Q9: 9/07-11/07 | 3,000 | $ 27,000 | 99 | $ 891 | (2,901) | $ (26,109) |
| 12/07-01/08 pro rated partial quarter | 2,000 | $ 18,000 | 227 | $ 2,043 | (1,773) | $ (15,957) |
| Total To Date | 31,500 | $283,500.00 | 4,147 | $ 37,323 | (27,363) | $(246,177.00) |
| Payments received as of 2-11-08 | | $ (23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $ 259,938.99 | | | | |

| Payments Made by Biosafe | | |
|---|---|---|
| Date | Amount | |
| 5/23/2007 | $13,976.01 | |
| 6/14/2007 | $6,165.00 | |
| 9/21/2007 | $3,420.00 | |
| | Total | $23,561.01 |

