IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALLEN & COMPANY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-CV-4596 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| SANFORD USD MEDICAL CENTER | ) | Magistrate Judge Arlander Keys |
| formerly known as SIOUX VALLEY | ) | |
| HOSPITAL and USD MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO STAY

Defendant Sanford Medical Center ("Sanford") moves this Court pursuant to the *Colorado River* doctrine for an order staying this case in deference to an action filed in February 2008 in the Circuit Court of the Second Judicial Circuit, Minnehaha County, South Dakota that involves substantially the same parties litigating substantially the same issues. In support of its motion, Sanford states as follows:

### Factual Background

Sanford and Allen & Company, LLC ("Allen") are joined in a contractual dispute arising out of an August 30, 2004 transaction. In that transaction, Sanford licensed certain cholesterol testing technology from BioSafe Medical Technologies, Inc. ("BioSafe") in exchange for BioSafe's guarantee that Sanford would receive specified minimum revenues from its use of BioSafe's technology. (Ex. 1, Agreement, ¶¶ 2.1, 9 & Addendum I.)[1] The term of the Agreement was 60 months. (*Id.* ¶ 4.) As consideration,

---

[1] Exhibit 1 to this motion is Sanford's South Dakota complaint, including the exhibits to that complaint. The Agreement is attached as Ex. A to Sanford's complaint. References

Sanford agreed to pay a monthly fee of $1,250 for the first year and $6,250 for the remainder of the term for the right to process up to 60,000 "determinations" (*i.e.,* results obtained from the analysis of human blood and its components) per year. (*Id.* ¶ 9.) As described in Addendum I to the Agreement, BioSafe guaranteed Sanford that Sanford would receive revenues from the cholesterol determinations of $22,500 in the first year of the Agreement and of $27,000 for each calendar quarter from and after September 1, 2005, and BioSafe promised that it would pay Sanford the amount of any shortfall. (*Id.*, Addendum I.)

In connection with the transaction, BioSafe informed Sanford that, as a part of a strategic alliance between BioSafe and First Commercial Capital Corp. ("First Commercial"), BioSafe was assigning to First Commercial the right to monthly fees from Sanford called for under Section 9 of the Agreement. (Ex. 1, Sanford Compl., ¶ 17.) The parties signed a document titled, "Master Lease Agreement," in order to reflect First Commercial's right to Sanford's payments under the Agreement. (Ex. 2, Allen Compl., Ex. A.)[2] First Commercial thus took the assignment, knowing that it was an assignment of payments owed under the Agreement by Sanford in South Dakota for cholesterol testing using BioSafe procedures and methodologies in South Dakota. (Ex. 1, Sanford Compl. ¶ 18.) Unbeknownst to Sanford until it was served with Allen's complaint last

---

herein to material within Sanford's complaint will be to "Ex. 1, Sanford Compl., ¶ ___," whereas references to the Agreement will be to "Ex. 1, Agreement, ¶ ___."

[2] Exhibit 2 to this motion is Allen's Illinois complaint, including the exhibits to that complaint. The Master Lease Agreement is attached as Ex. A to Allen's complaint. References herein material within Allen's complaint will be to "Ex. 2, Allen Compl., ¶ ___."

month, First Commercial apparently assigned its right to the Sanford payments to Allen on August 30, 2004. [3]  (Ex. 3, Sanford Am. Compl. ¶ 18 & Ex. C.)[4]

Sanford made all payments required by Section 9 of the Agreement through January 31, 2008.  (Ex. 1, Sanford Compl. ¶ 19.)  However, BioSafe failed to perform its obligations under the Agreement.  During the first year of the Agreement, BioSafe referred no cholesterol determinations to Sanford.  (*Id.* ¶ 21.)  Then, after Sanford's chief financial officer provided documentary evidence that $22,500 was due to Sanford, BioSafe failed to pay this amount.  (*Id.* ¶¶ 22-23 & Ex. B.)

After the first year of the Agreement, BioSafe was responsible for ensuring Sanford a quarterly revenue stream of at least $27,000 under Addendum I.  (*Id.* ¶ 24.)  After Sanford's chief financial officer provided documentary evidence that $27,000 was due to Sanford for the period September 1, 2005 through November 30, 2005, BioSafe failed to pay this amount.  (*Id.* ¶ 25 & Ex. C.)  On October 19, 2007, Sanford's chief financial officer notified BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreements.  (*Id.* ¶ 27 & Ex. D.)  As of January 31, 2008, BioSafe owed a total of $259,938.99 (plus interest) to Sanford for shortfalls on the guaranteed contract revenue. (*Id.* ¶ 30 & Ex. E.)  BioSafe has failed to pay any of these amounts.  (*Id.* ¶ 33.)  As a

---

[3] On September 20, 2004, Delphi Energy Fund, Inc. ("Delphi") notified Sanford that it was the new assignee of the payments originally called for under section 9 of the Agreement.  (Ex. 1, Sanford Compl., ¶ 18; Ex. 3, Sanford Am. Compl. ¶ 17 & Ex. B.)

[4] Exhibit 3 to this motion is Sanford's Motion for Amended Complaint, filed in the South Dakota action, which includes a copy of the amended complaint together with its exhibits.  References herein to material within Sanford's proffered amended complaint will be to "Ex. 3, Sanford Am. Compl., ¶ ___."

result of BioSafe's material breaches under the Agreement, Sanford finally stopped making further payments and initiated its lawsuit in South Dakota.

### Procedural Background

On February 22, 2008, Sanford filed its action in the Circuit Court of the Second Judicial Circuit, Minnehaha County, South Dakota. (Ex. 1.) In its original complaint, Sanford set forth claims for breach of contract and declaratory judgment against BioSafe, Delphi, and First Commercial. (*See* Ex. 1, Sanford Compl., passim.) BioSafe answered Sanford's complaint on April 21, 2008. (Ex. 4.)

Sanford served BioSafe with interrogatories, requests for production of documents, and requests for admissions on July 29, 2008. (Ex. 5.) On the same day, Sanford also filed a motion to file an amended complaint, which is set for hearing in the South Dakota case on September 8, 2008. (Ex. 3; *see also* Ex. 6, reflecting hearing date.) The amended complaint replaces defendants Delphi and First Commercial with defendant Allen. (Ex. 3, Sanford Am. Compl. ¶¶ 5-6.) It includes a count for declaratory judgment against Allen, seeking a declaration that Sanford properly ceased payment – to Delphi or Allen, the assignee of First Commercial which in turn was the assignee of BioSafe – of the fees called for by the Agreement, regardless of whether they are characterized as license fees or lease fees.[5] (Ex. 3, Sanford Am. Compl., Count II & ¶ 41.) The amended complaint also adds a new claim against BioSafe and Allen for civil conspiracy and unjust enrichment. (*Id.* ¶¶ 43-46.)

---

[5] Sanford's payments are sometimes referred to as equipment lease fees by BioSafe and Allen. However, as a point of clarification, those payments were never made for the lease of any equipment, because Sanford used its own equipment to perform cholesterol testing for BioSafe, and BioSafe never actually provided any equipment for lease to Sanford. (*Id.* ¶ 39.)

On August 18, 2008, Sanford filed a summary judgment motion on Count I of its complaint against BioSafe.  (Ex. 6.)  Sanford's summary judgment motion is set for presentment on September 8, 2008 in the South Dakota court.  (*Id.*)

Allen filed this case in the Circuit Court of the Eighteenth Judicial Circuit, Chancery Division, DuPage County, Illinois, on July 11, 2008.  (Dkt. No. 1.)  Allen's complaint contains two claims.  The first is a claim for declaratory judgment premised on the notion that language in the Master Lease Agreement "waived [Sanford's] rights to seek venue in any jurisdiction other than that of the State of Illinois or the Federal Courts."  (Ex. 2, Allen Compl., ¶ 8.)  The second is a breach of contract claim premised on the notion that, after accounting for Sanford's payments under the [Sanford-BioSafe] Agreement through January 31, 2008, a balance of $111,641.99 allegedly remains due and owing to Allen.  (*Id.* ¶ 13.)

Sanford timely removed Allen's complaint to this Court on August 13, 2008.  (Dkt. No. 1.)  This motion follows.

### **Argument**

Sanford requests that this Court stay the case before it in deference to the South Dakota state court action pursuant to the *Colorado River* doctrine.  *Colorado River Water Conserv. Dist. v. U.S.*, 424 U.S. 800, 817 (1976).  Although staying an action under *Colorado River* is only warranted in exceptional circumstances, 424 U.S. at 817, a federal court may stay a case where there is a concurrent proceeding in state court and a stay would promote "wise judicial administration."  *Id.* at 818.

There are two steps to the analysis of a motion to stay under the *Colorado River* doctrine.  First, the actions must be parallel.  Second, the Court must evaluate ten factors

to determine whether a stay should be ordered.  Here, the actions are parallel and all of the applicable factors weigh in favor of staying the federal action before this Court.

**A.      This case and the South Dakota state court action are parallel.**

Under the *Colorado River* doctrine, suits are parallel if they involve substantially the same parties litigating substantially the same issues.  *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th Cir. 1992) (quoting *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988)).  "A slight difference in the parties and issues in the federal and state cases is insufficient to destroy the parallel nature of the two proceedings . . . ."  *Id.* at 701.

Here, both suits involve claims to ascertain the rights and liabilities arising out of the same transaction.  Specifically, both suits seek to determine whether Sanford has an obligation to continue making the payments described in Paragraph 9 of the Agreement.  In the South Dakota action, Sanford says it appropriately ceased making those payments in February 2008 following BioSafe's material breaches.  In this action, Allen says Sanford breached its obligations when it ceased making those payments.

In addition, both actions involve additional claims arising out of the same transaction, with the same operative facts.  Sanford has brought claims against BioSafe for breach of contract and against Allen for civil conspiracy and unjust enrichment.  Whereas Allen has brought an additional claim – i.e., its declaratory judgment claim – effectively asking this Court to determine whether the South Dakota state court is properly exercising jurisdiction over the case before it.

The bottom line is that both actions involve contract-based claims premised on the same deal involving the same parties.  The chief difference is that the South Dakota

action is more comprehensive, both because it also names BioSafe as a defendant and it includes a civil conspiracy and unjust enrichment claim against Allen arising out of the same transaction.  *See Caminiti & Iatarola*, 962 F.2d at 700 (concurrent proceedings are "*'parallel' when substantially the same parties are contemporaneously litigating substantially the same issues in another forum . . . .'*") (emphasis in original).

**B.    A stay is appropriate in the case, given that all of the applicable *Colorado River* factors weigh in favor of staying this action.**

An analysis under *Colorado River* requires the Court to consider ten separate factors.  The Supreme Court has noted that "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors against that exercise is required."  *Colorado River*, 424 U.S. at 818-19.  In this case, nine of the factors favor granting a stay of the federal case.[6]

**1.    Inconvenience of the federal forum**

The federal forum in Chicago is far less convenient to Sanford, which is located in South Dakota, than the South Dakota action.  In addition, Sanford's witnesses and documents are located in South Dakota.  All of the meetings that took place in connection with the transactions at issue occurred in South Dakota.  Prior to execution of the Agreement, Sanford never set foot in Illinois in connection with the underlying transactions.  Allen would be expected to make similar points with respect to the South Dakota action, although it took the assignment knowing Sanford was in South Dakota.  This factor is either neutral or weighs in favor of staying the federal action.

---

[6] The tenth factor – *i.e.,* whether the state has assumed jurisdiction over the property – is not applicable in this case because there is no res at issue.

2.    **Avoiding piecemeal litigation**

In this case, piecemeal litigation would inevitably occur should the federal and state actions proceed simultaneously. Because piecemeal litigation is extremely costly, confusing, wasteful, and may lead to both races to the courthouse as well as potentially inconsistent results, this factor weighs heavily in favor of staying the federal action.

The guiding and fundamental principle behind the *Colorado River* doctrine is avoiding such wasteful and unnecessarily duplicative litigation. *Colorado River*, 424 U.S. at 817. This case presents the paradigmatic situation – the issues presented by the parallel cases are the same, and allowing the state action to proceed alone will conserve the resources of the Court and the parties while providing a comprehensive means of disposing of the disputes between the parties.

Allen may argue that different issues are presented in the federal and state actions, including which court should properly address Allen's challenge to the propriety of the South Dakota court's jurisdiction. However, those issues can and should be presented to and resolved by the South Dakota court. Moreover, "formal symmetry between the two actions" is not required in order to order a stay of the federal action. *Caminiti & Iatarola*, 962 F.2d at 701-02. Rather, all that is required is "a substantial likelihood that the State Action will dispose of all claims presented in the federal case." *Id.* In this case, as in *Caminiti & Iatarola*, "there is not only 'substantial likelihood that the state litigation will dispose of all claims presented in the federal case,' but virtual certainty." *Id.* at 702 (citation omitted).

Duplicative litigation also inevitably leads to an undesirable race to the courthouse. The Seventh Circuit has cautioned against the dangers of duplicative

litigation: "First, a party may try to accelerate or stall proceedings in one of the forums in order to ensure that the court most likely to rule in its favor will decide a particular issue first. Second, the possibility exists that one court, unaware that the other court has already ruled, will resolve an issue differently and create a conflict between the two forums.[] Thus, the results of simultaneous litigation of identical issues in the state and federal courts may be both 'unseemly' and a 'grand waste' of the efforts of the parties and the courts." *LaDuke v. Burlington N. R.R. Co.*, 879 F.2d 1556, 1560 (7th Cir. 1989) (footnote and citations omitted). Further, duplicative litigation brings with it a significant risk of inconsistent interlocutory rulings, such as discovery orders, that are not ordinarily entitled to preclusive effect. *Id.* at 1560 & n.6.

"When a case proceeds on parallel tracks in state and federal court, the threat to efficient adjudication is self-evident." *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 694 (7th Cir. 1985). However, the effect of duplicative litigation runs deeper than being a "'grand waste' of the efforts of the parties and the courts": "The legitimacy of the court system in the eyes of the public and fairness to the individual litigants also are endangered by duplicative suits that are the product of gamesmanship or that result in conflicting adjudication." *LaDuke*, 879 F.2d at 1560 (citing *Lumen*, 780 F.2d at 694). As one court noted, "a decision to stay the federal proceeding would definitely avoid piecemeal litigation and the attendant risks of duplicative efforts with possibly conflicting results . . . especially . . . where [as here] the validity, interpretation and enforcement of the agreements as well as the nature of the relationships between the parties . . . are controlled by [state] law . . . ." *P&P Marketing, Inc. v. Dillon*, 746 F. Supp. 1354, 1372-73 (N.D. Ill. 1990).

The South Dakota state court action is more comprehensive than the Chicago federal court action.  All of the parties to the federal court action are before the state court in South Dakota, but not all of the parties before the state court in South Dakota are before the federal court in Chicago.  The South Dakota action would resolve all of the issues between all of the parties; however, even if the federal court were to resolve all the issues before it, additional litigation would still be required in South Dakota to resolve all matters in the South Dakota matter.  This factor weighs heavily in favor of staying the federal action.

> **3.    Order in which jurisdiction was obtained in the concurrent forums**

The South Dakota state court action was first filed in February 2008.  Allen filed its action five months later.  This factor weighs in favor of staying the federal action.

> **4.    Source of governing law**

All claims and issues in both the federal and state actions will be resolved by state law.  The Seventh Circuit has recognized that state courts have a greater interest in developing their own law than federal courts.  *See A.G. Edwards & Sons, Inc. v. Public Building Comm'n*, 921 F.2d 118, 121-22 (7th Cir. 1990).  There are no federal questions presented by either complaint.  Further, no federal interest is served by allowing the federal case to proceed.  As the Seventh Circuit has observed, where "the entire constellation of contractual claims is presented only in the state court proceeding [as here] and is governed by state law, the state court is in a far superior position to perform this task."  *Lumen*, 780 F.2d 696.  Therefore, this factor weighs heavily in favor of staying the federal action.  *See, e.g., id.*

**5.    Adequacy of state-court action to protect the federal plaintiff's rights**

The South Dakota state court action is adequate to protect Allen's rights. Allen accepted an assignment of the proceeds of an agreement that was negotiated and entered in South Dakota. Allen also filed its own claim in state court, so it obviously did not feel it needed its rights protected by a federal court. Allen can make no serious contention that the state court action will not adequately protect its rights, particularly in light of the fact that it chose to file in state court itself. *See LaDuke*, 879 F.2d at 1559. Additionally, there is a presumption that state courts will adjudicate claims fairly. *Interstate Material*, 847 F.2d at 1290. In this case, the similarity of the federal and state actions "is sufficient to justify the conclusion that the 'state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issue[] between the parties." *Lumen*, 780 F.2d at 696 (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983)). Thus, this factor weighs in favor of staying the federal action.

**6.    Relative progress of state and federal proceedings**

The South Dakota state court action is much further along than this one. It was filed five months earlier than the federal action. BioSafe has already answered the complaint. Written discovery has been served. Sanford has pending motions to amend its complaint and for summary judgment. By contrast, in the federal action, the only proceedings to date involve the removal to this Court and the instant motion to stay. If this action were to proceed, there is a high degree of likelihood that all of the progress that has been made in the South Dakota action will need to be repeated here. Thus, this factor weighs in favor of staying the federal action.

**7.      Presence or absence of concurrent jurisdiction**

The South Dakota court and this Court have concurrent jurisdiction.  Allen may be expected to argue that the South Dakota court does not have jurisdiction; however, that would be both wrong and disputed.  Moreover, that issue would be more properly raised before the South Dakota court.  This factor either weighs in favor of a stay or would be neutral.

**8.      Availability of removal**

Allen obviously does not have an interest in being in federal court because having had the option of filing in federal court, Allen itself chose to file in state court in Illinois.  Nevertheless, removal is available in the South Dakota action because, on information and belief, all of the defendants are not citizens of the same state as the plaintiff and the matter in controversy exceeds $75,000.  Thus, any interest Allen has in being in a federal forum can be satisfied by removing the South Dakota state court action.  This factor weighs in favor of granting a stay or dismissal.

**9.      Vexatious or contrived nature of the federal claim**

Prior to the time that Sanford was aware of Allen, Allen knew that Sanford filed a lawsuit in South Dakota that affected Allen's its alleged interests in the Paragraph 9 payments under the Agreement.  Rather than seeking to join in that action, however, Allen filed an action in Illinois in an effort to effectively ask an Illinois court to determine whether the South Dakota court has properly asserted jurisdiction over Sanford's claims.  That issue should more properly be raised before the South Dakota court.  Thus, Allen's claims in this action are both contrived and vexatious and should be resolved in South Dakota.  Therefore, this factor weighs in favor of staying the federal action.

**<u>Conclusion</u>**

Nine out of the ten *Colorado River* factors weigh in favor of staying Allen's complaint in this case.  In light of this, and the fact that substantially the same parties are litigating substantially the same issues in both the South Dakota case and the case before this Court, Defendant Sanford Medical Center respectfully requests an order staying or dismissing this case in deference to the South Dakota action.

<div style="margin-left: 50%;">

Respectfully submitted,

SANFORD MEDICAL CENTER

</div>

Dated: August 27, 2008

<div style="margin-left: 50%;">

By:    /s/ Kevin B. Duff

One of its attorneys

Kevin B. Duff
Michael Rachlis
Darnella J. Ward
Rachlis Durham Duff & Adler, LLC
542 South Dearborn Street, Suite 900
Chicago, Illinois 60605
phone: 312-733-3950
fax:     312-733-3952

</div>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALLEN & COMPANY, LLC,                          )
                                               )
            Plaintiff,                         )
                                               )
      v.                                       )        No. **08 C 4596**
                                               )
SANFORD USD MEDICAL CENTER                     )        Hon. Robert W. Gettleman
formerly known as SIOUX VALLEY                 )        Magistrate Judge Keys
HOSPITAL and USD MEDICAL CENTER,               )
                                               )
            Defendant.                         )

**INDEX OF EXHIBITS
TO DEFENDANT'S MOTION TO STAY**

Exhibit 1          Sanford's Complaint in the South Dakota action, with exhibits

Exhibit 2          Allen's Complaint in this matter, with exhibits

Exhibit 3          Sanford's Motion for Amended Complaint in the South Dakota action,
                   with exhibits

Exhibit 4          BioSafe's Answer to Sanford's Complaint in the South Dakota action

Exhibit 5          Sanford's Requests for Admission, Requests for Production, and
                   Interrogatories to BioSafe in the South Dakota action

Exhibit 6          Sanford's Motion for Summary Judgment in the South Dakota action, with
                   exhibits

# EXHIBIT 1

| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | : SS | |
| COUNTY OF MINNEHAHA | ) | SECOND JUDICIAL CIRCUIT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
| --- | --- |
| SANFORD USD MEDICAL CENTER formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, | CIV. |
| Plaintiff, | |
| vs. | COMPLAINT |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., DELPHI ENERGY FUND, INC., and FIRST COMMERCIAL CAPITAL CORP., | |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center formerly known as Sioux Valley Hospital and

USD Medical Center, for its Complaint, states and alleges as follows:

### PARTIES

1.

Sanford USD Medical Center was formerly known as Sioux Valley Hospital and USD

Medical Center, and is referred to in this Complaint as "Sanford."

2.

Sanford is a not-for-profit charitable organization that is headquartered and provides

services from Sioux Falls, Minnehaha County, South Dakota.

3.

Defendant BioSafe Medical Technologies, Inc. ("BioSafe") is an Illinois corporation with

its corporate offices at 100 Field Drive, Suite 240, Lake Forest, Illinois.

4.

Defendant Delphi Energy Fund, Inc. ("Delphi Energy") is a corporation with its corporate office at 29 South LaSalle Street, Suite 828, Chicago, Illinois, 60603.

5.

Defendant First Commercial Capital Corp. ("First Commercial") has its corporate office at 601 South LaSalle, Suite, Suite 600, Chicago, Illinois, 60605.

6.

Defendants Delphi Energy and First Commercial are named in this lawsuit for purposes of Count Two of the Complaint seeking a declaratory judgment that Sanford no longer has responsibility to pay either of them certain "license fees" or lease payments, which arose under Section 9 of the Agreement between Sanford and BioSafe, which fees BioSafe factored to First Commercial, who in turn assigned its right to Delphi Energy.

## ALLEGATIONS COMMON TO COUNTS

7.

Sanford and Defendant BioSafe entered into an Agreement dated August 30, 2004. A true and correct copy of this Agreement is attached as Exhibit A hereto and is incorporated by reference herein.

8.

BioSafe initiated contact with Sanford after Sanford acquired certain cholesterol testing equipment as a part of the acquisition of Central Plains Clinic, Ltd.

2

9.

BioSafe sought out the relationship with Sanford in Sioux Falls, sent letters to and communicated by phone with Sanford in Sioux Falls, and sought an Agreement to refer to Sanford in Sioux Falls certain blood or other samples for cholesterol testing in Sioux Falls.

10.

BioSafe wrote the Agreement that is attached as Exhibit A.

11.

Sanford acquired no equipment from BioSafe, but rather used equipment already owned by Sanford to conduct the cholesterol tests on samples referred by BioSafe.

12.

Sanford used methodologies and procedures from BioSafe to perform the cholesterol testing for BioSafe, but continued to use a separate methodology and procedure on Sanford's own cholesterol testing. As a means of compensating BioSafe for the cholesterol testing sent to Sanford and for the methodologies and procedures, Sanford agreed to pay a monthly fee under section 9 of the Agreement that BioSafe characterized as a "license fee."

13.

Under section 9 of the Agreement, Sanford agreed to a monthly license fee of $1,250.00 per month for the first year of the Agreement, and for a monthly license fee of $6,250.00 per month for the remaining term, with BioSafe representing that there could be as many as 60,000 cholesterol tests referred by BioSafe to Sanford per year.

14.

Sanford and BioSafe executed Addendum I and Addendum II to the Agreement, which are included in Exhibit A hereto.

3

15.

Under Addendum I, BioSafe agreed to guarantee revenue to Sanford from the cholesterol determinations of $22,500.00 in the first year of the Agreement and of $27,000.00 for each calendar quarter from and after September 1, 2005.

16.

Although the term of the Agreement began on August 30, 2004, Sanford and BioSafe executed the Agreement, Addendum I and Addendum II as of June 1, 2004.

17.

On June 15, 2004, BioSafe notified Sanford that, as a part of a strategic alliance between BioSafe and First Commercial, BioSafe was assigning to First Commercial the right to monthly fees called for under Section 9 of the Agreement. First Commercial knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota.

18.

On September 20, 2004, Delphi Energy notified Sanford Hospital that it was the new assignee of the payments originally called for under section 9 of the Agreement between BioSafe and Sanford. Delphi Energy knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota.

19.

Sanford has paid license fees from the inception of the Agreement until a check issued on January 25, 2008, paying license fees through January 31, 2008. Sanford paid the license fee

4

initially in the sum of $1,250.00 per month, and subsequent to September 1, 2005, in the amount of $6,250.00 per month.

20.

Under Addendum I to the Agreement, BioSafe was to make an initial annual payment of up to $22,500.00 to Sanford if the volume of cholesterol determinations during the first year of the Agreement did not result in that level of revenue to Sanford.

21.

During the first year of the Agreement, BioSafe referred no cholesterol determinations to Sanford.

22.

On October 27, 2005, Sanford, through the letter attached as Exhibit B hereto, requested BioSafe to pay the $22,500.00 that BioSafe owed for the first year of the contract.

23.

BioSafe has failed to pay the amount owed for the first year of the contract.

24.

After the first year of the contract, BioSafe was responsible to ensure a revenue stream of at least $27,000.00 per quarter to Sanford under Addendum I to the Agreement.

25.

On February 6, 2006, Sanford notified BioSafe that it had received no referrals for determination from BioSafe during the one quarter period of September 1, 2005, through November 30, 2005. A true and correct copy of the letter from Sanford to BioSafe dated February 6, 2006, is attached as Exhibit C hereto.

5

26.

In the quarter beginning March of 2006, some samples for cholesterol testing were referred from BioSafe to Sanford. The volume of testing referred to Sanford, however, was far below the volumes anticipated and revenue guaranteed by BioSafe at the time of the contract under Addendum I to the Agreement.

27.

On October 19, 2007, Sanford notified BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreements. A true and correct copy of the letter dated October 18, 2007 and enclosed accounting is Exhibit D hereto. As of September 1, 2007, BioSafe owed to Sanford a total of $214,938.99 for shortfalls on the guaranteed contract revenue.

28.

BioSafe's responses to the Sanford letters were to pledge repeatedly to make up for the shortfalls, to promise to refer additional cholesterol testing to Sanford in the future, and to blame the absence of payment on BioSafe's own cash flow difficulties.

29.

Sanford has continued until January 25, 2008, to pay the "license fees" under section nine of the Agreement with BioSafe, notwithstanding BioSafe's failure to ever pay the contractual guaranteed sum under Addendum I.

30.

As of January 31, 2008, BioSafe owes a total of $259,938.99 (plus interest) to Sanford, as set forth in the spreadsheet attached as Exhibit E hereto and incorporated by reference herein.

## COUNT ONE – BREACH OF CONTRACT

31.

Sanford incorporates by reference the allegations of paragraphs 1 through 30, as if fully set forth herein.

32.

Sanford and Defendant BioSafe entered into a contract, a true and correct copy of which is attached as Exhibit A hereto. Under Addendum I to the contract, included in Exhibit A hereto, BioSafe agreed to certain volume levels and guaranteed certain revenue levels to Sanford.

33.

BioSafe has breached the Agreement by failing to pay monies that is owes under the Agreement to Sanford.

34.

Sanford has suffered loss and injury as a result of BioSafe's breach of contract, including the past due and owing amount of $259,938.99 as of January 31, 2008, plus interest, costs and attorneys fees recoverable under Section 10.11 against BioSafe.

## COUNT TWO – DECLARATORY JUDGMENT

35.

Sanford incorporates by reference the allegations of paragraphs 1 through 35 of this Complaint, as if fully set forth herein.

36.

BioSafe assigned to First Commercial its right to "license fees" under section 9 of the Agreement. First Commercial later assigned its rights to collect those "license fees" to Delphi Energy.

7

37.

Sanford has paid the license fees under Section 9 of the Agreement to First Commercial and then to Delphi Energy through January 31, 2008.

38.

The obligation to pay the license fees arises under section nine of the Agreement.

39.

The license fees, although sometimes referred to as equipment leases by the Defendants, are not for the lease of any equipment whatsoever, because Sanford uses equipment that it owns to perform the cholesterol testing for BioSafe. The license fees, rather, are to compensate BioSafe and for processes and methods prescribed by BioSafe on the cholesterol testing that Sanford does for BioSafe.

40.

Sanford is ceasing its payments of the so-called license fees effective February 1, 2008.

41.

A controversy now exists, or may exist, over whether Sanford can cease payment to Delphi Energy, the assignee of First Commercial which in turn was the assignee of BioSafe, on any further license fees or equipment lease payments, because of BioSafe's non-performance and prior material breaches of the Agreement.

42.

Any controversy, if any, concerning Sanford's decision and right to cease any further payments of license fees is a controversy ripe for a declaratory judgment under SDCL 21-24.

WHEREFORE, Plaintiff Sanford USD Medical Center, f/k/a Sioux Valley Hospital and USD Medical Center, hereby prays for relief as follows:

8

A.     That Sanford have and recovery a judgment against Defendant BioSafe Medical
       Technologies, Inc., in the principal amount of $259,988.99 owed as of January 31,
       2008, plus pre-judgment interest thereon;

B.     That Sanford have and recover its costs, interest, expenses, disbursements and
       attorneys fees under Section 10.11 of the Agreement against BioSafe;

C.     That Sanford receive a declaratory judgment that it bears no responsibility to pay
       any further license fees or claimed equipment lease fees to any of the Defendants;
       and

D.     That Sanford have and recover such other and further relief as deemed just and
       equitable by the Court.

Dated at Sioux Falls, South Dakota, this 22nd day of February, 2008.

                                    DAVENPORT, EVANS, HURWITZ &
                                    SMITH, L.L.P.


                                    ROBERTO A. LANGE
                                    206 West 14th Street
                                    P. O. Box 1030
                                    Sioux Falls, SD 57101-1030
                                    Telephone (605)336-2880
                                    Fax No.: (605)335-3639
                                    *Attorneys for Plaintiffs*

9

*overnite delivery 8/20/08*
*wth*

## AGREEMENT

*30th day of*

This Agreement is made and entered into as of the 1st day of January, 2004 ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, IL 60045, and its Affiliates, (collectively, "BioSafe") and Company, whose name and address is set forth on the signature page hereof, and its Affiliates (collectively, "Company").

WHEREAS, BioSafe is in the business of developing and selling diagnostic screens and tests using micro-samples of human blood, including its Cholesterol Panel;

WHEREAS, on the terms and conditions hereinafter set forth, Company desires (i) to market and sell in the Territory a cholesterol screening kit containing the same components as the BioSafe Cholesterol Panel and (ii) to perform in its laboratory the analysis of such test using BioSafe's proprietary methods, techniques and processes under a non-transferable and non-assignable revocable license; and,

WHEREAS, on the terms and conditions hereinafter set forth, BioSafe is willing to grant Company a non-transferable and non-assignable revocable right to use BioSafe's proprietary methods, techniques and processes to perform the laboratory analysis of such test.

NOW; THEREFORE, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived therefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1.   Definitions. The following terms when used in this Agreement, including the preamble and recitals, shall have the following meanings:

1.1   "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

1.2   "Agreement" means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

1.3   "BioSafe" is defined in the preamble to this Agreement.

1.4   "BioSafe Indemnified Parties" is defined in Section 8.

1.5   "BioSafe Marks" means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the term of this Agreement, by or on behalf of BioSafe.

1.6   "BioSafe Patent Rights" means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

1.7   "BioSafe Technology" means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

1.8   "BioSafe Technology Rights" means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including (i) medical, chemical and other scientific data and (ii) processes and methodology used in the development, testing and analysis of the Cholesterol Panel.

1.9   "Cholesterol Panel" means BioSafe's kit containing all of the components required for an individual to participate in the capillary collection of blood using BioSafe's collection kit which, through laboratory analysis using BioSafe's proprietary methods, techniques and processes, measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.10  "Collection Card" means the BioSafe proprietary self-collection card on which specimens of blood are deposited and from which the laboratory analysis is performed to measure the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.11  "Company" is defined in the preamble to this Agreement.

1.12  "Company Test" means a self-collection blood screen kit, the components of which are the same as those contained in the Cholesterol Panel (although such components, except for the Collection Card, may be purchased from sources other than those used by BioSafe), which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.



EXHIBIT
A

1.13 "Determination" means the result obtained from the analysis of human blood and its components.

1.14 "Effective Date" is defined in the preamble to this Agreement.

1.15 "Field" means the collection, transportation, testing and analysis of human blood and its components, and the reporting of the results thereof.

1.16 "Governmental Body" means any court, government (federal, state, local or foreign), department, commission, board, agency, official or other regulatory, administrative or governmental authority.

1.17 "HDL" means high density lipoprotein.

1.18 "LDL" means low density lipoprotein.

1.19 "Party" means BioSafe or Company; "Parties" means BioSafe and Company.

1.20 "Person" means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

1.21 "Territory" means the United States.

2. License.

2.1 Grant. BioSafe hereby grants to Company, and Company hereby unconditionally and irrevocably accepts, a non-exclusive, non-transferable and non-assignable revocable license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology solely in the Field exclusively in the Territory for the purpose of processing, and making Determinations from, the Company Test. The grant of the license is subject to Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do analysis of total cholesterol, HDL, LDL and triglycerides screens using BioSafe's proprietary methods, techniques and processes, and to the continued fulfillment of all of the other terms and conditions of this Agreement. In addition, the license has been granted solely, and is valid only, for the number of Determinations set forth in Section 9. Determinations in excess of such annual number shall be in violation of the license and shall be subject to additional charges in accordance with BioSafe's policies and procedures. In consideration of the license granted herein to Company, beginning with the Effective Date, Company shall pay to BioSafe the monthly license fee set forth in Section 9. Such license fee shall be due and payable by the Company on the first day of each month. If the Effective Date does not fall on the first day of the month, the first payment shall be a pro-rata portion of the monthly license fee, calculated on a 30-day basis, due and payable on the Effective Date. In connection with the license, BioSafe: (i) will provide training to Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes; (ii) will provide Company with a list of all components used in the Cholesterol Panel to enable Company to assemble a self-collection blood screen kit substantially identical to the Cholesterol Panel; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Cholesterol Panel, and (iv) will make Collection Cards available for purchase at an initial cost of $1.25 each, subject to change upon 90 days prior written notice.

2.2 Non-exclusive. Company understands and acknowledges that, since the license herein granted is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses or the right to distribute or manufacturer the Cholesterol Panel or any similar type product during the term of this Agreement; in each case without breaching this Agreement; provided, however, that notwithstanding the foregoing to the contrary; during the term of this Agreement, Company shall be the exclusive licensee within the State of South Dakota of BioSafe Technology for the Company Test.

2.3 Sale Outside the Territory. Company shall not market, sell or offer for sale the Company Test outside of the Territory. Accordingly, Company shall limit its sales activities with respect to the Company Test to customers located in the Territory. Company shall refer to BioSafe all orders and inquiries relating to a cholesterol screen originating from within or outside the Territory to the extent such orders or inquiries relate to such screens destined for use outside the Territory.

2.4 Competing Activities. During the term of this Agreement and for a period of one year following its termination, Company will not, without BioSafe's prior written consent: (i) make, use, license, sublicense, assign, sell, offer to sell or otherwise transfer the Company Test for or to, or enter any agreement or authorize any third party to do any of the foregoing with, (a) any Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides, (b) any Affiliates or agents of a Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides or (c) any Person that Company, its Affiliates or agents knows or believes will manufacture, distribute, sell or otherwise transfer, or has manufactured, distributed, sold or otherwise transferred, the Company Test or the Cholesterol Panel to, on behalf of, or under any agreement with, a party identified in the immediately preceding clauses (a) and (b); or (ii) sell or distribute the

2

Company Test or the Cholesterol Panel as a consumer product through mass merchandisers, drug stores or other retail stores.

2.5 Non-assignable. Neither the license granted to Company, nor any of the rights, technology and trademarks included in the license, are assignable or transferable in any manner or way whatsoever by Company, including the right of Company to grant any sub-licenses.

2.6 Reverse Engineering. Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

2.7 Advertising and Publications. Company will not use on a web site or in any other manner or way any material of any kind or nature in any form or medium that refers, in any manner or way, to the BioSafe Technology, the BioSafe Patent Rights, the BioSafe Technology Rights, the Cholesterol Panel, BioSafe or any other BioSafe intellectual property without BioSafe having first reviewed the proposed use and approved it in writing. Company will not publish outcome or evidence-based data obtained using the Company Test without BioSafe's prior written approval.

2.8 No Challenge. At no time, either during or following the expiration of the term of this Agreement, will Company challenge or assist any other Person in challenging the BioSafe Marks, the BioSafe Patents Rights or the registration thereof.

2.9 No Registration of Similar Marks. At no time, either during or following the expiration of the term of this Agreement, will Company attempt to register any trademarks, service marks, marks, names or trade names confusingly similar to or closely resembling any of the BioSafe Marks.

2.10 No Similar Methods. At no time, either during or following the expiration of the term of this Agreement, will Company use or attempt to use any method, technique or process similar to the BioSafe Technology to analyze or make Determinations which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

2.11 Proprietary Rights. Title and full ownership of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to Company any right of ownership or any other right of any kind or nature whatsoever in or to such rights, technology, marks and other BioSafe intellectual property; other than the right to use such rights, technology and marks in accordance with the terms and provisions of this Agreement.

2.12 Cessation of Use. At the expiration of the term, or the termination of Company's right to use the license granted herein, any and all rights and licenses that Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's intellectual property shall immediately terminate and Company shall immediately cease using them in any manner or way whatsoever. Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of its other intellectual property. Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other intellectual property subsequent to the expiration or termination of this Agreement and the termination of the license granted hereby.

2.13 Independent Contractor Status. The relationship of BioSafe and Company established by this Agreement is that of independent contractors, and no other relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner which expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between Company and its customers are Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3. Company's Obligations. During the Term of this Agreement, Company will: (i) pay to BioSafe, its agent or assignee a monthly license fee in accordance with the terms of this Agreement; (ii) assemble the Company Test only with the components set forth on the list of components provided by BioSafe (including the Collection Card), or those deemed by BioSafe to be substantially identical, purchase from BioSafe all Collection Cards included in the Company Test, and procure from BioSafe or independently from BioSafe all other components in the Company Test; (iii) sell the Company Test in accordance with all applicable laws, rules and regulations, including the Health Insurance Portability

3

and Accountability Act of 1996, and the privacy regulations created as a result of such act, and all of the terms and provisions of this Agreement; (iv) conduct its business of selling the Company Test solely in its name, at its sole cost and expense; (v) avoid deceptive, misleading or unethical practices or making any false or misleading representations with respect to the Company Test; (vi) maintain competent, well-trained personnel of its own selection who shall engage in the sale and the laboratory analysis of the Company Test; (vii) obtain all licenses, permits, registrations and approvals; governmental or otherwise, and pay all duties, taxes, excises and payments, that are required for Company to sell the Company Test and to perform the laboratory analysis; (viii) be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Company Test in the Territory; (ix) be solely responsible for all costs and expenses of any kind or nature related in any manner or way to the assembling, sale and analysis of the Company Test, including any required translations; (x) maintain its certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the term of this Agreement; (xi) ensure appropriate hazardous and non-hazardous waste disposal in accordance with all applicable rules and regulations; (xii) ensure it has adequate and legally compliant laboratory information systems and laboratory report-generating systems, including security of the data base related to patient confidentiality, accuracy of laboratory reports and transmission of related data, appearance of laboratory reports and secured back-up storage of relevant records; (xiii) maintain at its cost and expense the laboratory facility and equipment, including a Roche P-Modular analyzer and/or any other equipment specified by BioSafe, to test, analyze and make Determinations from the Company Test using BioSafe proprietary methods, techniques and processes; (xiv) be responsible for all of its own expenses, including providing such office space, facilities and personnel as are required to perform its obligations under this Agreement and all costs and expenses related to the advertising, marketing, promotion and sale of the Company Test, and the analysis thereof, in the Territory; (xv) not incur any expense chargeable to BioSafe except as may specifically be authorized in advance in writing by BioSafe; (xvi) maintain in effect during the term of this Agreement and for a period of five years thereafter appropriate liability insurance policies, copies of which shall be delivered to BioSafe, covering the sale and laboratory analysis of the Company Test with a recognized insurance carrier on such terms as are acceptable to BioSafe, which must include BioSafe as an additional named insured for the same limits of liability as are provided for Company, but in no event less than two million dollars, a waiver of subrogation rights against BioSafe and the requirement that BioSafe receive not less than sixty days prior written notice of any modification or termination of coverage; (xvii) observe and adhere to the provisions of any confidentiality agreement between BioSafe and Company; (xviii) indemnify BioSafe in accordance with the provisions of this Agreement; and (xix) prominently display on the front of the packaging of the Company Test, in a place approved by BioSafe, the BioSafe logo, "Science by BioSafe", the form of which will be furnished by BioSafe to Company.

4.    Term. S ubject to e arlier t ermination o f Company's right t o u se t he l icense, u pon t he o ccurrence o f a ny e vent specified below, the term of this Agreement shall be for a 60-month period commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such 60-month period.

4.1   BioSafe's Right to Terminate. Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate Company's license and the use of all rights, technology and processes related thereto prior to the expiration of the term immediately upon the occurrence of any of the following events: (i) any law, rule or regulation is adopted or is in effect in the Territory, or elsewhere, that would restrict any of BioSafe's rights hereunder, otherwise invalidates any provision hereof or materially affects BioSafe's or Company's ability to perform its obligations under this Agreement; (ii) if Company makes any false or untrue statement or representation herein or in the performance of its obligations hereunder; (iii) if Company, in BioSafe's sole opinion, engages in any fraudulent or dishonest activity; (iv) if Company breaches any of the provisions of Sections 2.3 through 2.10, Section 6 or Company attempts to assign this Agreement, or any of its rights and obligations herein.; (v) if Company fails to become accredited or fails any BioSafe laboratory proficiency testing or fails to correct deficiencies within the specified period to maintain its certification to use BioSafe's proprietary methods, techniques and processes; (vi) as set forth in Section 5; (vii) Company exceeds the annual number of Determinations for which the license has been granted; (viii) Company fails to make timely payment of any monthly license fee due hereunder; (ix) Company breaches or is in default of a material obligation under this Agreement (other than the payment of the monthly license fee) and the default or breach is not cured to BioSafe's satisfaction within ten days after Company's receipt of written notice stating the nature of the default; (x) Company becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up, liquidated its business, stopped doing business as a going concern, merges or consolidates its business or transfers all or substantially all of its assets, voluntarily or otherwise; or (xi) an order

4

or notice shall be published by any government or Governmental Body requiring the cessation of activities by Company or BioSafe.

4.2 Rights Upon Termination or Expiration. Upon expiration of the term of this Agreement, or termination of Company's right to use the license prior thereto, in accordance with the provisions of this Agreement, all rights, privileges and licenses granted in this Agreement to Company shall immediately cease and terminate. Accordingly: (i) Company shall immediately cease using any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of BioSafe's intellectual property, and shall certify in writing to BioSafe that it has completely terminated its use thereof; (ii) Company shall immediately cease all sales and other activities with respect to the Company Test, and Company shall take all action required to terminate Company's registration, if any was required, as a seller of the Company Test and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required; (iii) Company shall immediately cease using and return to BioSafe all of BioSafe's confidential information; (iv) all indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived; and (v) BioSafe shall not have any obligation to repurchase or to credit Company for its inventory of Collection Cards or Company Tests at the time of termination of Company's right to use the license, or expiration of the term, of this Agreement.

4.3 Survival of Prior Obligations. Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the term or otherwise: (i) shall not relieve Company of any obligation incurred prior to such termination; and (ii) the obligation of Company under the provisions of any confidentiality agreement between BioSafe and Company with respect to the protection and non-disclosure of Confidential Information, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

5. Patents. Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third party of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks. BioSafe shall have the right, but not the obligation, (and Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of Company, if necessary, anywhere in the world against a third party at its own expense. Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BioSafe's expense. If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without Company's prior consent. BioSafe shall not be liable to Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for alleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other intellectual property of BioSafe infringes any patent, copyright or trademark or other intellectual property right of such third party. BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding. BioSafe will pay any final judgment entered against Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, BioSafe shall be relieved of any obligation to defend or pay for such defense unless Company notifies BioSafe in writing of such claim, suit, action or proceeding within five business days after becoming aware of it and Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding. If it is finally determined by a court of competent jurisdiction, or if BioSafe in its sole discretion determines, that any of BioSafe's intellectual property infringes any copyright, trademark or any other intellectual right of a third party, then BioSafe may, in its sole discretion and expense, take any action. Notwithstanding any other provision herein contained to the contrary, BioSafe shall not have any liability for any infringement which results from any act of Company, including Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other intellectual property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, method or process or Company's modifications of BioSafe's rights, technology or property.

5

6.    Company's Representations and Warranties. Company represents and warrants that each of the following shall survive the execution and delivery of this Agreement, are true and correct now and will be throughout the entire term of Agreement: (i) Company is an entity duly organized, existing and in good standing under the laws of the state of its incorporation or organization set forth on the signature page hereof, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities and to incur the obligations herein contained; (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, does not require the approval or consent of any third Person, does not and will not conflict with, violate or breach Company's articles of incorporation or organization, any agreement to which it is a party or any law, rule or regulation or court decree or order; (iii) this Agreement is the legal, valid and binding obligation of Company, enforceable in accordance with its terms at all times; (iv) Company will comply with all applicable laws, consent decrees and regulations of any federal, state or Governmental Body wherever located; (v) Company owns, holds or possesses all Governmental Body and private licenses, franchises, permits, privileges, approvals and other authorizations which are necessary for it to carry on and conduct its business, to sell the Company Test and to make Determinations; (vi) there is no action, suit or proceeding pending or, to the best knowledge of Company, threatened, which questions the legality or propriety of the transaction contemplated by this Agreement or which, if decided adversely against Company, would prevent Company from fulfilling all of its obligations under this Agreement; and (vii) Company has no expectation and has received no assurance or guarantee of any kind or nature it will obtain any anticipated amount of profits or revenue as a result of Company selling the Company Test or making Determinations.

7.    Disclaimer of Warrant and Limitation of Liability.

7.1    Disclaimer of Warranty. Section 7.1 has been deleted in its entirety. There is no Section 7.1 of the Agreement.

7.2    Limitation of Liability. In no event shall BioSafe be liable under any legal or equitable theory, and Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential or punitive damages of any kind or nature whatsoever, however caused, suffered by Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.

8.    Indemnification. Company shall indemnify and hold BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a BioSafe Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any BioSafe Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by Company of, or any failure by Company to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by Company.

BioSafe shall indemnify and hold Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a Company Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any Company Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by BioSafe.

9.    Determinations and Monthly License Fee. In consideration of the license granted herein to Company, beginning with the Effective Date and until December 31, 200~~5~~, Company will pay to BioSafe a monthly license fee of one thousand two hundred and fifty dollars ($1,250) per month and commencing January 1, 2005 and for the remainder of the Term, Company will pay a monthly license fee of six thousand two hundred and fifty dollars ($6,250) for the right to process up to sixty thousand (60,000) Determinations per year. Each such payment shall be due and payable by the Company on the first day of each month. If the Effective Date does not fall on the first day of the month, the first and last payment shall be a pro-rata portion of the amount payable.

During normal business hours and upon reasonable notice, BioSafe shall have the right to inspect and audit Company's books and records to confirm the number of annual Determinations performed by Company. All costs and expenses of such inspection and audit shall be paid by BioSafe unless it is determined that the number of annual Determinations performed by Company exceeded the annual number of Determinations indicated above, in which case Company shall be responsible for such costs and expenses.

10. Miscellaneous Provisions.

10.1 Amendments And Waiver. The Parties, by mutual agreement in writing, may amend, modify or supplement this Agreement. Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof. The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof. Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

10.2 Assignment. This Agreement is personal to Company; therefore, Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe. No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of Company. BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company or notice.

10.3 Benefit of Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties. Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims Company may have against BioSafe. Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto and their successors and permitted assigns and the BioSafe Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

10.4 Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the original or the same counterpart. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterparts.

10.5 Governing Law. The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States. EACH OF THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION.

10.6 Headings. The Section headings contained in this Agreement are for convenience only and shall not serve to modify, interpret or affect the meaning of the Sections at the beginning of which they appear.

10.7 Section 10.7 has been deleted in its entirety. There is no section 10.7 of the Agreement.

10.8 No Drafting Presumption. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

10.9 Severability. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement. The Parties shall endeavor in good faith negotiations to replace the invalid, inoperative, illegal or unenforceable provision with a valid and enforceable one, the economic effect of which comes as close as possible to that of the invalid provision.

10.10 Notices. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (i) when delivered, if delivered personally, (ii) four days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid, (iii) the next business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service, and (iv) on the date of delivery if delivered by facsimile transmission, receipt confirmed, provided that a confirmation copy is sent on the next business day by registered or certified mail, return receipt requested and postage prepaid, in each case addressed as follows:

If to BioSafe, to:

> BioSafe Medical Technologies, Inc.
> 100 Field Drive, Suite 240
> Lake Forest, Illinois USA 60045
> Attention: President
> Facsimile: 847.234.8222
> Confirmation Phone No.: 847.234.8111

7

If to Company, to the address set forth on the signature page hereof,

or to such other address as the recipient Party may indicate by a notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such notice).

10.11   Attorneys' Fees and Costs.   In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

10.12   Announcements.   N either Party shall i ssue a ny p ress r elease o r o ther p ublicity m aterials w ith r espect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party. This restriction shall not apply to disclosures required by law or regulation.

10.13   Cumulative Remedies.   If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

10.14   Extension of Term.   Upon sixty (60) days written notice given prior to the end of the term of this Agreement, Company shall have the right to extend this Agreement for an additional five (5) year period provided that BioSafe and the Company can agree to terms and conditions acceptable to both of the Parties for such additional five (5) year term.

10.15   Further Assurances.   Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonable deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

10.16   Interpretation.   Whenever used in this Agreement, (i) the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders, and (ii) "including" shall be deemed to mean "including not limited to".

10.17   Interest.   Any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.

10.18   Entire Agreement.   This Agreement constitutes t he e ntire a greements a nd understandings b etween the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

THE REMAINDER OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK. THE NEXT PAGE IS THE SIGNATURE PAGE.

8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE MEDICAL TECHNOLOGIES, INC.

By: _____
David C. Fleisner, President

COMPANY

Sioux Valley Hospital USD Medical Center
(Print Company name and state of incorporation or organization)

By: _____
(Signature of authorized party)

Rosemary Bour  VP ER/Trauma/Surgery
(Print name and title of person signing)

1305 W 18th St, Sioux Falls, SD 57105
(Print address of Company)

605 - 333 - 6422
(Print Company telephone number)

605 - 333 - 1531
(Print Company facsimile number)

BMT-mydocs-License Agreement for Labs-Cholesterol-v3.4-rev'd 8-28-03-Sioux Valley

*BM*
*BS September Addendum I*    *LB BM*
*June*    *August 2005*

For the one-year period from January 1, 2004 through December 31, 2004, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 Cholesterol Determinations for such year at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Company for such calendar year provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

*September*
*LB*    For each calendar quarter from and after January 1, 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 Cholesterol Determinations per quarter at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Company for such calendar quarter provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

*LB X BM*    Notwithstanding anything in this Agreement to the contrary, Company shall have the right to suspend this Agreement upon written notice to BioSafe given within the sixty (60) day period following the end of any calendar year in the term of this Agreement with respect to which the Company's annual gross revenue in such calendar year from Cholesterol Determinations referred to it by BioSafe or from any other source, including but not limited to Cholesterol Determinations performed on tests sold by Company, is less than the amount set forth below for the Anticipated Gross Revenue for such year (provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim).

For purposes of this Agreement, Anticipated Gross Revenue for the first calendar year in the term of this Agreement is twenty-two thousand five hundred dollars ($22,500), and the Anticipated Gross Revenue for each of the second, third, fourth and fifth calendar years in the term of this Agreement is one hundred eight thousand dollars ($108,000).

Notwithstanding the foregoing provisions to the contrary, if any year in the term of this Agreement is less than a full calendar year, Anticipated Gross Revenue for such period shall be determined by multiplying the Anticipated Gross Revenue for such year (set forth above) by a fraction, the numerator of which shall be the actual number of days in the year in question, and the denominator of which shall be three hundred and sixty-five (365).

Dated: 6/1/04

BioSafe Medical Technologies, Inc.    COMPANY

By: _____    By: Rosemary Bouer ___

06/08/2004 10:36 FAX 605 335 8434        CLM CLIENT SUPPORT                     ☑ 002
   05/06/2004   09:52      947-234-8422        BIG SAFE

## ADDENDUM II

Notwithstanding anything to the contrary contained in this Agreement, at any time during the term of this Agreement, BioSafe may grant licenses of the BioSafe Technology for the Company Test for use within the State of South Dakota to laboratories with facilities in more than one state, including South Dakota, and such grant shall not be deemed to be a breach of this Agreement.

Dated: _6/1/04_

BioSafe Medical Technologies, Inc.                    Company

By: _____                    By: _____

                                                    Kay W Reinartz
                                                    General Manager

C: Kay Reinartz



## Sioux Valley Hospital
## USD Medical Center



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.siouxvalley.org

October 27, 2005

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Since Sioux Valley Hospital has been referred zero (ø) determinations from Biosafe or any other source pursuant to this agreement and zero (ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of September 1, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by November 10, 2005.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital



EXHIBIT

A

Accredited by the Joint Commission for Accreditation of Healthcare Organizations





Sioux Valley Hospital
USD Medical Center

1305 W. 18th Street
PO Box 5039
Sioux Falls, South Dakota 57117-5039
(605) 333-1000
www.siouxvalley.org

February 6, 2006

COPY

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The one-quarter period (September 1, 2005 through November 30, 2005) of the agreement
between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from
cholesterol determinations referred to it by Biosafe or from any other source is less than
twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol
determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall
pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars
($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar
quarter.

Since Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any
other source pursuant to this agreement and zero (Ø) revenue, Sioux Valley Hospital is
claiming that a payment of twenty-seven thousand dollars ($27,000) is due to Sioux Valley
Hospital from Biosafe Medical Technologies, Inc. as of November 30, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley
Hospital by February 20, 2006.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital



EXHIBIT



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.sanfordhealth.org

October 18, 2007

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) and eight (8) subsequent calendar quarters (September 2005 through August 31, 2007) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital have been completed.

According to Addendum I of the agreement; for the one-year period from September 1, 2004 through August 31, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Furthermore, according to Addendum I of the agreement; for each calendar quarter from and after September 1, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

In the first one-year period, Sioux Valley Hospital has been referred zero (∅) determinations from Biosafe or any other source and zero (∅) revenue. Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the first one-year period of the agreement.

In the subsequent eight (8) calendar quarters, Sioux Valley Hospital has been referred Three thousand eight hundred twenty one (3,821) determinations from Biosafe or any other source pursuant to this agreement and thirty-four thousand three hundred eighty-nine dollars ($34,389) billed revenue ($23,561.01 paid on account as of 9/30/2007). Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of one hundred ninety-two

Accredited by the Joint Commission on Accreditation of Healthcare Organizations



EXHIBIT

_D_

thousand four hundred thirty eight dollars and ninety-nine cents ($192,438.99) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the eight calendar quarter periods from September 1, 2005 through August 31, 2007 of the agreement.

This letter is to inform you that total payment of two hundred fourteen thousand nine hundred thirty eight dollars and ninety-nine cents ($214,938.99) is due and payment is expected by November 16. A worksheet summary of charges, payments received, and balance due is attached to this letter.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

## BioSafe Contract: Contract vs Actual
### Term of Contract: September 1, 2004 thru August 31, 2009
### 5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| Total To Date | 26,500 | $238,500.00 | 3,821 | $ 34,389 | (22,679) | $(204,111.00) |
| Payments Received | | $(23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $214,938.99 | | | | |

## BioSafe Contract: Contract vs Actual

Term of Contract: September 1, 2004 thru August 31, 2009
5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| Q9: 9/07-11/07 | 3,000 | $ 27,000 | 99 | $ 891 | (2,901) | $ (26,109) |
| 12/07-01/08 pro rated partial quarter | 2,000 | $ 18,000 | 227 | $ 2,043 | (1,773) | $ (15,957) |
| Total To Date | 31,500 | $ 283,500.00 | 4,147 | $ 37,323 | (27,353) | $ (246,177.00) |
| Payments received as of 2-11-08 | | $ (23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $ 259,938.99 | | | | |

| Payments Made by Biosafe | |
|---|---|
| Date | Amount |
| 5/23/2007 | $13,976.01 |
| 6/14/2007 | $6,165.00 |
| 9/21/2007 | $3,420.00 |
| | Total | $23,561.01 |



EXHIBIT

# EXHIBIT 2

IN THE CIRCUIT COURT OF DUPAGE COUNTY, ILLINOIS
CHANCERY DIVISION, EIGHTEENTH DISTRICT

2008MR001107

ALLEN & COMPANY, LLC

       Plaintiff,

    v.

SANFORD USD MEDICAL CENTER
formerly known as SIOUX VALLEY
HOSPITAL and USD MEDICAL CENTER,

       Defendant.

Status Date: 11/07/08
Assigned To: 2005

Case No.

**FILED**

Jul 11 2008 - 10:05 AM

_Chris Kachiroubas_

CLERK OF THE
18TH JUDICIAL CIRCUIT
DU PAGE COUNTY ILLINOIS

## COMPLAINT IN CHANCERY

NOW COMES the Plaintiff, ALLEN & COMPANY, LLC (hereinafter, "Plaintiff") by and through its attorneys, MOMKUS McCLUSKEY, LLC, and in support of its Complaint in Chancery against Defendant, SANFORD USD MEDICAL CENTER, formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, (hereinafter, "Sanford"), states as follows:

## COUNT I – DECLARATORY JUDGMENT

1.    At all times mentioned, Plaintiff was an Illinois corporation in goodstanding, with its office in Oak Brook, Illinois.

2.    Upon information and belief, Sanford is a hospital located and doing business in Sioux Falls, Minnehaha County, South Dakota.

3.    On August 30, 2004, Sanford and BioSafe Medical Technologies, Inc. (hereinafter, "BioSafe") entered into a valid and enforceable lease agreement (hereinafter, "Sanford - BioSafe Lease Agreement") in which BioSafe leased to Sanford various cholesterol testing equipment and/or cholesterol testing procedures and methodologies. In return, Sanford agreed to pay to BioSafe a monthly license fee of $1,250 per month for the first year of the

1

Agreement, and then a monthly license fee of $6,250 per month for the remaining term of the Agreement.

4.    Following the execution of the Lease Agreement, the right to the payments pursuant to the Sanford-BioSafe Lease Agreement was transferred to First Commercial Capital Corporation (hereinafter, "First Commercial"). Sanford executed a Lease Agreement with First Commercial (hereinafter, "Sanford - First Commercial Lease Agreement) granting First Commercial the right to twelve (12) monthly payments of $1,000 each, followed by forty-eight (48) monthly payments of $6,250 each. (Sanford – First Commercial Lease Agreement Equipment Schedule). (*Exhibit "A"*).

5.    On August 30, 2004, First Commercial executed a valid and enforceable Non-Recourse Installment Note with Plaintiff, (hereinafter, the "Installment Note"), granting First Commercial's right to payment under the Lease Agreement to Plaintiff in return for value received. (*Exhibit "B"*).

6.    On February 22, 2008, Sanford filed a complaint against BioSafe, First Commercial, and Delphi Energy Fund, Inc. as defendants in the Second Judicial Circuit, Minnehaha County, South Dakota (hereinafter, "South Dakota suit"). *Sanford USD Medical Center formerly known as Sioux Valley Hospital and USD Medical Center v. BioSafe Medical Technologies, Inc., Delphi Energy Fund, Inc., and First Commercial Capital Corp.* (*Exhibit "C"*). Not all of the entities concerned in the matter were included in the South Dakota suit, as Plaintiff was not named as a party.

7.    In its South Dakota suit, Sanford pled two counts, the first for breach of contract, claiming that BioSafe breached its contract with Sanford by failing to pay monies that it owed under its contract with Sanford, (¶33), and the second seeking a declaratory judgment that

2

Sanford owes no duty to pay any further fees to any of the defendants in the South Dakota action. (¶41).

8.     Pursuant to the Sanford – First Commercial Lease Agreement, Sanford has waived its rights to seek venue in any jurisdiction other than that of the State of Illinois or the Federal Courts.

> LESSEE [Sanford] WAIVES TRIAL BY JURY AND SUBMITS TO THE JURISDICTION OF THE FEDERAL DISTRICT COURTS OF COMPETENT JURISDICTION OR ANY STATE COURT WITHIN THE STATE OF ILLINOIS AND WAIVES ANY RIGHT TO ASSERT THAT ANY ACTION INSTITUTED BY LESSOR IN ANY SUCH COURT IS IN THE IMPROPER VENUE OR SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM."

(Sanford – First Commercial Lease Agreement, ¶16) (Emphasis in original).

9.     A controversy now exists over whether Sanford can proceed with its South Dakota action, which may affect the rights of Plaintiff, when Sanford has signed a Lease Agreement specifying that it would submit any controversies arising out of the agreement to the jurisdiction of Illinois. (Sanford – First Commercial Lease Agreement, ¶16).

10.     Any controversy concerning Sanford's right to initiate litigation outside of the jurisdiction of Illinois that might affect Plaintiff's rights under the Sanford – First Commercial Lease Agreement and the Installment Note is a controversy ripe for declaratory judgment under 735 ILCS 5/2-701.

WHEREFORE, Plaintiff, ALLEN & COMPANY, LLC, seeks a declaratory judgment by this Honorable Court that all disputes affecting Plaintiff's rights under and any controversies concerning the lease agreements and installment note be submitted to the jurisdiction of Illinois; for reasonable attorney's fees and costs; and for any further remedy deemed just and proper by this Honorable Court.

3

## COUNT II – BREACH OF CONTRACT

11.    Plaintiff incorporates by reference the allegations of paragraphs 1 through 10 of this Complaint as if fully set forth herein.

12.    Pursuant to the Installment Note, Plaintiff is entitled to receive from Sanford twelve (12) monthly payments of $1,000 each and forty-eight (48) monthly installments of $6,250 each, together with an interest rate of 7.5 percent per year to be increased by two (2) percent at the date of the maturity of each installment. Without the calculation of the increased interest rate to be applied to late installments, Plaintiff was owed $251,394.62 under the Installment Note.

13.    The last payment made by Sanford pursuant to its Lease Agreement was on February 11, 2008. As of that date, the balance of the money Sanford owed under the Lease Agreement was $111,641.99. Sanford has not made any payments since that time and is now in default in excess of thirty (30) days.

14.    Jurisdiction in Illinois is proper as Sanford has submitted to the jurisdiction of any Illinois state court, pursuant to Paragraph 16 of the Sanford – First Commercial Lease Agreement.

15.    Plaintiff has performed all of its duties under the Installment Note.

16.    Sanford has ceased performing under its Lease Agreement, and as a result, Plaintiff has been damaged by an amount no less than $111,641.99.

4

WHEREFORE, Plaintiff, ALLEN & COMPANY, LLC, respectfully moves this Honorable Court to enter an order in its favor and against Defendant, SANFORD USD MEDICAL CENTER, formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, for monies in excess of $111,641.99 plus interest, for attorney's fees and costs, and for any further remedy deemed by the Honorable Court to be just and proper.

Respectfully Submitted

MOMKUS McCLUSKEY, LLC

By: _____
One of its Attorneys

James McCluskey
Lauryn Parks
MOMKUS McCLUSKEY, LLC
3051 Oak Grove Road
Downers Grove, Illinois 60515
630-434-0400
Attorneys for Plaintiff
Attorney no.: 20508
W:\21_25\2123.080168\Pleadings\Complaint.doc

Our Downers Grove Office is moving
As of July 25, 2008.
Please send all payments and correspondence to
Momkus McCluskey LLC
1001 Warrenville Road, Suite 500
Lisle, IL 60532
Our phone and fax numbers will not change

First Commercial Capital Corp.
**MASTER LEASE AGREEMENT**

First Commercial Capital Corp.
601 S. LaSalle St., Suite 600
Chicago, Illinois 60605
(312) 566-0608

Lessee: Sioux Valley Hospital USD Medical Center
Address: 1305 W. 18th St.
　　　　 Sioux Falls, SD 57105

Master Lease Agreement No. 2658-01
Date: _August 30, 2004_

First Commercial Capital Corp. ("Lessor") hereby leases to Lessee and Lessee leases from Lessor, in accordance with the terms and conditions hereinafter set forth, the equipment and property together with all replacements, substitutions, additions, accessories, alterations and repairs incorporated therein or now or hereafter affixed thereto (herein collectively referred to as the "Equipment" described in each Equipment Schedule which may be executed by Lessor and Lessee from time to time (individually a "Schedule" and collectively, the "Schedules"), each of which is made a part hereof. For all purposes of this Master Lease Agreement ("Lease"), each Schedule relating to one or more items of Equipment shall be deemed a separate lease incorporating all of the terms and provisions of this Lease. In the event of a conflict between the terms of this Lease and the terms and conditions of a Schedule, the terms and conditions of the Schedule shall govern and control that Schedule.

The person executing this Lease for and on behalf of Lessee warrants and represents, which warranty and representation shall survive the expiration or termination of this Lease, that this Lease and the execution hereof has been duly and validly authorized by Lessee, constitutes a valid and binding obligation of Lessee and that he has authority to make such execution for and on behalf of Lessee.

IN WITNESS WHEREOF, this Lease has been executed by Lessee this _30th_ day of _August_, 20_04_.

Sioux Valley Hospital USD Medical Center

By: _Rosemary Rowe_

Title: _VP, ER/Trauma/Surgery_

ACCEPTED AT CHICAGO, ILLINOIS
First Commercial Capital Corp. (Lessor)

By: _____

Title: _President_

1. **Term and Rental.** The term of this Lease (the "Minimum Lease Term") for any item of Equipment shall be set forth in the Schedule relating to such item of Equipment and shall commence (the "Commencement Date") on the acceptance Date ("Acceptance Date"), which shall be the applicable of: (1) the date of delivery of the Equipment to Lessee; (2) in the case of Equipment which is the subject of a sale and leaseback between Lessor and Lessee, the date upon which Lessor purchases such Equipment from Lessee; or (3) in the case of Equipment requiring installation, the date of installation of the Equipment. If the Acceptance Date is other than the first day of a calendar month, then the Commencement Date of the Minimum Lease Term set forth in any Schedule shall be the first day of the calendar month following the month which includes the Acceptance Date and Lessee shall pay to Lessor, in addition to all other sums due hereunder, an amount equal to one-thirtieth of the amount of the average monthly rental payment due or to become due hereunder multiplied by the number of days from and including the Acceptance Date to the Commencement Date of the Minimum Lease Term set forth in the Schedule. Lessee agrees to pay the total rental for the entire term hereof, which shall be the total amount of all rental payments set forth in the Schedule, plus such additional amounts as may become due hereunder or pursuant to any written modification hereof or additional written agreement hereto. Except as otherwise specified in the Schedule, rental payments hereunder shall be monthly and shall be payable in advance on the first day of each month during the term of this Lease beginning with the Commencement Date of the Minimum

Page 1 of 10

EXHIBIT
**A**

Lease Term and shall be sent to the address of the Lessor specified in this Lease or in the Schedule or as otherwise directed by the Lessor in writing. Time is of the essence. Rental payments or any other payments due hereunder not made on or before the due date shall be overdue and shall be subject to a service charge in an amount equal to two percent (2%) per month of the overdue payments or the maximum rate permitted by law whichever is less (the "Service Charge Rate"). If Lessor shall at any time accept a rental payment after it shall become due, such acceptance shall not constitute or be construed as a waiver of any or all of Lessor's rights hereunder, including without limitation those rights of Lessor set forth in Sections 12 and 13 hereof.

2. **Title.** This is an agreement of lease only. Lessee shall have no right, title or interest in or to the Equipment leased hereunder, except as to the use thereof subject to the terms and conditions of this Lease. All of the Equipment shall remain personal property (whether or not the Equipment may at any time become attached or affixed to real property). The Equipment is and shall remain the sole and exclusive property of Lessor or its assignees. All replacements, substitutions, modifications, repairs, alterations, additions and accessories incorporated in or affixed to the Equipment (herein collectively called "additions" and included in the definition of "Equipment"), whether before or after the Commencement Date, shall become the property of Lessor upon being so incorporated or affixed and shall be returned to Lessor as provided in Section 3. Upon the request of Lessor, Lessee will affix to the Equipment labels or other markings supplied by Lessor indicating its ownership of the Equipment and shall keep the same affixed for the entire term of this Lease. Lessee agrees to promptly execute and deliver or cause to be executed and delivered to Lessor and Lessor is hereby authorized to record or file, any statement and/or instrument requested by Lessor for the purpose of showing Lessor's interest in the Equipment, including without limitation, financing statements, security agreements, and waivers with respect to rights in the Equipment from any owners or mortgagees of any real estate where the Equipment may be located. In the event that Lessee fails or refuses to execute and/or file Uniform Commercial Code financing statements or other instruments or recordings which Lessor or its assignee reasonably deems necessary to perfect or maintain perfection of Lessor's or its assignee's interests hereunder, Lessee hereby appoints Lessor as Lessee's limited attorney-in-fact to execute and record all documents necessary to perfect or maintain the perfection of Lessor's interests hereunder. Lessee shall pay Lessor for any costs and fees relating to any filings hereunder including, but not limited to, costs, fees, searches, document preparation, documentary stamps, privilege taxes and reasonable attorneys' fees. If any item of Equipment includes computer software, Lessee shall execute and deliver and shall cause Seller (as hereinafter defined) to deliver all such documents as are necessary to effectuate assignment of all applicable software licenses to Lessor. Lessee shall at its expense: (i) indemnify, protect and defend Lessor's title to the Equipment from and against all persons claiming against or through Lessee; (ii) at all times keep the Equipment free from any and all liens, encumbrances, attachments, levies, executions, burdens, charges or legal process of any and every type whatsoever; (iii) give Lessor immediate written notice of any breach of this Lease described in clause (ii); and (iv) indemnify, protect and save Lessor harmless from any loss, cost or expense (including reasonable attorneys' fees) caused by the Lessee's breach of any of the provisions of this Lease, whether incurred by Lessor in pursuing its rights against Lessee or defending against any claims or defenses asserted by or through Lessee. In the event that this transaction is not deemed to be a lease governed by Article 2A of the UCC, as security for the full and prompt payment and performance of all present and future liabilities and obligations of Lessee to Lessor under the Lease, Lessee grants to Lessor a security interest in all Lessee's rights and interest in the Equipment and all accessions and modifications thereto and all proceeds and products of the foregoing.

3. **Acceptance and Return of Equipment.** Lessor shall, at any time prior to unconditional acceptance of all Equipment by Lessee, have the right to cancel this Lease with respect to such Equipment (and if the Equipment or any portion thereof has not previously been delivered, Lessor may refuse to pay for the Equipment or any portion thereof or refuse to cause the same to be delivered) if: (a) the Acceptance Date with respect to any item of Equipment to be leased pursuant to any Schedule has not occurred within sixty (60) days of the estimated Acceptance Date set forth in such Schedule or (b) there shall be, in the reasonable judgment of Lessor, a material adverse change in the financial condition or credit standing of Lessee or of any guarantor of Lessee's performance under this Lease since the date of the most recent financial statements of Lessee or of such

guarantor submitted to Lessor. Upon any cancellation by Lessor pursuant to this Section or the provisions of any Schedule, Lessee shall forthwith reimburse to Lessor all sums paid by Lessor with respect to such Equipment plus all costs and expenses of Lessor incurred in connection with such Equipment and any interest or rentals due hereunder in connection with such Equipment and shall pay to Lessor all other sums then due hereunder, whereupon if Lessee is not then in default and has fully performed all of its obligations hereunder, Lessor will, upon request of Lessee, transfer to Lessee without warranty or recourse any rights that Lessor may then have with respect to such Equipment. Lessee agrees to promptly execute and deliver to Lessor (in no event later than 15 days after the Acceptance Date) a confirmation by Lessee of unconditional acceptance of the Equipment in the form supplied by Lessor (the "Equipment Acceptance"). Lessee agrees, before execution of the aforesaid Equipment Acceptance, to inform Lessor in writing of any defects in the Equipment, or in the installation thereof, which have come to the attention of Lessee or its agents and which might give rise to a claim by Lessee against the Seller or any other person. If Lessee fails to give notice to Lessor of any such defects or fails to deliver to Lessor the Equipment Acceptance as provided herein, it shall be deemed an acknowledgment by Lessee (for purposes of this Lease only) that no such defects in the Equipment or its installation exist and it shall be conclusively presumed, solely as between Lessor and its assignees and Lessee, that such Equipment has been unconditionally accepted by Lessee for lease hereunder. Except as otherwise provided in any Schedule, Lessee shall provide Lessor ninety (90) days prior written notice by registered or certified mail of its intention to return the Equipment upon expiration of the Minimum Lease Term. Upon expiration or the cancellation or termination of the Lease with respect to any Equipment, Lessee shall, at its own expense, assemble, crate, insure and deliver all of the Equipment and all of the service records and all software and software documentation subject to this Lease and any Schedules hereto to Lessor in the same good condition and repair as when received, reasonable wear and tear resulting only from proper use thereof excepted, to such reasonable destination within the continental United States as Lessor shall designate. Lessee shall, immediately prior to such return of each item of Equipment, provide to Lessor a letter from the manufacturer of the Equipment or another service organization reasonably acceptable to Lessor certifying that said item is in good working order, reasonable wear and tear resulting only from proper use thereof excepted, that such item is eligible for a maintenance agreement by such manufacturer and all software is included thereon. If any computer software requires relicensing when removed from Lessee's premises, Lessee shall bear all costs of such relicensing. If Lessee fails for any reason to provide the notice set forth above or to re-deliver the Equipment back to Lessor in accordance with the terms set forth above, Lessee shall pay to Lessor, at Lessor's election, an amount equal to the highest monthly payment set forth in the Schedule for a period of not less than three (3) months ("Holdover Period") and at the end of such Holdover Period, Lessee shall return the Equipment to Lessor as provided herein. If Lessee fails or refuses to return the Equipment as provided herein at the end of any Holdover Period, the term of such Schedule shall be deemed to have been automatically renewed for successive Holdover Periods until Lessee returns the Equipment in accordance with the terms set forth above and during which time, Lessee shall pay to Lessor, at Lessor's option, an amount equal to one hundred percent (100%) of the highest monthly payment set forth in the Schedule or the highest rate permitted by law, whichever is less, for each month or portion thereof, until Lessee so returns the Equipment to Lessor.

4. **Disclaimer of Warranties. LESSEE HAS EXCLUSIVELY SELECTED AND CHOSEN THE TYPE, DESIGN, CONFIGURATION, SPECIFICATION AND QUALITY OF THE EQUIPMENT HEREIN LEASED AND THE VENDOR, DEALER, SELLER, MANUFACTURER OR SUPPLIER THEREOF (HEREIN COLLECTIVELY CALLED "SELLER"), AS SET FORTH IN THE SCHEDULES. LESSOR MAKES NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS, ADAPTABILITY, ANY IMPLIED WARRANTY OF QUIET ENJOYMENT OR NON-INTERFERENCE OR SUITABILITY FOR ANY PARTICULAR PURPOSE, AND, LESSEE LEASES, HIRES AND RENTS THE EQUIPMENT "AS IS."** Lessee understands and agrees that neither Seller, nor any agent of Seller, is an agent of Lessor or is in any manner authorized to waive or alter any term or condition of this Lease. Lessor shall not

be liable for any loss or damage suffered by Lessee or by any other person or entity, direct or indirect or consequential, including, but not limited to, business interruption and injury to persons or property, resulting from non-delivery or late delivery, installation, failure or faulty operation, condition, suitability or use of the Equipment leased by Lessee hereunder, or for any failure of any representations, warranties or covenants made by the Seller. Any claims of Lessee shall not be made against Lessor but shall be made, if at all, solely and exclusively against Seller, or any persons other than the Lessor. Lessor hereby authorizes Lessee to enforce during the term of this Lease, in its name, but at Lessee's sole effort and expense, all warranties, agreements or representations, if any, which may have been made by Seller to Lessor or to Lessee, and Lessor hereby assigns to Lessee solely for the limited purpose of making and prosecuting any such claim, all rights which Lessor may have against Seller for breach of warranty or other representation respecting the Equipment.

5. **Care, Transfer and Use of Equipment.** Lessee, at its own expense, shall maintain the Equipment in good operating condition, repair and appearance in accordance with Seller's specifications and in compliance with all applicable laws and regulations and shall protect the Equipment from deterioration except for reasonable wear and tear resulting only from proper use thereof. When generally offered, Lessee shall, at its expense, keep a maintenance contract in full force and effect, throughout the term of this Lease and any Schedule hereto. The disrepair or inoperability of the Equipment regardless of the cause thereof shall not relieve Lessee of the obligation to pay rental hereunder. Lessee shall not make any modification, alteration or addition to the Equipment (other than normal operating accessories or controls). Lessee will not, and will not permit anyone other than the authorized field engineering representatives of Seller or other maintenance organization reasonably acceptable to Lessor to inspect, adjustment, preventative or remedial maintenance or repair to the Equipment. **Lessee may not (a) relocate or operate the Equipment at locations other than the premises of Lessee specified in the applicable Schedule (the "Premises"), except with Lessor's prior written consent, which shall not be unreasonably withheld if such other location is within the continental United States, or (b) SELL, CONVEY, TRANSFER, ENCUMBER, PART WITH POSSESSION OF, OR ASSIGN ANY ITEM OF EQUIPMENT OR ANY OF ITS RIGHTS HEREUNDER, AND ANY SUCH PURPORTED TRANSACTION SHALL BE NULL AND VOID AND OF NO FORCE OR EFFECT.** In the event of a relocation of the Equipment or any item thereof to which Lessor consents, all costs (including any additional property taxes or other taxes and any additional expense of insurance coverage) resulting from any such relocation, shall be promptly paid by Lessee upon presentation to Lessee of evidence supporting such cost. Lessor shall have the right during normal hours upon reasonable notice to Lessee, subject to applicable laws and regulations, to enter Lessee's Premises in order to inspect, observe, affix labels or other markings, or to exhibit the Equipment to prospective purchasers or future lessees thereof, or to otherwise protect Lessor's interest therein.

6. **Net Lease. THIS LEASE AND ANY SCHEDULE HERETO IS A NET LEASE, AND ALL PAYMENTS HEREUNDER ARE NET TO LESSOR.** All taxes, assessments, licenses, and other charges (including, without limitation personal property taxes and sales, use and leasing taxes and penalties and interest on such taxes) imposed, levied or assessed on the ownership, possession, rental or use of the Equipment after delivery of the Equipment to Lessee and thereafter during the term of this Lease and any Schedule hereto (except for Lessor's federal or state net income taxes) shall be paid by Lessee when due and before the same shall become delinquent, whether such taxes are assessed or would ordinarily be assessed against Lessor or Lessee. To the extent possible under applicable law, for personal property or advalorem tax return purposes only, Lessee shall include the Equipment on such returns as may be required, which returns shall be timely filed by it. In any event, Lessee shall file all tax returns required for itself or Lessor and Lessor hereby appoints Lessee as its attorney-in-fact for such purpose. In case of failure by Lessee to so pay said taxes, assessments, licenses or other charges, Lessor may pay all or any part of such items, in which event the amount so paid by Lessor including any interest or penalties thereon and reasonable attorneys' fees incurred by Lessor in pursuing its rights against Lessee or defending against any claims or defenses asserted by or through Lessee shall be immediately paid by Lessee to Lessor as additional rental hereunder. Lessee shall promptly pay all costs, expenses and obligations of every kind and nature incurred in connection with the use or operation of the

Equipment which may arise or become due during the term of this Lease and any Schedule hereto, whether or not specifically mentioned herein. In case of failure by Lessee to comply with any provision of this Lease and any Schedule hereto, Lessor shall have the right, but not the obligation, to effect such compliance on behalf of Lessee. In such event, all costs and expenses incurred by Lessor in effecting such compliance shall be immediately paid by Lessee to Lessor as additional rental hereunder.

7.  **Indemnity.** Lessee shall and does hereby agree to indemnify, defend and hold Lessor and its assigns harmless from and against any and all taxes described in Section 6 above, liability, loss, costs, injury, damage, penalties, suits, judgements, demands, claims, expenses and disbursements (including without limitation, reasonable attorneys' fees incurred by Lessor in pursuing its rights against Lessee or defending against any claims or defenses asserted by or through Lessee) of any kind whatsoever arising out of, on account of, or in connection with this Lease and the Equipment leased hereunder, including, without limitation, its manufacture, selection, purchase, delivery, rejection, installation, ownership, possession, leasing, renting, operation, control, use, maintenance and the return thereof. This indemnity shall survive the Minimum Lease Term or earlier cancellation or termination of this Lease and any Schedule hereto.

8.  **Insurance.** Commencing on the date that risk of loss or damage passes to Lessor from the Seller and continuing until Lessee has re-delivered possession of the Equipment to Lessor, Lessee shall, at its own expense, keep the Equipment (including all additions thereto) insured against all risks of loss or damage from every and any cause whatsoever in such amounts (but in no event less than the greater of the replacement value thereof or the amount set forth in the applicable Casualty Schedule, whichever is higher), with such deductibles and exclusions as approved by Lessor and in such form as is satisfactory to Lessor. All such insurance policies shall protect Lessor and Lessor's assignee(s) as loss payees as their interests may appear. Lessee shall also, at its own expense, carry public liability insurance, with Lessor and Lessor's assignee(s) as an additional insured, in such amounts with such companies and in such form as is satisfactory to Lessor, with respect to injury to person or property resulting from or based in any way upon or in any way connected with or relating to the installation, use or alleged use, or operation of any or all of the Equipment, or its location or condition. Not less than ten days prior to the Acceptance Date, Lessee shall deliver to Lessor satisfactory evidence of such insurance and shall further deliver evidence of renewal of each such policy not less than thirty (30) days prior to expiration thereof. Each such policy shall contain an endorsement providing that the insurer will give Lessor not less than thirty (30) days prior written notice of the effective date of any alteration, change, cancellation, or modification of such policy or the failure by Lessee to timely pay all required premiums, costs or charges with respect thereto. Upon Lessor's request, Lessee shall cause its insurance agent(s) to execute and deliver to Lessor Loss Payable Clause Endorsement and Additional Insured Endorsement (bodily injury and property damage liability insurance) forms provided to Lessee by Lessor. In case of the failure to procure or maintain such insurance, Lessor shall have the right, but not the obligation, to obtain such insurance and any premium paid by Lessor shall be immediately due and payable by Lessee to Lessor as additional rent hereunder. The maintenance of any policy or policies of insurance pursuant to this Section shall not limit any obligation or liability of Lessee pursuant to Sections 7 or 9 or any other provision of this Lease and any Schedule hereto.

9.  **Risk of Loss.** Until such time as the Equipment is returned and delivered to and accepted by Lessor, pursuant to the terms of this Lease and any Schedule hereto, Lessee hereby assumes and shall bear the entire risk of loss, damage, theft and destruction of the Equipment, or any portion thereof, from any cause whatsoever ("Equipment Loss"). Without limitation of the foregoing, no Equipment Loss shall relieve Lessee in any way from its obligations hereunder. Lessee shall promptly notify Lessor in writing of any Equipment Loss. In the event of any such Equipment Loss , Lessee shall: (a) in the event Lessor determines such Equipment to be repairable, promptly place, at Lessee's expense, the Equipment in good repair, condition and working order in accordance with Seller's specifications and to the satisfaction of Lessor; or (b) in the event of an actual or constructive total loss of any item of Equipment, at Lessor's option: (i) promptly replace, at Lessee's expense, the Equipment with like equipment of the same or a later model with the same additions as the Equipment, and in good repair, condition and working order in accordance with the Seller's specifications and to the satisfaction of Lessor; or (ii) immediately pay to Lessor the amount obtained by multiplying the Actual Equipment Cost as

specified in the applicable Schedule by the percentage contained in the applicable Casualty Schedule for the date of such Equipment Loss plus, any unpaid rentals or any amounts due hereunder or, if no Casualty Schedule has been made a part of any applicable Schedule, an amount equal to the present value of the total amount of unpaid rentals and all other amounts due and to become due under any applicable Schedule during the term thereof as of the date of any payment, discounted at a rate equal to the discount rate of the Federal Reserve Bank of Chicago as of the Commencement Date of the Lease with respect to each applicable Schedule, plus an additional amount equal to the fair market value of the Equipment immediately prior to the loss, theft, damage, or destruction, but in no event shall the amount of such fair market value be less than twenty percent (20%) of the actual cost of the Equipment.  In the event Lessee is required to repair or replace any such item of Equipment pursuant to Subsections (a) or (b)(i) of the preceding sentence, the insurance proceeds received by Lessor, if any, pursuant to Section 8, after the use of such funds to pay any unpaid amounts then due hereunder, shall be paid to Lessee or, if applicable, to a third party repairing or replacing the Equipment upon Lessee's furnishing proof satisfactory to Lessor that such repair or replacement has been completed in a satisfactory manner.  In the event Lessor elects option (b)(ii), Lessee shall be entitled to a credit against the payment required by said Subsection in an amount equal to such insurance proceeds actually received by Lessor pursuant to Section 8 on account of such Equipment, and, upon payment by Lessee to Lessor of all of the sums required pursuant to Subsection (b)(ii), the applicable Schedule shall terminate with respect to such item of Equipment and Lessee shall be entitled to whatever interest Lessor may have in such item "as is, where is" and "with all faults" in its then condition and location without warranties of any type whatsoever, express or implied.

10.  **Covenants of Lessee.  Lessee agrees that its obligations under this Lease and any Schedule hereto, including without limitation, the obligation to pay rental, are irrevocable and absolute, shall not abate for any reason whatsoever (including any claims against Lessor), and shall continue in full force and effect regardless of any inability of Lessee to use the Equipment or any part thereof for any reason whatsoever including, without limitation, war, act of God, storms, governmental regulations, strike or other labor troubles, loss, damage, destruction, disrepair, obsolescence, failure of or delay in delivery of the Equipment, or failure of the Equipment to properly operate for any cause.** In the event of any alleged claim (including a claim which would otherwise be in the nature of a set-off) against Lessor, Lessee shall fully perform and pay its obligations hereunder (including all rents, without set-off or defense of any kind) and its only and exclusive recourse against Lessor shall be by a separate action.  Lessee agrees to furnish promptly to Lessor the annual financial statements of Lessee (and of any guarantors of Lessee's performance under this Lease and any Schedule hereto), prepared in accordance with generally accepted accounting principles and certified by independent certified public accountants, and such interim financial statements of Lessee as Lessor may require during the entire term of this Lease and any Schedule hereto.  Lessee, if requested, shall provide at Lessee's expense an opinion of its counsel acceptable to Lessor affirming the covenants, representations and warranties of Lessee under this Lease and any Schedule hereto.

11.  **Representations and Warranties.**  In order to induce Lessor in enter into this Lease and any Schedule hereto and to lease the Equipment to Lessee hereunder, Lessee represents and warrants that: (a) **Financial Statements.** (i) applications, financial statements, and reports which have been submitted by Lessee and any Obligors (as hereinafter defined) to Lessor are, and all information hereafter furnished by Lessee and Obligors to Lessor will be, true and correct in all material respects as of the date submitted; (ii) as of the date hereof, the date of any Schedule and any Acceptance Date, there has been no material adverse change in any matter stated in such applications, financial statements and reports; and, (iii) none of the foregoing omit or omitted to state any material fact. (b) **Organization.** Lessee is an organizational entity described on the signature page hereof and is duly organized, validly existing and is duly qualified to do business and is in good standing in each State in which the Equipment will be located. (c) **Authority.** Lessee has full power, authority and right to execute, deliver and perform this Lease and any Schedule hereto, and the execution, delivery and performance hereof has been authorized by all necessary action of Lessee. (d) **Enforceability.**  This Lease and any Schedule or other document executed in connection therewith has been duly executed and delivered by Lessee and any Obligor and constitutes a legal, valid and binding obligation of Lessee and any Obligor enforceable in accordance with

its terms. (e) **Consents.** The execution, delivery and performance of this Lease and any Schedule hereto does not require any approval or consent of any stockholders, partners or proprietors or of any trustee or holders of any indebtedness or obligations of Lessee, and will not contravene any law, regulation, judgment or decree applicable to Lessee, or the certificate of incorporation, partnership agreement, by-laws or other governing documents of Lessee, or contravene the provisions of, or constitute a default under, or result in the creation of any lien upon any property of Lessee under any mortgage, instrument or other agreement to which Lessee is a party or by which Lessee or its assets may be bound or affected.   Except as disclosed, no authorization, approval, license, filing or registration with any court or governmental agency or instrumentality is necessary in connection with the execution, delivery, performance, validity and enforceability of this Lease and any Schedule hereto. (f) **Title.** On each Commencement Date, Lessor shall have good and marketable title to the items of Equipment which is subject to this Lease and any Schedule hereto on such date, free and clear of all liens, except the lien of Seller which will be released upon receipt of payment. Lessee warrants that no party has a security interest in the Equipment which will not be released on or before payment by Lessor to Seller of the Equipment and that the Equipment is and shall at all times remain personal property regardless of how it may be affixed to any real property. (g) **Litigation.** There is no action, suit, investigation or proceeding by or before any court, arbitrator, agency or governmental authority pending or threatened against or affecting Lessee:  (i) which involves the Equipment or the transactions contemplated by this Lease and any Schedule hereto; or (ii) which, if adversely determined, could have a material adverse effect on the financial condition, business or operation of Lessee.

12. **Events of Default.** An event of default ("Event of Default") shall occur hereunder if Lessee or any Obligor ("Obligor" shall include any guarantor or surety of any obligations of Lessee to Lessor under this Lease and any Schedule hereto): (i) fails to pay any installment of rent or other payment required hereunder when due; or (ii) attempts to or does remove from the Premises (except a relocation with Lessor's consent as provided in Section 5), sell, transfer, encumber, part with possession of, or sublet any item of the Equipment; or (iii) shall suffer or have suffered, in the reasonable judgment of Lessor, a material adverse change in its financial condition since the date of the last financial statements submitted to Lessor, and as a result thereof Lessor deems itself to be insecure, or any of the statements or other documents or information submitted at any time heretofore or hereafter by Lessee or Obligor to Lessor has misstated or shall misstate or has failed or shall fail to state a material fact; or (iv) breaches or shall have breached any representation or warranty made or given by Lessee or Obligor in this Lease or in any other document furnished to Lessor in connection herewith, or any such representation or warranty shall be untrue or, by reason of failure to state a material fact or otherwise, shall be misleading; or (v) fails to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder, and such failure or breach shall continue unremedied for a period of ten days after the earlier of (a) the date on which Lessee obtains, or should have obtained knowledge of such failure or breach, or (b) the date on which notice thereof shall be given by Lessor to Lessee; or (vi) shall become insolvent or bankrupt or make an assignment for the benefit of creditors or consent to the appointment of a trustee or receiver, or a trustee or receiver shall be appointed for a substantial part of its property without its consent, or bankruptcy or reorganization or insolvency proceeding shall be instituted by or against Lessee or Obligor; or (vii) conveys, sells, transfers or assigns substantially all of Lessee's or Obligor's assets or ceases doing business as a going concern, or, if a corporation, ceases to be in good standing or files a statement of intent to dissolve, or abandons any or all of the Equipment; or (viii) shall be in breach of or default under any lease or other agreement at any time executed with Lessor or any other lessor or with any lender to Lessee or Obligor.

13. **Remedies.** Upon the occurrence of an Event of Default (the "Default Date") set forth in Section 12 and at any time thereafter, Lessor may, in its sole and absolute discretion, do any one or more of the following: (a) upon notice to Lessee cancel all or any portion of this Lease and some or all Schedules executed pursuant thereto; (b) enter Lessee's Premises and without removal of the Equipment, render the Equipment unusable or, require Lessee to assemble the Equipment and make it available to Lessor at a place designated by Lessor, and/or dispose of the Equipment by sale or otherwise (all of which determinations may be made by Lessor in its sole and absolute discretion) without any duty to account for such action or inaction or for any proceeds or

profits with respect thereto; (c) declare immediately due and payable all sums due and to become due hereunder for the full term of the Lease (including any renewal or purchase obligations which Lessee has contracted to pay); (d) with or without canceling this Lease, recover from Lessee damages, in an amount equal to the sum of: (i) all unpaid rent and other amounts that became due and payable on, or prior to, the Default Date, (ii) the present value of all future rentals and other amounts described in the Lease and not included in (i) above discounted to the Default Date at a rate equal to the discount rate of the Federal Reserve Bank of Chicago as of the Commencement Date of the Lease with respect to each Schedule (which discount rate, Lessee agrees is a commercially reasonable rate which takes into account the facts and circumstances at the time such Schedule commenced), (iii) all commercially reasonable costs and expenses incurred by Lessor in enforcing Lessor's rights under this Lease or defending against any claims or defenses asserted by or through Lessee, including but not limited to, costs of repossession, recovery, storage, repair, sale, re-lease and reasonable attorneys' fees, (iv) the estimated residual value of the Equipment as of the expiration of the Lease, (v) any indemnity amount payable to Lessor; and (vi) interest on all of the foregoing from the Default Date until the date payment is received by Lessor at 2 1/2% in excess of the Prime Rate (or its equivalent) per annum in effect on the date of such payment at the First National Bank of Chicago) or the highest rate permitted by law, whichever is less; (e) exercise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law. Lessor reserves the right, in its sole and absolute discretion, to release or sell any or all of the Equipment at a public auction or in a private sale, at such time, on such terms and with such notice as Lessor shall in its sole and absolute discretion deem reasonable. In such event, without any duty on Lessor's part to effect any such re-lease or sale of the Equipment, Lessor will credit the present value of any proceeds from such sale or re-lease actually received and retainable by it (net of any and all costs or expenses) discounted from the date of Lessor's receipt thereof to the Default Date at 2 1/2% in excess of the Prime Rate (or its equivalent) per annum in effect on the date of such payment at the First National Bank of Chicago, or the highest rate permitted by law, whichever is less to the amounts due to Lessor from Lessee under the provisions of (c), (d) and/or (e) above. A cancellation of this Lease shall occur only upon notice by Lessor and only as to such items of Equipment as Lessor specifically elects to cancel and this Lease shall continue in full force and effect as to the remaining items of Equipment, if any. If this Lease and/or any Schedule is deemed at any time to be one intended as security, Lessee agrees that the Equipment shall secure, in addition to the indebtedness set forth herein, any other indebtedness at any time owing by Lessee to Lessor. No remedy referred to in this Section is intended to be exclusive, but shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity. No express or implied waiver by Lessor of any default shall constitute a waiver of any other default by Lessee or a waiver of any of Lessor's rights.

14. Assignment by Lessor. **LESSOR MAY (WITH OR WITHOUT NOTICE TO LESSEE) SELL, TRANSFER, ASSIGN OR GRANT A SECURITY INTEREST IN ALL OR ANY PART OF ITS INTEREST IN THIS LEASE, ANY SCHEDULE, ANY ITEMS OF EQUIPMENT OR ANY AMOUNT PAYABLE HEREUNDER.** In such an event, Lessee shall, upon receipt of notice, acknowledge any such sale, transfer, assignment or grant of a security interest and shall pay its obligations hereunder or amounts equal thereto to the respective transferee, assignee or secured party in the manner specified in any instructions received from Lessor. Notwithstanding any such sale, transfer, assignment or grant of a security interest by Lessor and so long as no event of default shall have occurred hereunder, neither Lessor nor any transferee, assignee or secured party shall interfere with Lessee's right of use or quiet enjoyment of the Equipment. In the event of such sale, transfer, assignment or grant of a security interest in all or any part of this Lease and any Schedule hereto, or in the Equipment or in sums payable hereunder, as aforesaid, Lessee agrees to execute such documents as may be reasonably necessary to evidence, secure and complete such sale, transfer, assignment or grant of a security interest and to perfect the transferee's, assignee's or secured party's interest therein and Lessee further agrees that the rights of any transferee, assignee or secured party shall not be subject to any defense, set-off or counterclaim that Lessee may have against Lessor or any other party, including the Seller, which defenses, set-offs and counterclaims shall be asserted only against such party, and that any such transferee, assignee or secured party shall have all of Lessor's rights hereunder, but shall assume none of Lessor's

obligations hereunder. Lessee acknowledges that any assignment or transfer by Lessor shall not materially change Lessee's duties or obligations under this Lease nor materially increase the burdens and risks imposed on Lessee. Lessee agrees that Lessor may assign or transfer this Lease or Lessor's interest in the Equipment even if said assignment or transfer could be deemed to materially affect the interests of Lessee. Nothing in the preceding sentence shall affect or impair the provisions of Section 4, Section 10 or any other provision of this Lease.

15. **Amendments.** This Lease and any Schedule hereto contain the entire agreement between the parties with respect to the Equipment, this Lease and any Schedule hereto and there is no agreement or understanding, oral or written, which is not set forth herein. This Lease and any Schedule hereto may not be altered, modified, terminated or discharged except by a writing signed by the party against whom such alteration, modification, termination or discharge is sought. Lessee's Initials *RB*

16. **Law.** This Lease and any Schedule hereto shall be binding only when accepted by Lessor at its corporate headquarters in Illinois and shall in all respects be governed and construed, and the rights and the liabilities of the parties hereto determined, except for local filing requirements, in accordance with the laws of the State of Illinois. **LESSEE WAIVES TRIAL BY JURY AND SUBMITS TO THE JURISDICTION OF THE FEDERAL DISTRICT COURTS OF COMPETENT JURISDICTION OR ANY STATE COURT WITHIN THE STATE OF ILLINOIS AND WAIVES ANY RIGHT TO ASSERT THAT ANY ACTION INSTITUTED BY LESSOR IN ANY SUCH COURT IS IN THE IMPROPER VENUE OR SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM.**

17. **Invalidity.** In the event that any provision of this Lease and any Schedule hereto shall be unenforceable in whole or in part, such provision shall be limited to the extent necessary to render the same valid, or shall be excised from this Lease or any Schedule hereto, as circumstances may require, and this Lease and the applicable Schedule shall be construed as if said provision had been incorporated herein as so limited, or as if said provision had not been included herein, as the case may be without invalidating any of the remaining provisions hereof.

18. **Security Interest.** As security for the full and prompt payment and performance of all present and future liabilities and obligations of Lessee to Lessor under this Agreement and the Lease, Lessee grants to Lessor a security interest in all Lessee's rights and interest in the Equipment and all proceeds and products thereof.

19. **Miscellaneous.** All notices and demands relating hereto shall be in writing and mailed by certified mail, return receipt requested, to Lessor or Lessee at their respective addresses above or shown in the Schedule, or at any other address designated by notice served in accordance herewith. Notice shall become effective when deposited in the United States mail, with proper postage prepaid, addressed to the party intended to be served at the address designated herein. All obligations of Lessee shall survive the termination or expiration of this Lease and any Schedule hereto. Should Lessor permit use by Lessee of any Equipment beyond the Minimum Lease Term, or, if applicable, any exercised extension or renewal term, the lease obligations of Lessee shall continue and such permissive use shall not be construed as a renewal of the term thereof, or as a waiver of any right or continuation of any obligation of Lessor hereunder, and Lessor may take possession of any such Equipment at any time upon demand. If more than one Lessee is named in this Lease, the liability of each shall be joint and several. Lessee shall, upon request of Lessor from time to time, perform all acts and execute and deliver to Lessor all documents which Lessor deems reasonably necessary to implement this Lease and any Schedule hereto, including, without limitation, certificates addressed to such persons as Lessor may direct stating that this Lease and the Schedule hereto is in full force and effect, that there are no amendments or modifications thereto, that Lessor is not in default hereof or breach hereunder, setting forth the date to which rentals due hereunder have been paid, and stating such other matters as Lessor may request. This Lease and any Schedule hereto shall be binding upon the parties and their successors, legal representatives and assigns. Lessee's successors and assigns shall include, without limitation, a receiver, debtor-in-possession, or trustee of or for Lessee. If any person, firm, corporation or other entity shall guarantee this Lease and the performance by Lessee of its obligations hereunder, all of the terms and provisions hereof shall be duly applicable to such Obligor. Lessee shall, at its expense and upon Lessor's demand, promptly execute, acknowledge, deliver, file, register and record

any and all further documents and take any and all other action reasonably requested by Lessor from time to time, for the purpose of fully effectuating the intent and purposes of each Lease Schedule, and to protect the interests of Lessor, its successors and assigns. Lessor may file a copy of this Lease Agreement in lieu of a financing statement.

20. **Lessee's Waivers.** To the extent permitted by applicable law, Lessee hereby waives any and all rights and remedies conferred upon a Lessee by Article 2A of the Uniform Commercial Code as adopted in any jurisdiction, including but not limited to Lessee's rights to: (i) cancel this Lease; (ii) repudiate this Lease; (iii) reject the Equipment; (iv) revoke acceptance of the Equipment; (v) recover damages from Lessor for any breaches of warranty or for any other reason; (vi) claim a security interest in the Equipment in Lessee's possession or control for any reason (vii) deduct all or any part of any claimed damages resulting from Lessor's default, if any, under this Lease; (viii) accept partial delivery of the Equipment (ix) "cover" by making any purchase or lease of or contract to purchase or lease Equipment in substitution for those due from Lessor; (x) recover any general, special, incidental, or consequential damages for any reason whatsoever; and (xi) specific performance, replevin, detinue, sequestration, claim, and delivery of the like for any Equipment identified to this Lease. To the extent permitted by applicable law, Lessee also hereby waives any rights now or hereafter conferred by statute or otherwise which may require Lessor to sell, lease or otherwise use any Equipment in mitigation of Lessor's damages as set forth in Paragraph 13 or which may otherwise limit or modify any of Lessor's rights or remedies under Paragraph 13. Any action by Lessee against Lessor for any default by Lessor under this Lease, including breach of warranty or indemnity, shall be commenced within one (1) year after any such cause of action accrues.

21. **Counterparts.** This Lease may be executed in any number of counterparts, each of which shall be deemed an original. Each Schedule shall be executed in three (3) serially numbered counterparts each of which shall be deemed an original but only counterpart number 1 shall constitute "chattel paper" or "collateral" within the meaning of the Uniform Commercial Code in any jurisdiction.

22. **Addendum.** ("X" if applicable)  [___]  See Addendum (s) attached hereto and made a part hereof.

**FIRST COMMERCIAL CAPITAL CORP. EQUIPMENT SCHEDULE**

First Commercial Capital Corp.
601 S. LaSalle St., Ste. 600
Chicago, Illinois 60605
(312) 566-0608

Equipment Location:

1305 W. 18th St.
Sioux Falls, SD 57105

Master Lease Agreement No. _2658-01_
Schedule No. 001
Acceptance Date: _8/30/2004_

Equipment Description:

1        Biosafe Cholesterol Panel System

**TERM AND RENTAL:**

Minimum Lease Term: _60_ months

Rental Payments to be made: _X_ monthly; ___ quarterly; other: _____

Security Deposit: $ 0.00

Expected Acceptance Date: _8/30/2004_

*Rental Payments:
$1000.00 rental payment for the first 12 payments
Followed by:
$6250.00 per rental payment for the next 48 rental payments

Initial Payment of $0.00 the first monthly rental payment.  Lessee shall make an initial payment as indicated in this Schedule upon execution of this Schedule. Any initial payment paid by Lessee may be used by Lessor and is non-refundable.  At Lessor's option any initial payment made hereunder may be applied by Lessor to cure any default of Lessee, in which event Lessee shall promptly restore the initial payment to their full amounts as set forth in this Schedule.  If all the terms and conditions herein to be performed by Lessee are fully performed and all of Lessee's obligations hereunder are fully complied with, that portion of any security deposit not so applied shall be refunded to Lessee at the termination or expiration of this Lease.
* Plus, if applicable, freight, taxes, insurance and maintenance which shall be paid by Lessee in accordance with the terms of the Lease and this Schedule.

First Commercial Capital Corp. (Lessor) hereby agrees to lease to the Lessee named below, and Lessee hereby agrees to lease and rent from Lessor the Equipment listed above, for the term and at the rental payments specified herein, all subject to the terms and conditions set forth herein and on the reverse side hereof and in the referenced Master Lease Agreement except as the same may be varied by the terms of this Schedule.

Addendum ("X" if applicable) [  ]
Re:

ACCEPTED AT CHICAGO, ILLINOIS

Sioux Valley Hospital USD Medical Center
Lessee

By: _Rosemary Rock_

Title: _VP, ER / Trauma / Surgery_

Date: _August 30, 2004_

FIRST COMMERCIAL CAPITAL CORP.
Lessor

By: _Brian Laul_

Title: _President_

Date: _8/30/2004_

08/25/2004  11:56    847-234-8222    BIO SAFE    PAGE  02

**FIRST COMMERCIAL CAPITAL CORP. EQUIPMENT ACCEPTANCE**

First Commercial Capital Corp.
601 S. LaSalle St., Suite 600
Chicago, Illinois 60605
(312) 566-0608

Master Lease Agreement No.  2658-01
Schedule No. 001

Equipment Description:

1       Biosafe Cholesterol Panel System

Gentlemen:

The undersigned, being duly authorized, hereby (i) certifies that all of the above-referenced Equipment (the "Equipment") has been delivered and inspected, is of an acceptable size, design, capacity and manufacture, is in good working order, repair and condition, and has been installed to the satisfaction of Lessee; and (ii) unconditionally accepts the Equipment for all purposes of the Lease.

It is understood and agreed that First Commercial Capital Corp. in no way or manner assumes any responsibility, either now or hereafter, for the use, performance, functioning, maintenance or service of the Equipment, or for its suitability or adaptability for any particular purpose.

Lessee: Sioux Valley Hospital USD Medical Center

By: *Rosemary Boren*

Title: *VP, ER / Trauma / Surgery*

Acceptance Date* as of:

*AUGUST 30, 2004*

* as defined in Section 1 of the Lease

## NON RECOURSE INSTALLMENT NOTE

**$251,394.62**                                    Equipment Lease # 2658-01

RE: Sioux Valley Hospital USD Medical Center        Date: August 30, 2004
    1305 W. 18th St.
    Sioux Falls, SD 57105

FOR VALUE RECEIVED, the undersigned promises to pay to the order of ALLEN AND COMPANY ("the bank") the principal sum of $ 251,394.62 together with the interest at the rate of 7.5 per annum from the date hereof to the maturity date of each installment on the principal balance from time to time in 12 monthly installments of $1000.00 followed by 48 monthly installments of $6250.00 each payable on 9/30/04 and including 8/30/09 with all such installments to be applied first to interest and the balance to the principal. After the maturity of any installment, the principal thereof shall bear interest until paid at a rate which shall be 2% higher than would otherwise be payable on this Note. Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

This note is secured by an Assignment and Security Agreement dated August 30, 2004 between the undersigned and the Bank to which reference is made to for a description of the collateral for this Note.

If any one of the said installments shall not have been paid and 90 days shall have elapsed after it was due, or if an Event of Default shall have occurred and be continuing as defined in any said Security Agreement, such holder may declare this Note to be due and payable, whereupon all unpaid principal and accrued interest shall become immediately due and payable.

This Note may be prepaid in whole or in part without premium or penalty. Partial prepayments shall be applied to installments of principal in the inverse order of maturity, and all prepayments shall first be applied to interest on the principal being paid to the date of prepayment.

The undersigned for itself and on behalf of any endorser or guarantor waives presentment, protest, notice or dishonor, and notice of any kind in respect to the Note or said endorsement or guaranty.

By acceptance of this Note the Bank and any subsequent holder of this Note agrees, that, except as otherwise provided in the Security Agreement, the undersigned does not have, nor shall it have, any liability or obligation with respect to the payment of this Note, and that except as otherwise provided on the Security Agreement, this Note is payable solely from proceeds received by the Bank from the Bank's interest in said collateral.



EXHIBIT
B

This Note and all rights hereunder shall be governed by the laws of the State of Illinois.

First Commercial Capital Corp.

President

Buy Rate: ___7.5

Discount: 12 payments of $1000.00 followed by 48 payments of $6250.00

@ 7.5 = ____ $ 251,394.62

## ASSIGNMENT AND SECURITY AGREEMENT

Without recourse (or evaluation of financial ability of Lessee to pay Lease described below) the undersigned as Lessor under the said lease does hereby assign, transfer, and set-over to  ALLEN AND COMPANY (the bank") of all or its right, title and interest in and to all rents and other payments, including without limitation, the proceeds of insurance and condemnation awards, due and to become due to the undersigned as said Lessor pursuant to or by reason of that certain said lease described as follows (the "Lease"), the original of which is attached hereto:

LESSOR:    First Commercial Capital Corp.

LESSEE:    Sioux Valley Hospital USD Medical Center
            1305 W. 18th St.
            Sioux Falls, SD 57105

Original Term in Months: 60

Equipment Lease #2658-01

Type of Equipment Being Leased:  Biosafe Cholesterol Panel System

Monthly Rental Payment:  12 Payments of $1000.00 followed by 48 Payments of $6250.00

Total Rent Owing on Date of this Agreement:   $ 312,000.00

Notwithstanding anything herein contained to the contrary, the Bank shall not hereby assume nor be obligated to perform any acts, duties, or responsibilities under or in connection with the Lease, and the undersigned promises to perform all of its obligations as Lessor thereunder.

The undersigned hereby grants to the Bank as its attorney-in-fact the power and authority to do any and all acts under the Lease which the undersigned could do save for this assignment, either in the name of the Bank or in the name of the undersigned, including without limitation the power to repossess  the leased equipment when entitled under the Lease, and to sell, lease, or otherwise dispose of the same in accordance with the terms of the Lease. In furtherance thereof and without limiting the foregoing, the Undersigned expressively grants to the Bank the power and authority to receipt for sums due and to become due the Lessor; to compromise, settle and or adjust all claims in respect to the Lease or any insurance on the property under the Lease; or institute suit or any proceeding either in its name or in the name of the undersigned in order to enforce any rights obtained by virtue of this Agreement; to grant extensions of time of payment to said Lessee or to any other person obligated on the Lease on or any accompanying guaranty; or to agree to the substitution of a Lessee without notice to the undersigned.

As collateral security for all payments hereby assigned as well as the performance of all provisions under the Lease, and subject always to the rights of the Lessee under the Lease, the undersigned does hereby hypothecate, pledge, and grant a security interest in all of the undersigned's right, title, and interest in and to the said leased equipment to the Bank. In the event there is a default under the terms of the Lease, the Bank shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of Illinois.

The undersigned warrants, as of this date and to the best of it's knowledge, that: it is the owner of the lease equipment free from all liens and encumbrances except the Lease; the Lease and any accompanying guarantees, waivers and/or other instruments are genuine and enforceable; the Lease is the only lease of the leased equipment and is and will continue to be free from all defenses, set-off and counterclaims; all signatures, names, addresses, amounts, and other statements and facts contained in the Lease are true and correct; the aggregate unpaid rentals shown above is correct; the leased equipment has been delivered to the Lessee in satisfactory condition and has been accepted by the Lessee; the lease transaction conforms to all applicable laws and regulations; and if any filing or recording is permitted or required to perfect or give notice of the respective interest of the undersigned and the Lessee in the leased equipment, then such filing or recording has been accomplished. If the undersigned breaches any of the foregoing warranties, it will be upon the Bank's request, promptly repurchase the remaining interest hereby assigned to the Bank for an amount equal to the unpaid rentals, and other payments due, and all expenses paid or incurred by the Bank less any unearned charges. Knowledge by the Bank of a breach of any of said warranties shall not constitute a waiver thereof by the Bank.

The undersigned hereby subordinates all rights to monies payable by said Lessee to the undersigned to all payments due or to become due under or arising out of the Lease from the Lessee to the Bank.

Without the Bank's prior written consent, the undersigned will not accept rent or other collections, repossess or consent to the return of the leased equipment, nor amend or modify the Lease. Any payments inadvertently so received shall be held in trust and promptly remitted to the Bank.

Dated this 30th day of August 2004.


LESSOR:     First Commercial Capital Corp.

BY:         _____

ITS:        President _____

| STATE OF SOUTH DAKOTA | ) | IN CIRCUIT COURT |
| | : SS | |
| COUNTY OF MINNEHAHA | ) | SECOND JUDICIAL CIRCUIT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SANFORD USD MEDICAL CENTER<br>formerly known as SIOUX VALLEY<br>HOSPITAL and USD MEDICAL CENTER, | \* | CIV. |
| Plaintiff, | \* | |
| vs. | \* | **SUMMONS** |
| BIOSAFE MEDICAL TECHNOLOGIES, INC.,<br>DELPHI ENERGY FUND, INC., and<br>FIRST COMMERCIAL CAPITAL CORP., | \* | |
| Defendants. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THE STATE OF SOUTH DAKOTA TO THE ABOVE-NAMED DEFENDANTS,
GREETINGS:

You, and each of you, are hereby summoned and required to answer the Complaint of the

Plaintiff in the above entitled action, a copy of which said Complaint is hereunto annexed and

herewith served upon you, and to serve a copy of your Answer to said Complaint upon the

subscribers, Davenport, Evans, Hurwitz & Smith, L.L.P., at their office at P.O. Box 1030, 206

West 14th Street, in the City of Sioux Falls, Minnehaha County, South Dakota, within thirty (30)

days after the service of this Summons upon you, exclusive of the day of such service, and each

of you, will hereby take notice that in case of your failure to answer said Complaint, judgment by

default may be rendered against you as requested in the said Complaint.



Dated at Sioux Falls, South Dakota, this 22nd day of February, 2008.

DAVENPORT, EVANS, HURWITZ &
SMITH, L.L.P.

ROBERTO A. LANGE
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiffs*

STATE OF SOUTH DAKOTA    )          IN CIRCUIT COURT
                        : SS
COUNTY OF MINNEHAHA    )        SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| SANFORD USD MEDICAL CENTER formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, | \* \* \* \* \* \* | CIV. |
| Plaintiff, | \* \* |  |
| vs. | \* \* | COMPLAINT |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., DELPHI ENERGY FUND, INC., and FIRST COMMERCIAL CAPITAL CORP., | \* \* \* \* | |
| Defendants. | \* \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center formerly known as Sioux Valley Hospital and USD Medical Center, for its Complaint, states and alleges as follows:

### PARTIES

1.

Sanford USD Medical Center was formerly known as Sioux Valley Hospital and USD Medical Center, and is referred to in this Complaint as "Sanford."

2.

Sanford is a not-for-profit charitable organization that is headquartered and provides services from Sioux Falls, Minnehaha County, South Dakota.

3.

Defendant BioSafe Medical Technologies, Inc. ("BioSafe") is an Illinois corporation with its corporate offices at 100 Field Drive, Suite 240, Lake Forest, Illinois.

4.

Defendant Delphi Energy Fund, Inc. ("Delphi Energy") is a corporation with its corporate office at 29 South LaSalle Street, Suite 828, Chicago, Illinois, 60603.

5.

Defendant First Commercial Capital Corp. ("First Commercial") has its corporate office at 601 South LaSalle, Suite, Suite 600, Chicago, Illinois, 60605.

6.

Defendants Delphi Energy and First Commercial are named in this lawsuit for purposes of Count Two of the Complaint seeking a declaratory judgment that Sanford no longer has responsibility to pay either of them certain "license fees" or lease payments, which arose under Section 9 of the Agreement between Sanford and BioSafe, which fees BioSafe factored to First Commercial, who in turn assigned its right to Delphi Energy.

## ALLEGATIONS COMMON TO COUNTS

7.

Sanford and Defendant BioSafe entered into an Agreement dated August 30, 2004.  A true and correct copy of this Agreement is attached as Exhibit A hereto and is incorporated by reference herein.

8.

BioSafe initiated contact with Sanford after Sanford acquired certain cholesterol testing equipment as a part of the acquisition of Central Plains Clinic, Ltd.

2

9.

BioSafe sought out the relationship with Sanford in Sioux Falls, sent letters to and communicated by phone with Sanford in Sioux Falls, and sought an Agreement to refer to Sanford in Sioux Falls certain blood or other samples for cholesterol testing in Sioux Falls.

10.

BioSafe wrote the Agreement that is attached as Exhibit A.

11.

Sanford acquired no equipment from BioSafe, but rather used equipment already owned by Sanford to conduct the cholesterol tests on samples referred by BioSafe.

12.

Sanford used methodologies and procedures from BioSafe to perform the cholesterol testing for BioSafe, but continued to use a separate methodology and procedure on Sanford's own cholesterol testing. As a means of compensating BioSafe for the cholesterol testing sent to Sanford and for the methodologies and procedures, Sanford agreed to pay a monthly fee under section 9 of the Agreement that BioSafe characterized as a "license fee."

13.

Under section 9 of the Agreement, Sanford agreed to a monthly license fee of $1,250.00 per month for the first year of the Agreement, and for a monthly license fee of $6,250.00 per month for the remaining term, with BioSafe representing that there could be as many as 60,000 cholesterol tests referred by BioSafe to Sanford per year.

14.

Sanford and BioSafe executed Addendum I and Addendum II to the Agreement, which are included in Exhibit A hereto.

3

15.

Under Addendum I, BioSafe agreed to guarantee revenue to Sanford from the cholesterol determinations of $22,500.00 in the first year of the Agreement and of $27,000.00 for each calendar quarter from and after September 1, 2005.

16.

Although the term of the Agreement began on August 30, 2004, Sanford and BioSafe executed the Agreement, Addendum I and Addendum II as of June 1, 2004.

17.

On June 15, 2004, BioSafe notified Sanford that, as a part of a strategic alliance between BioSafe and First Commercial, BioSafe was assigning to First Commercial the right to monthly fees called for under Section 9 of the Agreement. First Commercial knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota.

18.

On September 20, 2004, Delphi Energy notified Sanford Hospital that it was the new assignee of the payments originally called for under section 9 of the Agreement between BioSafe and Sanford. Delphi Energy knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota.

19.

Sanford has paid license fees from the inception of the Agreement until a check issued on January 25, 2008, paying license fees through January 31, 2008. Sanford paid the license fee

4

initially in the sum of $1,250.00 per month, and subsequent to September 1, 2005, in the amount of $6,250.00 per month.

20.

Under Addendum I to the Agreement, BioSafe was to make an initial annual payment of up to $22,500.00 to Sanford if the volume of cholesterol determinations during the first year of the Agreement did not result in that level of revenue to Sanford.

21.

During the first year of the Agreement, BioSafe referred no cholesterol determinations to Sanford.

22.

On October 27, 2005, Sanford, through the letter attached as Exhibit B hereto, requested BioSafe to pay the $22,500.00 that BioSafe owed for the first year of the contract.

23.

BioSafe has failed to pay the amount owed for the first year of the contract.

24.

After the first year of the contract, BioSafe was responsible to ensure a revenue stream of at least $27,000.00 per quarter to Sanford under Addendum I to the Agreement.

25.

On February 6, 2006, Sanford notified BioSafe that it had received no referrals for determination from BioSafe during the one quarter period of September 1, 2005, through November 30, 2005. A true and correct copy of the letter from Sanford to BioSafe dated February 6, 2006, is attached as Exhibit C hereto.

26.

In the quarter beginning March of 2006, some samples for cholesterol testing were referred from BioSafe to Sanford. The volume of testing referred to Sanford, however, was far below the volumes anticipated and revenue guaranteed by BioSafe at the time of the contract under Addendum I to the Agreement.

27.

On October 19, 2007, Sanford notified BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreements. A true and correct copy of the letter dated October 18, 2007 and enclosed accounting is Exhibit D hereto. As of September 1, 2007, BioSafe owed to Sanford a total of $214,938.99 for shortfalls on the guaranteed contract revenue.

28.

BioSafe's responses to the Sanford letters were to pledge repeatedly to make up for the shortfalls, to promise to refer additional cholesterol testing to Sanford in the future, and to blame the absence of payment on BioSafe's own cash flow difficulties.

29.

Sanford has continued until January 25, 2008, to pay the "license fees" under section nine of the Agreement with BioSafe, notwithstanding BioSafe's failure to ever pay the contractual guaranteed sum under Addendum I.

30.

As of January 31, 2008, BioSafe owes a total of $259,938.99 (plus interest) to Sanford, as set forth in the spreadsheet attached as Exhibit E hereto and incorporated by reference herein.

6

## COUNT ONE – BREACH OF CONTRACT

### 31.

Sanford incorporates by reference the allegations of paragraphs 1 through 30, as if fully set forth herein.

### 32.

Sanford and Defendant BioSafe entered into a contract, a true and correct copy of which is attached as Exhibit A hereto. Under Addendum I to the contract, included in Exhibit A hereto, BioSafe agreed to certain volume levels and guaranteed certain revenue levels to Sanford.

### 33.

BioSafe has breached the Agreement by failing to pay monies that is owes under the Agreement to Sanford.

### 34.

Sanford has suffered loss and injury as a result of BioSafe's breach of contract, including the past due and owing amount of $259,938.99 as of January 31, 2008, plus interest, costs and attorneys fees recoverable under Section 10.11 against BioSafe.

## COUNT TWO – DECLARATORY JUDGMENT

### 35.

Sanford incorporates by reference the allegations of paragraphs 1 through 35 of this Complaint, as if fully set forth herein.

### 36.

BioSafe assigned to First Commercial its right to "license fees" under section 9 of the Agreement. First Commercial later assigned its rights to collect those "license fees" to Delphi Energy.

7

37.

Sanford has paid the license fees under Section 9 of the Agreement to First Commercial and then to Delphi Energy through January 31, 2008.

38.

The obligation to pay the license fees arises under section nine of the Agreement.

39.

The license fees, although sometimes referred to as equipment leases by the Defendants, are not for the lease of any equipment whatsoever, because Sanford uses equipment that it owns to perform the cholesterol testing for BioSafe. The license fees, rather, are to compensate BioSafe and for processes and methods prescribed by BioSafe on the cholesterol testing that Sanford does for BioSafe.

40.

Sanford is ceasing its payments of the so-called license fees effective February 1, 2008.

41.

A controversy now exists, or may exist, over whether Sanford can cease payment to Delphi Energy, the assignee of First Commercial which in turn was the assignee of BioSafe, on any further license fees or equipment lease payments, because of BioSafe's non-performance and prior material breaches of the Agreement.

42.

Any controversy, if any, concerning Sanford's decision and right to cease any further payments of license fees is a controversy ripe for a declaratory judgment under SDCL 21-24.

WHEREFORE, Plaintiff Sanford USD Medical Center, f/k/a Sioux Valley Hospital and USD Medical Center, hereby prays for relief as follows:

A.  That Sanford have and recovery a judgment against Defendant BioSafe Medical Technologies, Inc., in the principal amount of $259,988.99 owed as of January 31, 2008, plus pre-judgment interest thereon;

B.  That Sanford have and recover its costs, interest, expenses, disbursements and attorneys fees under Section 10.11 of the Agreement against BioSafe;

C.  That Sanford receive a declaratory judgment that it bears no responsibility to pay any further license fees or claimed equipment lease fees to any of the Defendants; and

D.  That Sanford have and recover such other and further relief as deemed just and equitable by the Court.

Dated at Sioux Falls, South Dakota, this 22nd day of February, 2008.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

ROBERTO A. LANGE
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiffs*

9

oversite delivery 8/29/06
with

# AGREEMENT

This Agreement is made and entered into as of the 30th day of January, 2004 ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, IL 60045, and its Affiliates, (collectively, "BioSafe") and Company, whose name and address is set forth on the signature page hereof, and its Affiliates (collectively, "Company").

WHEREAS, BioSafe is in the business of developing and selling diagnostic screens and tests using micro-samples of human blood, including its Cholesterol Panel;

WHEREAS, on the terms and conditions hereinafter set forth, Company desires (i) to market and sell in the Territory a cholesterol screening kit containing the same components as the BioSafe Cholesterol Panel and (ii) to perform in its laboratory the analysis of such test using BioSafe's proprietary methods, techniques and processes under a non-transferable and non-assignable revocable license; and,

WHEREAS, on the terms and conditions hereinafter set forth, BioSafe is willing to grant Company a non-transferable and non-assignable revocable right to use BioSafe's proprietary methods, techniques and processes to perform the laboratory analysis of such test.

NOW, THEREFORE, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived herefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1.    Definitions.  The following terms when used in this Agreement, including the preamble and recitals, shall have the following meanings:

1.1  "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

1.2  "Agreement" means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

1.3  "BioSafe" is defined in the preamble to this Agreement.

1.4  "BioSafe Indemnified Parties" is defined in Section 8.

1.5  "BioSafe Marks" means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the term of this Agreement, by or on behalf of BioSafe.

1.6  "BioSafe Patent Rights" means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

1.7  "BioSafe Technology" means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

1.8  "BioSafe Technology Rights" means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including (i) medical, chemical and other scientific data and (ii) processes and methodology used in the development, testing and analysis of the Cholesterol Panel.

1.9  "Cholesterol Panel" means BioSafe's kit containing all of the components required for an individual to participate in the capillary collection of blood using BioSafe's collection kit which, through laboratory analysis using BioSafe's proprietary methods, techniques and processes, measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.10 "Collection Card" means the BioSafe proprietary self-collection card on which specimens of blood are deposited and from which the laboratory analysis is performed to measure the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.11 "Company" is defined in the preamble to this Agreement.

1.12 "Company Test" means a self-collection blood screen kit, the components of which are the same as those contained in the Cholesterol Panel (although such components, except for the Collection Card, may be purchased from sources other than those used by BioSafe), which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.



EXHIBIT

A

1.13 "Determination" means the result obtained from the analysis of human blood and its components.

1.14 "Effective Date" is defined in the preamble to this Agreement.

1.15 "Field" means the collection, transportation, testing and analysis of human blood and its components, and the reporting of the results thereof.

1.16 "Governmental Body" means any court, government (federal, state, local or foreign), department, commission, board, agency, official or other regulatory, administrative or governmental authority.

1.17 "HDL" means high density lipoprotein.

1.18 "LDL" means low density lipoprotein.

1.19 "Party" means BioSafe or Company; "Parties" means BioSafe and Company.

1.20 "Person" means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

1.21 "Territory" means the United States.

2.   License.

2.1   Grant. BioSafe hereby grants to Company, and Company hereby unconditionally and irrevocably accepts, a non-exclusive, non-transferable and non-assignable revocable license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology solely in the Field exclusively in the Territory for the purpose of processing, and making Determinations from, the Company Test. The grant of the license is subject to Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do analysis of total cholesterol, HDL, LDL and triglycerides screens using BioSafe's proprietary methods, techniques and processes, and to the continued fulfillment of all of the other terms and conditions of this Agreement. In addition, the license has been granted solely, and is valid only, for the number of Determinations set forth in Section 9. Determinations in excess of such annual number shall be in violation of the license and shall be subject to additional charges in accordance with BioSafe's policies and procedures. In consideration of the license granted herein to Company, beginning with the Effective Date, Company shall pay to BioSafe the monthly license fee set forth in Section 9. Such license fee shall be due and payable by the Company on the first day of each month. If the Effective Date does not fall on the first day of the month, the first payment shall be a pro-rata portion of the monthly license fee, calculated on a 30-day basis, due and payable on the Effective Date. In connection with the license, BioSafe: (i) will provide training to Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes; (ii) will provide Company with a list of all components used in the Cholesterol Panel to enable Company to assemble a self-collection blood screen kit substantially identical to the Cholesterol Panel; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Cholesterol Panel, and (iv) will make Collection Cards available for purchase at an initial cost of $1.25 each, subject to change upon 90 days prior written notice.

2.2   Non-exclusive. Company understands and acknowledges that, since the license herein granted is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses or the right to distribute or manufacture the Cholesterol Panel or any similar type product during the term of this Agreement; in each case without breaching this Agreement; provided, however, that notwithstanding the foregoing to the contrary; during the term of this Agreement, Company shall be the exclusive licensee within the State of South Dakota of BioSafe Technology for the Company Test.

2.3   Sale Outside the Territory. Company shall not market, sell or offer for sale the Company Test outside of the Territory. Accordingly, Company shall limit its sales activities with respect to the Company Test to customers located in the Territory. Company shall refer to BioSafe all orders and inquiries relating to a cholesterol screen originating from within or outside the Territory to the extent such orders or inquiries relate to such screens destined for use outside the Territory.

2.4   Competing Activities. During the term of this Agreement and for a period of one year following its termination, Company will not, without BioSafe's prior written consent: (i) make, use, license, sublicense, assign, sell, offer to sell or otherwise transfer the Company Test for or to, or enter any agreement or authorize any third party to do any of the foregoing with, (a) any Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides, (b) any Affiliates or agents of a Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides or (c) any Person that Company, its Affiliates or agents knows or believes will manufacture, distribute, sell or otherwise transfer, or has manufactured, distributed, sold or otherwise transferred, the Company Test or the Cholesterol Panel to, on behalf of, or under any agreement with, a party identified in the immediately preceding clauses (a) and (b); or (ii) sell or distribute the

2

Company Test or the Cholesterol Panel as a consumer product through mass merchandisers, drug stores or other retail stores.

2.5 <u>Non-assignable</u>. Neither the license granted to Company, nor any of the rights, technology and trademarks included in the license, are assignable or transferable in any manner or way whatsoever by Company, including the right of Company to grant any sub-licenses.

2.6 <u>Reverse Engineering</u>. Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

2.7 <u>Advertising and Publications</u>. Company will not use on a web site or in any other manner or way any material of any kind or nature in any form or medium that refers, in any manner or way, to the BioSafe Technology, the BioSafe Patent Rights, the BioSafe Technology Rights, the Cholesterol Panel, BioSafe or any other BioSafe intellectual property without BioSafe having first reviewed the proposed use and approved it in writing. Company will not publish outcome or evidence-based data obtained using the Company Test without BioSafe's prior written approval.

2.8 <u>No Challenge</u>. At no time, either during or following the expiration of the term of this Agreement, will Company challenge or assist any other Person in challenging the BioSafe Marks, the BioSafe Patents Rights or the registration thereof.

2.9 <u>No Registration of Similar Marks</u>. At no time, either during or following the expiration of the term of this Agreement, will Company attempt to register any trademarks, service marks, marks, names or trade names confusingly similar to or closely resembling any of the BioSafe Marks.

2.10 <u>No Similar Methods</u>. At no time, either during or following the expiration of the term of this Agreement, will Company use or attempt to use any method, technique or process similar to the BioSafe Technology to analyze or make Determinations which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

2.11 <u>Proprietary Rights</u>. Title and full ownership of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to Company any right of ownership or any other right of any kind or nature whatsoever in or to such rights, technology, marks and other BioSafe intellectual property, other than the right to use such rights, technology and marks in accordance with the terms and provisions of this Agreement.

2.12 <u>Cessation of Use</u>. At the expiration of the term, or the termination of Company's right to use the license granted herein, any and all rights and licenses that Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's intellectual property shall immediately terminate and Company shall immediately cease using them in any manner or way whatsoever. Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of its other intellectual property. Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other intellectual property subsequent to the expiration or termination of this Agreement and the termination of the license granted hereby.

2.13 <u>Independent Contractor Status</u>. The relationship of BioSafe and Company established by this Agreement is that of independent contractors, and no other relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner which expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between Company and its customers are Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3. <u>Company's Obligations</u>. During the Term of this Agreement, Company will: (i) pay to BioSafe, its agent or assignee a monthly license fee in accordance with the terms of this Agreement; (ii) assemble the Company Test only with the components set forth on the list of components provided by BioSafe (including the Collection Card), or those deemed by BioSafe to be substantially identical, purchase from BioSafe all Collection Cards included in the Company Test, and procure from BioSafe or independently from BioSafe all other components in the Company Test; (iii) sell the Company Test in accordance with all applicable laws, rules and regulations, including the Health Insurance Portability

3

and Accountability Act of 1996, and the privacy regulations created as a result of such act, and all of the terms and provisions of this Agreement; (iv) conduct its business of selling the Company Test solely in its name, at its sole cost and expense; (v) avoid deceptive, misleading or unethical practices or making any false or misleading representations with respect to the Company Test; (vi) maintain competent, well-trained personnel of its own selection who shall engage in the sale and the laboratory analysis of the Company Test; (vii) obtain all licenses, permits, registrations and approvals, governmental or otherwise, and pay all duties, taxes, excises and payments, that are required for Company to sell the Company Test and to perform the laboratory analysis; (viii) be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Company Test in the Territory; (ix) be solely responsible for all costs and expenses of any kind or nature related in any manner or way to the assembling, sale and analysis of the Company Test, including any required translations; (x) maintain its certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the term of this Agreement; (xi) ensure appropriate hazardous and non-hazardous waste disposal in accordance with all applicable rules and regulations; (xii) ensure it has adequate and legally compliant laboratory information systems and laboratory report-generating systems, including security of the data base related to patient confidentiality, accuracy of laboratory reports and transmission of related data, appearance of laboratory reports and secured back-up storage of relevant records; (xiii) maintain at its cost and expense the laboratory facility and equipment, including a Roche P-Modular analyzer and/or any other equipment specified by BioSafe, to test, analyze and make Determinations from the Company Test using BioSafe proprietary methods, techniques and processes; (xiv) be responsible for all of its own expenses, including providing such office space, facilities and personnel as are required to perform its obligations under this Agreement and all costs and expenses related to the advertising, marketing, promotion and sale of the Company Test, and the analysis thereof, in the Territory; (xv) not incur any expense chargeable to BioSafe except as may specifically be authorized in advance in writing by BioSafe; (xvi) maintain in effect during the term of this Agreement and for a period of five years thereafter appropriate liability insurance policies, copies of which shall be delivered to BioSafe, covering the sale and laboratory analysis of the Company Test with a recognized insurance carrier on such terms as are acceptable to BioSafe, which must include BioSafe as an additional named insured for the same limits of liability as are provided for Company, but in no event less than two million dollars, a waiver of subrogation rights against BioSafe and the requirement that BioSafe receive not less than sixty days prior written notice of any modification or termination of coverage; (xvii) observe and adhere to the provisions of any confidentiality agreement between BioSafe and Company; (xviii) indemnify BioSafe in accordance with the provisions of this Agreement; and (xix) prominently display on the front of the packaging of the Company Test, in a place approved by BioSafe, the BioSafe logo, "Science by BioSafe", the form of which will be furnished by BioSafe to Company.

4.    Term. Subject to earlier termination of Company's right to use the license, upon the occurrence of any event specified below, the term of this Agreement shall be for a 60-month period commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such 60-month period.

4.1    BioSafe's Right to Terminate. Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate Company's license and the use of all rights, technology and processes related thereto prior to the expiration of the term immediately upon the occurrence of any of the following events: (i) any law, rule or regulation is adopted or is in effect in the Territory, or elsewhere, that would restrict any of BioSafe's rights hereunder, otherwise invalidates any provision hereof or materially affects BioSafe's or Company's ability to perform its obligations under this Agreement; (ii) if Company makes any false or untrue statement or representation herein or in the performance of its obligations hereunder; (iii) if Company, in BioSafe's sole opinion, engages in any fraudulent or dishonest activity; (iv) if Company breaches any of the provisions of Sections 2.3 through 2.10, Section 6 or Company attempts to assign this Agreement, or any of its rights and obligations herein.; (v) if Company fails to become accredited or fails any BioSafe laboratory proficiency testing or fails to correct deficiencies within the specified period to maintain its certification to use BioSafe's proprietary methods, techniques and processes; (vi) as set forth in Section 5; (vii) Company exceeds the annual number of Determinations for which the license has been granted; (viii) Company fails to make timely payment of any monthly license fee due hereunder; (ix) Company breaches or is in default of a material obligation under this Agreement (other than the payment of the monthly license fee) and the default or breach is not cured to BioSafe's satisfaction within ten days after Company's receipt of written notice stating the nature of the default; (x) Company becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up, liquidated its business, stopped doing business as a going concern, merges or consolidates its business or transfers all or substantially all of its assets, voluntarily or otherwise; or (xi) an order

4

or notice shall be published by any government or Governmental Body requiring the cessation of activities by Company or BioSafe.

4.2  Rights Upon Termination or Expiration.  Upon expiration of the term of this Agreement, or termination of Company's right to use the license prior thereto, in accordance with the provisions of this Agreement, all rights, privileges and licenses granted in this Agreement to Company shall immediately cease and terminate.  Accordingly: (i) Company shall immediately cease using any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of BioSafe's intellectual property, and shall certify in writing to BioSafe that it has completely terminated its use thereof; (ii) Company shall immediately cease all sales and other activities with respect to the Company Test, and Company shall take all action required to terminate Company's registration, if any was required, as a seller of the Company Test and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required; (iii) Company shall immediately cease using and return to BioSafe all of BioSafe's confidential information; (iv) all indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived; and (v) BioSafe shall not have any obligation to repurchase or to credit Company for its inventory of Collection Cards or Company Tests at the time of termination of Company's right to use the license, or expiration of the term, of this Agreement.

4.3  Survival of Prior Obligations.  Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the term or otherwise: (i) shall not relieve Company of any obligation incurred prior to such termination; and (ii) the obligation of Company under the provisions of any confidentiality agreement between BioSafe and Company with respect to the protection and non-disclosure of Confidential Information, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

5.  Patents.  Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third party of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks.  BioSafe shall have the right, but not the obligation, (and Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of Company, if necessary, anywhere in the world against a third party at its own expense.  Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BioSafe's expense.  If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without Company's prior consent.  BioSafe shall not be liable to Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for alleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other intellectual property of BioSafe infringes any patent, copyright or trademark or other intellectual property right of such third party.  BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding.  BioSafe will pay any final judgment entered against Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, BioSafe shall be relieved of any obligation to defend or pay for such defense unless Company notifies BioSafe in writing of such claim, suit, action or proceeding within five business days after becoming aware of it and Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding.  If it is finally determined by a court of competent jurisdiction, or if BioSafe in its sole discretion determines, that any of BioSafe's intellectual property infringes any copyright, trademark or any other intellectual right of a third party, then BioSafe may, in its sole discretion and expense, take any action. Notwithstanding any other provision herein contained to the contrary, BioSafe shall not have any liability for any infringement which results from any act of Company, including Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other intellectual property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, method or process or Company's modifications of BioSafe's rights, technology or property.

5

6.  Company's Representations and Warranties.  Company represents and warrants that each of the following shall survive the execution and delivery of this Agreement, are true and correct now and will be throughout the entire term of Agreement: (i) Company is an entity duly organized, existing and in good standing under the laws of the state of its incorporation or organization set forth on the signature page hereof, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities and to incur the obligations herein contained; (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, does not require the approval or consent of any third Person, does not and will not conflict with, violate or breach Company's articles of incorporation or organization, any agreement to which it is a party or any law, rule or regulation or court decree or order; (iii) this Agreement is the legal, valid and binding obligation of Company, enforceable in accordance with its terms at all times; (iv) Company will comply with all applicable laws, consent decrees and regulations of any federal, state or Governmental Body wherever located; (v) Company owns, holds or possesses all Governmental Body and private licenses, franchises, permits, privileges, approvals and other authorizations which are necessary for it to carry on and conduct its business, to sell the Company Test and to make Determinations; (vi) there is no action, suit or proceeding pending or, to the best knowledge of Company, threatened, which questions the legality or propriety of the transaction contemplated by this Agreement or which, if decided adversely against Company, would prevent Company from fulfilling all of its obligations under this Agreement; and (vii) Company has no expectation and has received no assurance or guarantee of any kind or nature it will obtain any anticipated amount of profits or revenue as a result of Company selling the Company Test or making Determinations.

7.   Disclaimer of Warrant and Limitation of Liability.

7.1   Disclaimer of Warranty.  Section 7.1 has been deleted in its entirety.  There is no Section 7.1 of the Agreement.

7.2   Limitation of Liability.  In no event shall BioSafe be liable under any legal or equitable theory, and Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential or punitive damages of any kind or nature whatsoever, however caused, suffered by Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.

8.   Indemnification.  Company shall indemnify and hold BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a BioSafe Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any BioSafe Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by Company of, or any failure by Company to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by Company.

BioSafe shall indemnify and hold Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a Company Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any Company Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by BioSafe.

9.   Determinations and Monthly License Fee.  In consideration of the license granted herein to Company, beginning with the Effective Date and until ~~December~~ 31, 200~~4~~, Company will pay to BioSafe a monthly license fee of one thousand two hundred and fifty dollars ($1,250) per month and commencing ~~January~~ 1, 2005 and for the remainder of the Term, Company will pay a monthly license fee of six thousand two hundred and fifty dollars ($6,250) for the right to process up to sixty thousand (60,000) Determinations per year.  Each such payment shall be due and payable by the Company on the first day of each month.  If the Effective Date does not fall on the first day of the month, the first and last payment shall be a pro-rata portion of the amount payable.

During normal business hours and upon reasonable notice, BioSafe shall have the right to inspect and audit Company's books and records to confirm the number of annual Determinations performed by Company.  All costs and expenses of such inspection and audit shall be paid by BioSafe unless it is determined that the number of annual Determinations performed by Company exceeded the annual number of Determinations indicated above, in which case Company shall be responsible for such costs and expenses.

6

10.  Miscellaneous Provisions.

10.1 Amendments And Waiver.  The Parties, by mutual agreement in writing, may amend, modify or supplement this Agreement.  Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof.  The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.  No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof.  Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

10.2 Assignment.  This Agreement is personal to Company; therefore, Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe.  No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of Company.  BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company or notice.

10.3 Benefit of Agreement.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties.  Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims Company may have against BioSafe.  Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto and their successors and permitted assigns and the BioSafe Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

10.4 Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the original or the same counterpart.  In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterpart.

10.5 Governing Law.  The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States.  EACH OF THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION.

10.6 Headings.  The Section headings contained in this Agreement are for convenience only and shall not serve to modify, interpret or affect the meaning of the Sections at the beginning of which they appear.

10.7  Section 10.7 has been deleted in its entirety.  There is no section 10.7 of the Agreement.

10.8 No Drafting Presumption.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

10.9 Severability.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement.  The Parties shall endeavor in good faith negotiations to replace the invalid, inoperative, illegal or unenforceable provision with a valid and enforceable one, the economic effect of which comes as close as possible to that of the invalid provision.

10.10  Notices.  All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (i) when delivered, if delivered personally, (ii) four days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid, (iii) the next business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service, and (iv) on the date of delivery if delivered by facsimile transmission, receipt confirmed, provided that a confirmation copy is sent on the next business day by registered or certified mail, return receipt requested and postage prepaid, in each case addressed as follows:

If to BioSafe, to:

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, Illinois USA 60045
Attention: President
Facsimile: 847.234.8222
Confirmation Phone No.: 847.234.8111

7

If to Company, to the address set forth on the signature page hereof,
or to such other address as the recipient Party may indicate by a notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such notice).

10.11   Attorneys' Fees and Costs.  In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

10.12   Announcements.  Neither Party shall issue any press release or other publicity materials with respect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party.  This restriction shall not apply to disclosures required by law or regulation.

10.13   Cumulative Remedies.  If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

10.14   Extension of Term.  Upon sixty (60) days written notice given prior to the end of the term of this Agreement, Company shall have the right to extend this Agreement for an additional five (5) year period provided that BioSafe and the Company can agree to terms and conditions acceptable to both of the Parties for such additional five (5) year term.

10.15   Further Assurances.  Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonable deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

10.16   Interpretation.  Whenever used in this Agreement, (i) the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders, and (ii) "including" shall be deemed to mean "including not limited to".

10.17   Interest.  Any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.

10.18   Entire Agreement.  This Agreement constitutes the entire agreements and understandings between the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

THE REMAINDER OF THIS PAGE HAS INTENTIONALL BEEN LEFT BLANK.  THE NEXT PAGE IS THE SIGNATURE PAGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE MEDICAL TECHNOLOGIES, INC.

By: _David C. Fleisner_

David C. Fleisner, President

COMPANY

_Sioux Valley Hospital USD Medical Center_
(Print Company name and state of incorporation or organization)

By: _Rosemary Bour_
(Signature of authorized party)

_Rosemary Bour VP PR/Trauma/Surgery_
(Print name and title of person signing)

_1305 W 18th St, Sioux Falls, SD 57105_
(Print address of Company)

_605 - 333 - 6422_
(Print Company telephone number)

_605 - 333 - 1531_
(Print Company facsimile number)

BMT-mydocs-License Agreement for Labs-Cholesterol-v3.4-rev'd 8-28-03-Sioux Valley

Addendum I

For the one-year period from January 1, 2004 through December 31, 2004, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 Cholesterol Determinations for such year at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Company for such calendar year provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

For each calendar quarter from and after January 1, 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 Cholesterol Determinations per quarter at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Company for such calendar quarter provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

Notwithstanding anything in this Agreement to the contrary, Company shall have the right to suspend this Agreement upon written notice to BioSafe given within the sixty (60) day period following the end of any calendar year in the term of this Agreement with respect to which the Company's annual gross revenue in such calendar year from Cholesterol Determinations referred to it by BioSafe or from any other source, including but not limited to Cholesterol Determinations performed on tests sold by Company, is less than the amount set forth below for the Anticipated Gross Revenue for such year (provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim).

For purposes of this Agreement, Anticipated Gross Revenue for the first calendar year in the term of this Agreement is twenty-two thousand five hundred dollars ($22,500), and the Anticipated Gross Revenue for each of the second, third, fourth and fifth calendar years in the term of this Agreement is one hundred eight thousand dollars ($108,000).

Notwithstanding the foregoing provisions to the contrary, if any year in the term of this Agreement is less than a full calendar year, Anticipated Gross Revenue for such year period shall be determined by multiplying the Anticipated Gross Revenue for such year (set forth above) by a fraction, the numerator of which shall be the actual number of days in the year in question, and the denominator of which shall be three hundred and sixty-five (365).

Dated: 8/1/04

BioSafe Medical Technologies, Inc.                    COMPANY

By: _____          By: _____

08/05/2006 10:36 FAX 605 328 6434          CLM CLIENT SUPPORT                          ☒002
05/05/2004  09:52      647-234-8222           BIO SAFE                               PAGE  02

## ADDENDUM II

Notwithstanding anything to the contrary contained in this Agreement, at any time during the term of this Agreement, BioSafe may grant licenses of the BioSafe Technology for the Company Test for use within the State of South Dakota to laboratories with facilities in more than one state, including South Dakota, and such grant shall not be deemed to be a breach of this Agreement.

Dated: 6 1 /04

BioSafe Medical Technologies, Inc.                     Company

By: _____              By: _____

Kay W. Reinarts
General Manager

c: Kay Reinartz



## Sioux Valley Hospital
## USD Medical Center

COPY

1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.siouxvalley.org

October 27, 2005

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Since Sioux Valley Hospital has been referred zero (ø) determinations from Biosafe or any other source pursuant to this agreement and zero (ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of September 1, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by November 10, 2005.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

EXHIBIT
B

Accredited by the Joint Commission on Accreditation of Healthcare Organizations





**Sioux Valley Hospital
USD Medical Center**

1305 W. 18th Street
PO Box 5039
Sioux Falls, South Dakota 57117-5039
(605) 333-1000
www.siouxvalley.org

February 6, 2006



David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The one-quarter period (September 1, 2005 through November 30, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

Since Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any other source pursuant to this agreement and zero (Ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-seven thousand dollars ($27,000) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of November 30, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by February 20, 2006.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

*Accredited by the Joint Commission on Accreditation of Healthcare Organizations*

EXHIBIT
C



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.sanfordhealth.org

October 18, 2007

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) and eight (8) subsequent calendar quarters (September 2005 through August 31, 2007) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital have been completed.

According to Addendum I of the agreement; for the one-year period from September 1, 2004 through August 31, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Furthermore, according to Addendum I of the agreement; for each calendar quarter from and after September 1, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

In the first one-year period, Sioux Valley Hospital has been referred zero (∅) determinations from Biosafe or any other source and zero (∅) revenue. Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the first one-year period of the agreement.

In the subsequent eight (8) calendar quarters, Sioux Valley Hospital has been referred Three thousand eight hundred twenty one (3,821) determinations from Biosafe or any other source pursuant to this agreement and thirty-four thousand three hundred eighty-nine dollars ($34,389) billed revenue ($23,561.01 paid on account as of 9/30/2007). Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of one hundred ninety-two

Accredited by the Joint Commission on Accreditation of Healthcare Organizations

EXHIBIT

D

thousand four hundred thirty eight dollars and ninety-nine cents ($192,438.99) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the eight calendar quarter periods from September 1, 2005 through August 31, 2007 of the agreement.

This letter is to inform you that total payment of two hundred fourteen thousand nine hundred thirty eight dollars and ninety-nine cents ($214,938.99) is due and payment is expected by November 16. A worksheet summary of charges, payments received, and balance due is attached to this letter.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sundene
Chief Financial Officer
Sioux Valley Hospital

## BioSafe Contract: Contract vs Actual

Term of Contract: September 1, 2004 thru August 31, 2009
5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| | | | | | | |
| Total To Date | 26,500 | $238,500.00 | 3,821 | $ 34,389 | (22,679) | $(204,111.00) |
| Payments Received | | $(23,581.01) | | | | |
| GRAND TOTAL of amount past due | | $214,938.99 | | | | |

## BioSafe Contract: Contract vs Actual

Term of Contract: September 1, 2004 thru August 31, 2009
5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| Q9: 9/07-11/07 | 3,000 | $ 27,000 | 99 | $ 891 | (2,901) | $ (26,109) |
| 12/07-01/08 pro rated partial quarter | 2,000 | $ 18,000 | 227 | $ 2,043 | (1,773) | $ (15,957) |
| Total To Date | 31,500 | $ 283,500.00 | 4,147 | $ 37,323 | (27,353) | $ (246,177.00) |
| Payments received as of 2-11-08 | | $ (23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $ 259,938.99 | | | | |

| Payments Made by Biosafe | | |
|---|---|---|
| Date | Amount | |
| 5/23/2007 | $13,976.01 | |
| 6/14/2007 | $6,165.00 | |
| 9/21/2007 | $3,420.00 | |
| | Total | $23,561.01 |



EXHIBIT

# EXHIBIT 3

STATE OF SOUTH DAKOTA )                    IN CIRCUIT COURT
                       : SS
COUNTY OF MINNEHAHA    )           SECOND JUDICIAL CIRCUIT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                    *
SANFORD USD MEDICAL CENTER          *
formerly known as SIOUX VALLEY      *
HOSPITAL and USD MEDICAL CENTER,    *          CIV. 08-825
                                    *
        Plaintiff,                  *
                                    *
    vs.                             *     **PLAINTIFFS' MOTION FOR**
                                    *       **AMENDED COMPLAINT**
BIOSAFE MEDICAL TECHNOLOGIES, INC., *
DELPHI ENERGY FUND, INC., and       *
FIRST COMMERCIAL CAPITAL CORP.,     *
                                    *
        Defendants.                 *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

        Plaintiff Sanford USD Medical Center formerly known as Sioux Valley Hospital and

USD Medical Center ("Sanford") hereby files this Motion under SDCL 15-6-15(a) for Amended

Complaint. The proposed Amended Complaint and exhibits thereto are attached. The primary

purpose of the Amended Complaint is to substitute Allen & Company, L.L.C. (which now claims

a right of payment from Sanford arising out of the BioSafe contract) in the place of Delphi

Energy Fund, Inc. and First Commercial Capital Corp. (which are the previous entities that once

claimed an interest in payment from Sanford arising out of the BioSafe contract).

        Sanford USD Medical Center at this time is seeking a Stipulation from the only party

served—Defendant BioSafe Medical Technologies, Inc.—to allow the Amended Complaint. If

that Defendant refuses to stipulate to the Amended Complaint, a hearing then will be scheduled.

Dated at Sioux Falls, South Dakota, this ___29th___ day of July, 2008.

> DAVENPORT, EVANS, HURWITZ &
> SMITH, L.L.P.
>
>
> _____
> ROBERTO A. LANGE
> 206 West 14th Street
> P. O. Box 1030
> Sioux Falls, SD 57101-1030
> Telephone (605)336-2880
> Fax No.: (605)335-3639
> *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and correct copy of the foregoing "*Plaintiff's Motion For Amended Complaint* " was served by mail upon:

> Jon C. Sogn
> LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
> P. O. Box 2700
> Sioux Falls, SD  57101-27000

on this ___29th___ day of July, 2008.

_____

2

STATE OF SOUTH DAKOTA   )                    IN CIRCUIT COURT
                        : SS
COUNTY OF MINNEHAHA     )            SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*
SANFORD USD MEDICAL CENTER          \*
formerly known as SIOUX VALLEY      \*
HOSPITAL and USD MEDICAL CENTER,    \*          CIV. 08-825
                                    \*
            Plaintiff,              \*
                                    \*          **A M E N D E D**
        vs.                         \*          **C O M P L A I N T**
                                    \*
BIOSAFE MEDICAL TECHNOLOGIES, INC., \*
and ALLEN & COMPANY, L.L.C,         \*
                                    \*
            Defendants.             \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center formerly known as Sioux Valley Hospital and

USD Medical Center, for its Complaint, states and alleges as follows:

## PARTIES

### 1.

Sanford USD Medical Center was formerly known as Sioux Valley Hospital and USD

Medical Center, and is referred to in this Complaint as "Sanford."

### 2.

Sanford is a not-for-profit charitable organization that is headquartered and provides

services from Sioux Falls, Minnehaha County, South Dakota.

### 3.

Defendant BioSafe Medical Technologies, Inc. ("BioSafe") is an Illinois corporation with

its corporate offices at 100 Field Drive, Suite 240, Lake Forest, Illinois.

4.

Defendant Allen & Company, L.L.C. is an Illinois limited liability corporation with its principal place of business at 1017 W. 35th Street, Oak Brook, Illinois, and having as its registered agent Raymond J. Allen.

5.

First Commercial Capital Corp. ("First Commercial") and Delphi Energy Fund, Inc. ("Delphi Energy"), initially were named as defendants in this lawsuit, both were businesses affiliated with Brian Linehan, and neither could be served because Mr. Linehan, despite having knowledge of the case, evaded service of process. First Commercial and Delphi Energy have no claim of a right to payment from Sanford, as that claim now is being asserted by a different entity called Allen & Company.

6.

Defendant Allen & Company ("Allen & Company") is named in this lawsuit for purposes of Count Two of the Complaint seeking a declaratory judgment that Sanford no longer has responsibility to pay either of them certain "license fees" or lease payments, which arose under Section 9 of the Agreement between Sanford and BioSafe, which fees BioSafe factored to First Commercial, which it seems assigned its right to Allen & Company.

## ALLEGATIONS COMMON TO COUNTS

7.

Sanford and Defendant BioSafe entered into an Agreement dated August 30, 2004. A true and correct copy of this Agreement is attached as Exhibit A hereto and is incorporated by reference herein.

2

8.

BioSafe initiated contact with Sanford after Sanford acquired certain cholesterol testing equipment as a part of the acquisition of Central Plains Clinic, Ltd.

9.

BioSafe sought out the relationship with Sanford in Sioux Falls, sent letters to and communicated by phone with Sanford in Sioux Falls, and sought an Agreement to refer to Sanford in Sioux Falls certain blood or other samples for cholesterol testing in Sioux Falls.

10.

BioSafe wrote the Agreement that is attached as Exhibit A.

11.

Sanford acquired no equipment from BioSafe, but rather used equipment already owned by Sanford to conduct the cholesterol tests on samples referred by BioSafe.

12.

Sanford used methodologies and procedures from BioSafe to perform the cholesterol testing for BioSafe, but continued to use a separate methodology and procedure on Sanford's own cholesterol testing. As a means of compensating BioSafe for the cholesterol testing sent to Sanford and for the methodologies and procedures, Sanford agreed to pay a monthly fee under section 9 of the Agreement that BioSafe characterized as a "license fee."

13.

Under section 9 of the Agreement, Sanford agreed to a monthly license fee of $1,250.00 per month for the first year of the Agreement, and for a monthly license fee of $6,250.00 per month for the remaining term, with BioSafe representing that there could be as many as 60,000 cholesterol tests referred by BioSafe to Sanford per year.

14.

Sanford and BioSafe executed Addendum I and Addendum II to the Agreement, which are included in Exhibit A hereto.

15.

Under Addendum I, BioSafe agreed to guarantee revenue to Sanford from the cholesterol determinations of $22,500.00 in the first year of the Agreement and of $27,000.00 for each calendar quarter from and after September 1, 2005.

16.

Although the term of the Agreement began on August 30, 2004, Sanford and BioSafe executed the Agreement, Addendum I and Addendum II as of June 1, 2004.

17.

On June 15, 2004, BioSafe notified Sanford that, as a part of a strategic alliance between BioSafe and First Commercial, BioSafe was assigning to First Commercial, an entity affiliated with Brian Linehan, the right to monthly fees called for under Section 9 of the Agreement. First Commercial knew or should have known that it was taking an assignment of payments owed under the Agreement by Sanford in South Dakota for licensing procedures and methodologies for cholesterol testing being referred to and done in South Dakota. On September 20, 2004, Delphi Energy, another entity affiliated with Brian Linehan, sent the letter attached as Exhibit B hereto to notify Sanford that it was the new assignee of the payments originally called for under section 9 of the Agreement between BioSafe and Sanford.

18.

Unbeknownst to Sanford until Allen and Company filed a lawsuit in Illinois on or about July 11, 2008, First Commercial had entered into an Assignment and Security Agreement to

4

Allen & Company dated August 30, 2004, (which is Exhibit C hereto) by which First

Commercial purported to assign clamed rights of payment from Sanford to Allen & Company.

Allen & Company was fully aware that the claimed right of payment was from Sanford in Sioux

Falls, South Dakota, for equipment allegedly leased in Sioux Falls.

19.

Sanford has paid license fees from the inception of the Agreement until a check issued on

January 25, 2008, paying license fees through January 31, 2008.  Sanford paid the license fee

initially in the sum of $1,250.00 per month, and subsequent to September 1, 2005, in the amount

of $6,250.00 per month.

20.

Under Addendum I to the Agreement, BioSafe was to make an initial annual payment of

up to $22,500.00 to Sanford if the volume of cholesterol determinations during the first year of

the Agreement did not result in that level of revenue to Sanford.

21.

During the first year of the Agreement, BioSafe referred no cholesterol determinations to

Sanford.

22.

On October 27, 2005, Sanford, through the letter attached as Exhibit D hereto, requested

BioSafe to pay the $22,500.00 that BioSafe owed for the first year of the contract.

23.

BioSafe has failed to pay the amount owed for the first year of the contract.

24.

After the first year of the contract, BioSafe was responsible to ensure a revenue stream of at least $27,000.00 per quarter to Sanford under Addendum I to the Agreement.

25.

On February 6, 2006, Sanford notified BioSafe that it had received no referrals for determination from BioSafe during the one quarter period of September 1, 2005, through November 30, 2005. A true and correct copy of the letter from Sanford to BioSafe dated February 6, 2006, is attached as Exhibit E hereto.

26.

In the quarter beginning March of 2006, some samples for cholesterol testing were referred from BioSafe to Sanford. The volume of testing referred to Sanford, however, was far below the volumes anticipated and revenue guaranteed by BioSafe at the time of the contract under Addendum I to the Agreement.

27.

On October 19, 2007, Sanford notified BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreements. A true and correct copy of the letter dated October 18, 2007 and enclosed accounting is Exhibit F hereto. As of September 1, 2007, BioSafe owed to Sanford a total of $214,938.99 for shortfalls on the guaranteed contract revenue.

28.

BioSafe's responses to the Sanford letters were to pledge repeatedly to make up for the shortfalls, to promise to refer additional cholesterol testing to Sanford in the future, and to blame the absence of payment on BioSafe's own cash flow difficulties.

29.

Sanford has continued until January 25, 2008, to pay the "license fees" under section nine of the Agreement with BioSafe, notwithstanding BioSafe's failure to ever pay the contractual guaranteed sum under Addendum I.

30.

As of January 31, 2008, BioSafe owes a total of $259,938.99 (plus interest) to Sanford, as set forth in the spreadsheet attached as Exhibit G hereto and incorporated by reference herein.

## COUNT ONE – BREACH OF CONTRACT
## AGAINST BIOSAFE

31.

Sanford incorporates by reference the allegations of paragraphs 1 through 30, as if fully set forth herein.

32.

Sanford and Defendant BioSafe entered into a contract, a true and correct copy of which is attached as Exhibit A hereto.  Under Addendum I to the contract, included in Exhibit A hereto, BioSafe agreed to certain volume levels and guaranteed certain revenue levels to Sanford.

33.

BioSafe has breached the Agreement by failing to pay monies that is owes under the Agreement to Sanford.

34.

Sanford has suffered loss and injury as a result of BioSafe's breach of contract, including the past due and owing amount of $259,938.99 as of January 31, 2008, plus interest, costs and attorneys fees recoverable under Section 10.11 against BioSafe.

## COUNT TWO – DECLARATORY JUDGMENT
## AGAINST ALLEN & COMPANY

35.

Sanford incorporates by reference the allegations of paragraphs 1 through 35 of this Complaint, as if fully set forth herein.

36.

BioSafe assigned to First Commercial its right to "license fees" under section 9 of the Agreement. First Commercial later assigned its rights to collect those "license fees" to Allen & Company

37.

Sanford has paid the license fees under Section 9 of the Agreement to First Commercial and then to Delphi Energy apparently for the benefit of Allen & Company through January 31, 2008.

38.

The obligation to pay the license fees arises under section nine of the Agreement.

39.

The license fees, although sometimes referred to as equipment leases by the Defendants, are not for the lease of any equipment whatsoever, because Sanford uses equipment that it owns to perform the cholesterol testing for BioSafe. The license fees, rather, were to compensate BioSafe and for processes and methods prescribed by BioSafe on the cholesterol testing that Sanford does for BioSafe.

40.

Sanford ceased its payments of the so-called license fees effective February 1, 2008, when it brought this lawsuit.

8

41.

A controversy now exists, or may exist, over whether Sanford properly ceased payment to Delphi Energy or Allen & Company, the assignee of First Commercial which in turn was the assignee of BioSafe, on any further license fees or equipment lease payments, because of BioSafe's non-performance and prior material breaches of the Agreement.

42.

The controversy concerning Sanford's decision and right to cease any further payments of license fees is a controversy ripe for a declaratory judgment under SDCL 21-24.

**COUNT THREE – CIVIL CONSPIRACY AND UNJUST ENRICHMENT**

43.

Sanford incorporates by reference the allegations of paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.

On information and belief, Allen & Company was compliant with Delphi Energy, Brian Linehan, and First Commercial and perhaps others in a plan to collect and continue to collect monies from Sanford on a contract where the underlying obligation of BioSafe was not being performed.

45.

Allen & Company, through other parties, collected money from Sanford despite Sanford not receiving the benefit of its bargain with BioSafe out of the underlying contract.

46.

Allen & Company was unjustly enriched through receipt and retention of monies from Sanford.

47.

Sanford sustained losses and injuries as a consequence of the unjust enrichment of Allen & Company and the civil conspiracy involving Allen & Company.

WHEREFORE, Plaintiff Sanford USD Medical Center, f/k/a Sioux Valley Hospital and USD Medical Center, hereby prays for relief as follows:

A. That Sanford have and recovery a judgment against Defendant BioSafe Medical Technologies, Inc., in the principal amount of $259,988.99 owed as of January 31, 2008, plus pre-judgment interest thereon;

B. That Sanford have and recover its costs, interest, expenses, disbursements and attorneys fees under Section 10.11 of the Agreement against BioSafe;

C. That Sanford receive a declaratory judgment that it bears no responsibility to pay any further license fees or claimed equipment lease fees to any of the Defendants;

D. That Sanford have and recovery compensatory and punitive damages from Allen & Company; and

E. That Sanford have and recover such other and further relief as deemed just and equitable by the Court.

Dated at Sioux Falls, South Dakota, this _____ day of July, 2008.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

_____

ROBERTO A. LANGE
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all questions of fact.

_____

## **CERTIFICATE OF SERVICE**

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and

correct copy of the foregoing "*Amended Complaint*" was served by mail upon:

    Jon C. Sogn
    LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
    P. O. Box 2700
    Sioux Falls, SD  57101-27000

on this _____ day of July, 2008.

_____

11

*overnite delivery 18/29 wsh*

## AGREEMENT

*30th day of*

This Agreement is made and entered into as of the 1st day of January, 2004 ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, IL 60045, and its Affiliates, (collectively, "BioSafe") and Company, whose name and address is set forth on the signature page hereof, and its Affiliates (collectively, "Company").

WHEREAS, BioSafe is in the business of developing and selling diagnostic screens and tests using micro-samples of human blood, including its Cholesterol Panel;

WHEREAS, on the terms and conditions hereinafter set forth, Company desires (i) to market and sell in the Territory a cholesterol screening kit containing the same components as the BioSafe Cholesterol Panel and (ii) to perform in its laboratory the analysis of such test using BioSafe's proprietary methods, techniques and processes under a non-transferable and non-assignable revocable license; and,

WHEREAS, on the terms and conditions hereinafter set forth, BioSafe is willing to grant Company a non-transferable and non-assignable revocable right to use BioSafe's proprietary methods, techniques and processes to perform the laboratory analysis of such test.

NOW, THEREFORE, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived herefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:
1.    Definitions.  The following terms when used in this Agreement, including the preamble and recitals, shall have the following meanings:

1.1    "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

1.2    "Agreement" means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

1.3    "BioSafe" is defined in the preamble to this Agreement.

1.4    "BioSafe Indemnified Parties" is defined in Section 8.

1.5    "BioSafe Marks" means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the term of this Agreement, by or on behalf of BioSafe.

1.6    "BioSafe Patent Rights" means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

1.7    "BioSafe Technology" means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

1.8    "BioSafe Technology Rights" means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including (i) medical, chemical and other scientific data and (ii) processes and methodology used in the development, testing and analysis of the Cholesterol Panel.

1.9    "Cholesterol Panel" means BioSafe's kit containing all of the components required for an individual to participate in the capillary collection of blood using BioSafe's collection kit which, through laboratory analysis using BioSafe's proprietary methods, techniques and processes, measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.10    "Collection Card" means the BioSafe proprietary self-collection card on which specimens of blood are deposited and from which the laboratory analysis is performed to measure the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.11    "Company" is defined in the preamble to this Agreement.

1.12    "Company Test" means a self-collection blood screen kit, the components of which are the same as those contained in the Cholesterol Panel (although such components, except for the Collection Card, may be purchased from sources other than those used by BioSafe), which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.



EXHIBIT

A

1.13 "Determination" means the result obtained from the analysis of human blood and its components.

1.14 "Effective Date" is defined in the preamble to this Agreement.

1.15 "Field" means the collection, transportation, testing and analysis of human blood and its components, and the reporting of the results thereof.

1.16 "Governmental Body" means any court, government (federal, state, local or foreign), department, commission, board, agency, official or other regulatory, administrative or governmental authority.

1.17 "HDL" means high density lipoprotein.

1.18 "LDL" means low density lipoprotein.

1.19 "Party" means BioSafe or Company; "Parties" means BioSafe and Company.

1.20 "Person" means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

1.21 "Territory" means the United States.

2.   License.

2.1   Grant.  BioSafe hereby grants to Company, and Company hereby unconditionally and irrevocably accepts, a non-exclusive, non-transferable and non-assignable revocable license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology solely in the Field exclusively in the Territory for the purpose of processing, and making Determinations from, the Company Test.  The grant of the license is subject to Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do analysis of total cholesterol, HDL, LDL and triglycerides screens using BioSafe's proprietary methods, techniques and processes, and to the continued fulfillment of all of the other terms and conditions of this Agreement.  In addition, the license has been granted solely, and is valid only, for the number of Determinations set forth in Section 9.  Determinations in excess of such annual number shall be in violation of the license and shall be subject to additional charges in accordance with BioSafe's policies and procedures.  In consideration of the license granted herein to Company, beginning with the Effective Date, Company shall pay to BioSafe the monthly license fee set forth in Section 9.  Such license fee shall be due and payable by the Company on the first day of each month.  If the Effective Date does not fall on the first day of the month, the first payment shall be a pro-rata portion of the monthly license fee, calculated on a 30-day basis, due and payable on the Effective Date.  In connection with the license, BioSafe: (i) will provide training to Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes; (ii) will provide Company with a list of all components used in the Cholesterol Panel to enable Company to assemble a self-collection blood screen kit substantially identical to the Cholesterol Panel; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Cholesterol Panel, and (iv) will make Collection Cards available for purchase at an initial cost of $1.25 each, subject to change upon 90 days prior written notice.

2.2   Non-exclusive.  Company understands and acknowledges that, since the license herein granted is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses or the right to distribute or manufacturer the Cholesterol Panel or any similar type product during the term of this Agreement; in each case without breaching this Agreement; provided, however, that notwithstanding the foregoing to the contrary; during the term of this Agreement, Company shall be the exclusive licensee within the State of South Dakota of BioSafe Technology for the Company Test.

2.3   Sale Outside the Territory.  C ompany s hall n ot m arket, s ell o r o ffer f or s ale t he C ompany T est o utside o f t he Territory.  Accordingly, Company shall limit its sales activities with respect to the Company Test to customers located in the Territory.  Company shall refer to BioSafe all orders and inquiries relating to a cholesterol screen originating from within or outside the Territory to the extent such orders or inquiries relate to such screens destined for use outside the Territory.

2.4   Competing Activities.  During the term of this Agreement and for a period of one year following its termination, Company will not, without BioSafe's prior written consent: (i) make, use, license, sublicense, assign, sell, offer to sell or otherwise transfer the Company Test for or to, or enter any agreement or authorize any third party to do any of the foregoing with, (a) any Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides, (b) any Affiliates or agents of a Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides or (c) any Person that Company, its Affiliates or agents knows or believes will manufacture, distribute, sell or otherwise transfer, or has manufactured, distributed, sold or otherwise transferred, the Company Test or the Cholesterol Panel to, on behalf of, or under any agreement with, a party identified in the immediately preceding clauses (a) and (b); or (ii) sell or distribute the

2

Company Test or the Cholesterol Panel as a consumer product through mass merchandisers, drug stores or other retail stores.

2.5 <u>Non-assignable</u>. Neither the license granted to Company, nor any of the rights, technology and trademarks included in the license, are assignable or transferable in any manner or way whatsoever by Company, including the right of Company to grant any sub-licenses.

2.6 <u>Reverse Engineering</u>. Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

2.7 <u>Advertising and Publications</u>. Company will not use on a web site or in any other manner or way any material of any kind or nature in any form or medium that refers, in any manner or way, to the BioSafe Technology, the BioSafe Patent Rights, the BioSafe Technology Rights, the Cholesterol Panel, BioSafe or any other BioSafe intellectual property without BioSafe having first reviewed the proposed use and approved it in writing. Company will not publish outcome or evidence-based data obtained using the Company Test without BioSafe's prior written approval.

2.8 <u>No Challenge</u>. At no time, either during or following the expiration of the term of this Agreement, will Company challenge or assist any other Person in challenging the BioSafe Marks, the BioSafe Patents Rights or the registration thereof.

2.9 <u>No Registration of Similar Marks</u>. At no time, either during or following the expiration of the term of this Agreement, will Company attempt to register any trademarks, service marks, marks, names or trade names confusingly similar to or closely resembling any of the BioSafe Marks.

2.10 <u>No Similar Methods</u>. At no time, either during or following the expiration of the term of this Agreement, will Company use or attempt to use any method, technique or process similar to the BioSafe Technology to analyze or make Determinations which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

2.11 <u>Proprietary Rights</u>. Title and full ownership of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to Company any right of ownership or any other right of any kind or nature whatsoever in or to such rights, technology, marks and other BioSafe intellectual property, other than the right to use such rights, technology and marks in accordance with the terms and provisions of this Agreement.

2.12 <u>Cessation of Use</u>. At the expiration of the term, or the termination of Company's right to use the license granted herein, any and all rights and licenses that Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's intellectual property shall immediately terminate and Company shall immediately cease using them in any manner or way whatsoever. Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of its other intellectual property. Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other intellectual property subsequent to the expiration or termination of this Agreement and the termination of the license granted hereby.

2.13 <u>Independent Contractor Status</u>. The relationship of BioSafe and Company established by this Agreement is that of independent contractors, and no other relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner which expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between Company and its customers are Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3.    <u>Company's Obligations</u>. During the Term of this Agreement, Company will: (i) pay to BioSafe, its agent or assignee a monthly license fee in accordance with the terms of this Agreement; (ii) assemble the Company Test only with the components set forth on the list of components provided by BioSafe (including the Collection Card), or those deemed by BioSafe to be substantially identical, purchase from BioSafe all Collection Cards included in the Company Test, and procure from BioSafe or independently from BioSafe all other components in the Company Test; (iii) sell the Company Test in accordance with all applicable laws, rules and regulations, including the Health Insurance Portability

and Accountability Act of 1996, and the privacy regulations created as a result of such act, and all of the terms and provisions of this Agreement; (iv) conduct its business of selling the Company Test solely in its name, at its sole cost and expense; (v) avoid deceptive, misleading or unethical practices or making any false or misleading representations with respect to the Company Test; (vi) maintain competent, well-trained personnel of its own selection who shall engage in the sale and the laboratory analysis of the Company Test; (vii) obtain all licenses, permits, registrations and approvals, governmental or otherwise, and pay all duties, taxes, excises and payments, that are required for Company to sell the Company Test and to perform the laboratory analysis; (viii) be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Company Test in the Territory; (ix) be solely responsible for all costs and expenses of any kind or nature related in any manner or way to the assembling, sale and analysis of the Company Test, including any required translations; (x) maintain its certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the term of this Agreement; (xi) ensure appropriate hazardous and non-hazardous waste disposal in accordance with all applicable rules and regulations; (xii) ensure it has adequate and legally compliant laboratory information systems and laboratory report-generating systems, including security of the data base related to patient confidentiality, accuracy of laboratory reports and transmission of related data, appearance of laboratory reports and secured back-up storage of relevant records; (xiii) maintain at its cost and expense the laboratory facility and equipment, including a Roche P-Modular analyzer and/or any other equipment specified by BioSafe, to test, analyze and make Determinations from the Company Test using BioSafe proprietary methods, techniques and processes; (xiv) be responsible for all of its own expenses, including providing such office space, facilities and personnel as are required to perform its obligations under this Agreement and all costs and expenses related to the advertising, marketing, promotion and sale of the Company Test, and the analysis thereof, in the Territory; (xv) not incur any expense chargeable to BioSafe except as may specifically be authorized in advance in writing by BioSafe; (xvi) maintain in effect during the term of this Agreement and for a period of five years thereafter appropriate liability insurance policies, copies of which shall be delivered to BioSafe, covering the sale and laboratory analysis of the Company Test with a recognized insurance carrier on such terms as are acceptable to BioSafe, which must include BioSafe as an additional named insured for the same limits of liability as are provided for Company, but in no event less than two million dollars, a waiver of subrogation rights against BioSafe and the requirement that BioSafe receive not less than sixty days prior written notice of any modification or termination of coverage; (xvii) observe and adhere to the provisions of any confidentiality agreement between BioSafe and Company; (xviii) indemnify BioSafe in accordance with the provisions of this Agreement; and (xix) prominently display on the front of the packaging of the Company Test, in a place approved by BioSafe, the BioSafe logo, "Science by BioSafe", the form of which will be furnished by BioSafe to Company.

4.    Term. Subject to earlier termination of Company's right to use the license, upon the occurrence of any event specified below, the term of this Agreement shall be for a 60-month period commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such 60-month period.

4.1    BioSafe's Right to Terminate. Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate Company's license and the use of all rights, technology and processes related thereto prior to the expiration of the term immediately upon the occurrence of any of the following events: (i) any law, rule or regulation is adopted or is in effect in the Territory, or elsewhere, that would restrict any of BioSafe's rights hereunder, otherwise invalidates any provision hereof or materially affects BioSafe's or Company's ability to perform its obligations under this Agreement; (ii) if Company makes any false or untrue statement or representation herein or in the performance of its obligations hereunder; (iii) if Company, in BioSafe's sole opinion, engages in any fraudulent or dishonest activity; (iv) if Company breaches any of the provisions of Sections 2.3 through 2.10, Section 6 or Company attempts to assign this Agreement, or any of its rights and obligations herein.; (v) if Company fails to become accredited or fails any BioSafe laboratory proficiency testing or fails to correct deficiencies within the specified period to maintain its certification to use BioSafe's proprietary methods, techniques and processes; (vi) as set forth in Section 5; (vii) Company exceeds the annual number of Determinations for which the license has been granted; (viii) Company fails to make timely payment of any monthly license fee due hereunder; (ix) Company breaches or is in default of a material obligation under this Agreement (other than the payment of the monthly license fee) and the default or breach is not cured to BioSafe's satisfaction within ten days after Company's receipt of written notice stating the nature of the default; (x) Company becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up, liquidated its business, stopped doing business as a going concern, merges or consolidates its business or transfers all or substantially all of its assets, voluntarily or otherwise; or (xi) an order

4

or notice shall be published by any government or Governmental Body requiring the cessation of activities by Company or BioSafe.

4.2  Rights Upon Termination or Expiration.  Upon expiration of the term of this Agreement, or termination of Company's right to use the license prior thereto, in accordance with the provisions of this Agreement, all rights, privileges and licenses granted in this Agreement to Company shall immediately cease and terminate.  Accordingly: (i) Company shall immediately cease using any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of BioSafe's intellectual property, and shall certify in writing to BioSafe that it has completely terminated its use thereof; (ii) Company shall immediately cease all sales and other activities with respect to the Company Test, and Company shall take all action required to terminate Company's registration, if any was required, as a seller of the Company Test and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required; (iii) Company shall immediately cease using and return to BioSafe all of BioSafe's confidential information; (iv) all indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived; and (v) BioSafe shall not have any obligation to repurchase or to credit Company for its inventory of Collection Cards or Company Tests at the time of termination of Company's right to use the license, or expiration of the term, of this Agreement.

4.3  Survival of Prior Obligations.  Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the term or otherwise: (i) shall not relieve Company of any obligation incurred prior to such termination; and (ii) the obligation of Company under the provisions of any confidentiality agreement between BioSafe and Company with respect to the protection and non-disclosure of Confidential Information, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

5.  Patents.  Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third party of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks.  BioSafe shall have the right, but not the obligation, (and Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of Company, if necessary, anywhere in the world against a third party at its own expense. Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BioSafe's expense.  If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without Company's prior consent.  BioSafe shall not be liable to Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for alleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other intellectual property of BioSafe infringes any patent, copyright or trademark or other intellectual property right of such third party.  BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding.  BioSafe will pay any final judgment entered against Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, BioSafe shall be relieved of any obligation to defend or pay for such defense unless Company notifies BioSafe in writing of such claim, suit, action or proceeding within five business days after becoming aware of it and Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding.  If it is finally determined by a court of competent jurisdiction, or if BioSafe in its sole discretion determines, that any of BioSafe's intellectual property infringes any copyright, trademark or any other intellectual right of a third party, then BioSafe may, in its sole discretion and expense, take any action. Notwithstanding any other provision herein contained to the contrary, BioSafe shall not have any liability for any infringement which results from any act of Company, including Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other intellectual property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, method or process or Company's modifications of BioSafe's rights, technology or property.

5

6.   Company's Representations and Warranties. Company represents and warrants that each of the following shall survive the execution and delivery of this Agreement, are true and correct now and will be throughout the entire term of Agreement: (i) Company is an entity duly organized, existing and in good standing under the laws of the state of its incorporation or organization set forth on the signature page hereof, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities and to incur the obligations herein contained; (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, does not require the approval or consent of any third Person, does not and will not conflict with, violate or breach Company's articles of incorporation or organization, any agreement to which it is a party or any law, rule or regulation or court decree or order; (iii) this Agreement is the legal, valid and binding obligation of Company, enforceable in accordance with its terms at all times; (iv) Company will comply with all applicable laws, consent decrees and regulations of any federal, state or Governmental Body wherever located; (v) Company owns, holds or possesses all Governmental Body and private licenses, franchises, permits, privileges, approvals and other authorizations which are necessary for it to carry on and conduct its business, to sell the Company Test and to make Determinations; (vi) there is no action, suit or proceeding pending or, to the best knowledge of Company, threatened, which questions the legality or propriety of the transaction contemplated by this Agreement or which, if decided adversely against Company, would prevent Company from fulfilling all of its obligations under this Agreement; and (vii) Company has no expectation and has received no assurance or guarantee of any kind or nature it will obtain any anticipated amount of profits or revenue as a result of Company selling the Company Test or making Determinations.

7.   Disclaimer of Warrant and Limitation of Liability.

7.1   Disclaimer of Warranty. Section 7.1 has been deleted in its entirety. There is no Section 7.1 of the Agreement.

7.2   Limitation of Liability. In no event shall BioSafe be liable under any legal or equitable theory, and Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential or punitive damages of any kind or nature whatsoever, however caused, suffered by Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.

8.   Indemnification. Company shall indemnify and hold BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a BioSafe Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any BioSafe Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by Company of, or any failure by Company to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by Company. BioSafe shall indemnify and hold Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a Company Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any Company Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by BioSafe.

9.   Determinations and Monthly License Fee. In consideration of the license granted herein to Company, beginning with the Effective Date and until ~~December~~ 31, 2004, Company will pay to BioSafe a monthly license fee of one thousand two hundred and fifty dollars ($1,250) per month and commencing ~~January~~ 1, 2005 and for the remainder of the Term, Company will pay a monthly license fee of six thousand two hundred and fifty dollars ($6,250) for the right to process up to sixty thousand (60,000) Determinations per year. Each such payment shall be due and payable by the Company on the first day of each month. If the Effective Date does not fall on the first day of the month, the first and last payment shall be a pro-rata portion of the amount payable.

During normal business hours and upon reasonable notice, BioSafe shall have the right to inspect and audit Company's books and records to confirm the number of annual Determinations performed by Company. All costs and expenses of such inspection and audit shall be paid by BioSafe unless it is determined that the number of annual Determinations performed by Company exceeded the annual number of Determinations indicated above, in which case Company shall be responsible for such costs and expenses.

10. <u>Miscellaneous Provisions</u>.

10.1 <u>Amendments And Waiver</u>. The Parties, by mutual agreement in writing, may amend, modify or supplement this Agreement. Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof. The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof. Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

10.2 <u>Assignment</u>. This Agreement is personal to Company; therefore, Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe. No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of Company. BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company or notice.

10.3 <u>Benefit of Agreement</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties. Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims Company may have against BioSafe. Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto and their successors and permitted assigns and the BioSafe Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

10.4 <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the original or the same counterpart. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterparts.

10.5 <u>Governing Law</u>. The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States. EACH OF THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION.

10.6 <u>Headings</u>. The Section headings contained in this Agreement are for convenience only and shall not serve to modify, interpret or affect the meaning of the Sections at the beginning of which they appear.

10.7 Section 10.7 has been deleted in its entirety. There is no section 10.7 of the Agreement.

10.8 <u>No Drafting Presumption</u>. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

10.9 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement. The Parties shall endeavor in good faith negotiations to replace the invalid, inoperative, illegal or unenforceable provision with a valid and enforceable one, the economic effect of which comes as close as possible to that of the invalid provision.

10.10 <u>Notices</u>. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (i) when delivered, if delivered personally, (ii) four days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid, (iii) the next business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service, and (iv) on the date of delivery if delivered by facsimile transmission, receipt confirmed, provided that a confirmation copy is sent on the next business day by registered or certified mail, return receipt requested and postage prepaid, in each case addressed as follows:

If to BioSafe, to:

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, Illinois USA 60045
Attention: President
Facsimile: 847.234.8222
Confirmation Phone No.: 847.234.8111

If to Company, to the address set forth on the signature page hereof,
or to such other address as the recipient Party may indicate by a notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such notice).

10.11    Attorneys' Fees and Costs.  In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

10.12    Announcements.  N either Party s hall i ssue a ny p ress r elease o r o ther p ublicity m aterials w ith r espect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party.  This restriction shall not apply to disclosures required by law or regulation.

10.13    Cumulative Remedies.  If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

10.14    Extension of Term.  Upon sixty (60) days written notice given prior to the end of the term of this Agreement, Company shall have the right to extend this Agreement for an additional five (5) year period provided that BioSafe and the Company can agree to terms and conditions acceptable to both of the Parties for such additional five (5) year term.

10.15    Further Assurances.  Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonable deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

10.16    Interpretation.  Whenever used in this Agreement, (i) the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders, and (ii) "including" shall be deemed to mean "including not limited to".

10.17    Interest.  Any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.

10.18    Entire Agreement.  This Agreement constitutes t he e ntire a greements a nd understandings b etween the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

THE REMAINDER OF THIS PAGE HAS INTENTIONALL BEEN LEFT BLANK.  THE NEXT PAGE IS THE SIGNATURE PAGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE MEDICAL TECHNOLOGIES, INC.

By: _David C. Fleisner_ (signature)

David C. Fleisner, President

COMPANY

_Sioux Valley Hospital USD Medical Center_
(Print Company name and state of incorporation or organization)

By: _Rosemary Bour_ (signature)
(Signature of authorized party)

_Rosemary Bour  VP ER/Trauma/Surgery_
(Print name and title of person signing)

_1305  W 18th St, Sioux Falls,  SD 57105_
(Print address of Company)

_605 - 333 - 6422_
(Print Company telephone number)

_605 - 333 - 1531_
(Print Company facsimile number)

BMT-mydocs-License Agreement for Labs-Cholesterol-v3.4-rev'd  8-28-03-Sioux Valley

Addendum I

For the one-year period from ~~January~~ 1, 2004 through ~~December~~ 31, ~~2004~~, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 Cholesterol Determinations for such year at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Company for such calendar year provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

For each calendar quarter from and after ~~January~~ 1, 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 Cholesterol Determinations per quarter at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Company for such calendar quarter provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

Notwithstanding anything in this Agreement to the contrary, Company shall have the right to suspend this Agreement upon written notice to BioSafe given within the sixty (60) day period following the end of any calendar year in the term of this Agreement with respect to which the Company's annual gross revenue in such calendar year from Cholesterol Determinations referred to it by BioSafe or from any other source, including but not limited to Cholesterol Determinations performed on tests sold by Company, is less than the amount set forth below for the Anticipated Gross Revenue for such year (provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim).

For purposes of this Agreement, Anticipated Gross Revenue for the first calendar year in the term of this Agreement is twenty-two thousand five hundred dollars ($22,500), and the Anticipated Gross Revenue for each of the second, third, fourth and fifth calendar years in the term of this Agreement is one hundred eight thousand dollars ($108,000).

Notwithstanding the foregoing provisions to the contrary, if any year in the term of this Agreement is less than a full calendar year, Anticipated Gross Revenue for such period shall be determined by multiplying the Anticipated Gross Revenue for such year (set forth above) by a fraction, the numerator of which shall be the actual number of days in the year in question, and the denominator of which shall be three hundred and sixty-five (365).

Dated: 6/1/04

BioSafe Medical Technologies, Inc.

By: _____

COMPANY

By: _____

05/05/2004 10:38 FAX 605 325 5434     CLM CLIENT SUPPORT     @002
   05/05/2004   09:52     847-234-8222     BIO SAFE

## ADDENDUM II

Notwithstanding anything to the contrary contained in this Agreement, at any time during the term of this Agreement, BioSafe may grant licenses of the BioSafe Technology for the Company Test for use within the State of South Dakota to laboratories with facilities in more than one state, including South Dakota, and such grant shall not be deemed to be a breach of this Agreement.

Dated: 6/1/04

BioSafe Medical Technologies, Inc.                Company

By: _____         By: _____

                                        Kay W Reinarts
                                        General Manager



# Delphi Energy Fund, Inc.
29 S. LaSalle St., Suite 828, Chicago, IL 60803
312.288.9400 Phone  312.332.7092 Fax

September 20, 2004

Sioux Valley Hospital USD
Attn: Accounts Payable
1385 W. 18th St.
Sioux Falls, SD 57105

Re: Lease No. 2658-01

To Whom It May Concern:

YOUR LEASE HAS BEEN ASSIGNED TO DELPHI ENERGY FUND, INC., 1879
NELTNOR BLVD., #285, WEST CHICAGO, IL 60185. YOU SHOULD EITHER
RECEIVE AN INVOICE OR BE AUTOMATICALLY DEBITED DIRECTLY FROM
THAT ASSIGNEE, BUT IF NEITHER HAS BEEN RECEIVED BY THE NEXT DUE
DATE, PLEASE SEND YOUR PAYMENT TO THE ADDRESS LISTED ABOVE.

Thank you again for allowing Delphi Energy Fund, Inc. to be of service to you. If
expansion or other equipment needs are in your future, please feel free to contact us if we
might be of assistance to you.

Best Regards,

Brian Linehan
President

EXHIBIT
B

## NON RECOURSE INSTALLMENT NOTE

**$251,394.62**                                    **Equipment Lease # 2658-01**

RE: **Sioux Valley Hospital USD Medical Center**      Date: August 30, 2004
      **1305 W. 18th St.**
      **Sioux Falls, SD 57105**

       FOR VALUE RECEIVED, the undersigned promises to pay to the order of **ALLEN AND COMPANY** ("the bank") the principal sum of $ 251,394.62 together with the interest at the rate of 7.5 per annum from the date hereof to the maturity date of each installment on the principal balance from time to time in 12 monthly installments of $1000.00 followed by 48 monthly installments of $6250.00 each payable on 9/30/04 and including 8/30/09 with all such installments to be applied first to interest and the balance to the principal. After the maturity of any installment, the principal thereof shall bear interest until paid at a rate which shall be 2% higher than would otherwise be payable on this Note. Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

       This note is secured by an Assignment and Security Agreement dated August 30, 2004 between the undersigned and the Bank to which reference is made to for a description of the collateral for this Note.

       If any one of the said installments shall not have been paid and 90 days shall have elapsed after it was due, or if an Event of Default shall have occurred and be continuing as defined in any said Security Agreement, such holder may declare this Note to be due and payable, whereupon all unpaid principal and accrued interest shall become immediately due and payable.

       This Note may be prepaid in whole or in part without premium or penalty. Partial prepayments shall be applied to installments of principal in the inverse order of maturity, and all prepayments shall first be applied to interest on the principal being paid to the date of prepayment.

       The undersigned for itself and on behalf of any endorser or guarantor waives presentment, protest, notice or dishonor, and notice of any kind in respect to the Note or said endorsement or guaranty.

       By acceptance of this Note the Bank and any subsequent holder of this Note agrees, that, except as otherwise provided in the Security Agreement, the undersigned does not have, nor shall it have, any liability or obligation with respect to the payment of this Note, and that except as otherwise provided on the Security Agreement, this Note is payable solely from proceeds received by the Bank from the Bank's interest in said collateral.



EXHIBIT
C

*C: Kay Reinato*



COPY

**Sioux Valley Hospital
USD Medical Center**

1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.siouxvalley.org

October 27, 2005

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Since Sioux Valley Hospital has been referred zero (ø) determinations from Biosafe or any other source pursuant to this agreement and zero (ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of September 1, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by November 10, 2005.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital



EXHIBIT

D





## Sioux Valley Hospital
## USD Medical Center

1305 W. 18th Street
PO Box 5039
Sioux Falls, South Dakota 57117-5039
(605) 333-1000
www.siouxvalley.org

February 6, 2006



David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The one-quarter period (September 1, 2005 through November 30, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

Since Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any other source pursuant to this agreement and zero (Ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-seven thousand dollars ($27,000) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of November 30, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by February 20, 2006.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

*Accredited by the Joint Commission on Accreditation of Healthcare Organizations*



EXHIBIT
E



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.sanfordhealth.org

October 18, 2007

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) and eight (8) subsequent calendar quarters (September 2005 through August 31, 2007) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital have been completed.

According to Addendum I of the agreement;  for the one-year period from September 1, 2004 through August 31, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Furthermore, according to Addendum I of the agreement; for each calendar quarter from and after September 1, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

In the first one-year period, Sioux Valley Hospital has been referred zero (∅) determinations from Biosafe or any other source and zero (∅) revenue. Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the first one-year period of the agreement.

In the subsequent eight (8) calendar quarters, Sioux Valley Hospital has been referred Three thousand eight hundred twenty one (3,821) determinations from Biosafe or any other source pursuant to this agreement and thirty-four thousand three hundred eighty-nine dollars ($34,389) billed revenue ($23,561.01 paid on account as of 9/30/2007). Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of one hundred ninety-two



EXHIBIT

tabbies®

F

thousand four hundred thirty eight dollars and ninety-nine cents ($192,438.99) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the eight calendar quarter periods from September 1, 2005 through August 31, 2007 of the agreement.

This letter is to inform you that total payment of two hundred fourteen thousand nine hundred thirty eight dollars and ninety-nine cents ($214,938.99) is due and payment is expected by November 16. A worksheet summary of charges, payments received, and balance due is attached to this letter.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

## BioSafe Contract: Contract vs Actual

Term of Contract: September 1, 2004 thru August 31, 2009
5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| | | | | | | |
| Total To Date | 26,500 | $238,500.00 | 3,821 | $ 34,389 | (22,679) | $(204,111.00) |
| Payments Received | | $(23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $214,938.99 | | | | |

## BioSafe Contract: Contract vs Actual
**Term of Contract: September 1, 2004 thru August 31, 2009**
**5 Years**

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| Q9: 9/07-11/07 | 3,000 | $ 27,000 | 99 | $ 891 | (2,901) | $ (26,109) |
| 12/07-01/08 pro rated partial quarter | 2,000 | $ 18,000 | 227 | $ 2,043 | (1,773) | $ (15,957) |
| Total To Date | 31,500 | $ 283,500.00 | 4,147 | $ 37,323 | (27,353) | $(246,177.00) |
| Payments received as of 2-11-08 | | $ (23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $ 259,938.99 | | | | |

| Payments Made by Biosafe | | |
|---|---|---|
| Date | Amount | |
| 5/23/2007 | $13,976.01 | |
| 6/14/2007 | $6,165.00 | |
| 9/21/2007 | $3,420.00 | |
| Total | $23,561.01 | |


EXHIBIT
G

STATE OF SOUTH DAKOTA   )          IN CIRCUIT COURT
                          : SS
COUNTY OF MINNEHAHA   )     SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| SANFORD USD MEDICAL CENTER formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, | \* \* \* \* CIV. 08-825 \* \* |
| Plaintiff, | \* \* |
| vs. | \* **STIPULATION TO ALLOW** \* **AMENDED COMPLAINT** |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., DELPHI ENERGY FUND, INC., and FIRST COMMERCIAL CAPITAL CORP., | \* \* \* \* |
| Defendants. | \* \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

     Plaintiff Sanford USD Medical Center and Defendant BioSafe Medical Technologies,

Inc., hereby stipulate and agree that the Court may enter an Order granting Plaintiffs' Motion to

Amend Complaint.

Dated: _____    Dated: _____

DAVENPORT, EVANS, HURWITZ &amp;      LYNN, JACKSON, SHULTZ &amp;
SMITH, L.L.P.                      LEBRUN


_____     _____
ROBERTO A. LANGE             JON C. SOGN
206 West 14th Street            P. O. Box 270
P. O. Box 1030               Sioux Falls, SD  57101
Sioux Falls, SD 57101-1030       Telephone:  (605)332-5999
Telephone (605)336-2880         Fax No.:  (605)332-4249
Fax No.: (605)335-3639            *Attorneys for Defendant*
 *Attorneys for Plaintiff*          *BioSafe Medical Technologies, Inc.*
 *Sanford USD Medical Center*

# EXHIBIT 4

4-21

STATE OF SOUTH DAKOTA :                        IN CIRCUIT COURT
                             SS
COUNTY OF MINNEHAHA  :                    SECOND JUDICIAL CIRCUIT


SANFORD USD MEDICAL CENTER          )          Civil No. _____
formerly known as SIOUX VALLEY      )
HOSPITAL, and USD MEDICAL           )
CENTER,                             )
                                    )
            Plaintiff,              )          **ANSWER**
                                    )
vs.                                 )
                                    )
BIOSAFE MEDICAL                     )
TECHNOLOGIES, INC., DELPHI          )
ENERGY FUND, INC., and FIRST        )
COMMERCIAL CAPITAL CORP.,           )
                                    )
            Defendants.             )


Comes now Biosafe Medical Technologies, Inc. ("Biosafe"), by and through its

undersigned attorneys, and in response to Plaintiff's Complaint denies each and every

allegation and holds Plaintiff to its burden of proof.

Defendant Biosafe intends to file an amended answer within the time allowed by

SDCL 15-6-15(a) to more specifically respond to the allegations set forth in Plaintiff's

Complaint, and set forth defenses and/or claims.  Further, Biosafe reserves its rights to

request removal of the pending action to another court or jurisdiction.

WHEREFORE, Defendant Biosafe requests that Plaintiff's Complaint be dismissed, Biosafe be awarded its attorney's fees and costs, and such other relief as deemed appropriate by the Court.

Dated this 21st day of April, 2008.

LYNN, JACKSON, SHULTZ & LEBRUN, P.C.

By: _____
Jon C. Sogn
Attorneys for Defendant Biotech Medical
Technologies, Inc.
P.O. Box 2700
Sioux Falls SD 57101-2700
(605) 332-5999

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of April, 2008, I sent:

Mr. Roberto A. Lange
Davenport, Evans, Hurwitz & Smith
206 W. 14th Street
P.O. Box 1030
Sioux Falls, SD 57101-1030

by facsimile to 605-335-3639 and by first class mail, postage prepaid, a true and correct copy of **Answer** relative to the above-entitled matter.

_____
Jon C. Sogn

# EXHIBIT 5

STATE OF SOUTH DAKOTA    )              IN CIRCUIT COURT
                         : SS
COUNTY OF MINNEHAHA      )          SECOND JUDICIAL CIRCUIT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| SANFORD USD MEDICAL CENTER<br>formerly known as SIOUX VALLEY<br>HOSPITAL and USD MEDICAL CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSAFE MEDICAL TECHNOLOGIES, INC.,<br>DELPHI ENERGY FUND, INC., and<br>FIRST COMMERCIAL CAPITAL CORP.,<br><br>Defendants. | CIV. 08-825<br><br><br>**PLAINTIFFS' REQUESTS FOR<br>ADMISSIONS TO DEFENDANT<br>BIOSAFE MEDICAL<br>TECHNOLOGIES, INC. (FIRST SET)** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Plaintiff Sanford USD Medical Center f/k/a Sioux Valley Hospital and USD Medical

Center, under SDCL 15-6-36, request that Defendant BioSafe Medical Technologies, Inc.

("BioSafe") admit the following:

1.    Admit that Sanford and Defendant BioSafe entered into an Agreement dated

August 30, 2004, a true and correct copy of which is attached as Exhibit A hereto.

2.    Admit that BioSafe initiated contact with Sanford after Sanford acquired certain

cholesterol testing equipment as a part of the acquisition of Central Plains Clinic, Ltd.

3.    Admit that BioSafe wrote the Agreement that is attached as Exhibit A.

4.    Admit that Sanford acquired no equipment from BioSafe, but rather used

equipment already owned by Sanford to conduct the cholesterol tests on samples referred by

BioSafe.

5.      Admit that Sanford used methodologies and procedures from BioSafe to perform the cholesterol testing for BioSafe, but continued to use a separate methodology and procedure on Sanford's own cholesterol testing.

6.      Admit that, as a means of compensating BioSafe for the cholesterol testing sent to Sanford and for the methodologies and procedures, Sanford agreed to pay a monthly fee under section 9 of the Agreement that BioSafe characterized as a "license fee."

7.      Admit that, under section 9 of the Agreement, Sanford agreed to a monthly license fee of $1,250.00 per month for the first year of the Agreement, and for a monthly license fee of $6,250.00 per month for the remaining term, with BioSafe representing that there could be as many as 60,000 cholesterol tests referred by BioSafe to Sanford per year.

8.      Admit that Sanford and BioSafe executed Addendum I and Addendum II to the Agreement, which are included in Exhibit A hereto.

9.      Admit that, under Addendum I, BioSafe agreed to guarantee revenue to Sanford from the cholesterol determinations of $22,500.00 in the first year of the Agreement and of $27,000.00 for each calendar quarter from and after September 1, 2005.

10.     Admit that Sanford and BioSafe executed the Agreement, Addendum I and Addendum II as of June 1, 2004.

11.     Admit that, on June 15, 2004, BioSafe notified Sanford that, as a part of a strategic alliance between BioSafe and First Commercial, BioSafe was assigning to First Commercial the right to monthly fees called for under Section 9 of the Agreement.

12.     Admit that, on September 20, 2004, Delphi Energy notified Sanford Hospital that it was the new assignee of the payments originally called for under section 9 of the Agreement between BioSafe and Sanford.

13.    Admit that Sanford received no notice of any assignment under the Agreement to Allen & Company, L.L.C.

14.    Admit that Sanford has paid license fees from the inception of the Agreement until a check issued on January 25, 2008, paying license fees through January 31, 2008.

15.    Admit that Sanford paid the license fee initially in the sum of $1,250.00 per month, and subsequent to September 1, 2005, in the amount of $6,250.00 per month.

16.    Admit that, under Addendum I to the Agreement, BioSafe was to make an initial annual payment of up to $22,500.00 to Sanford if the volume of cholesterol determinations during the first year of the Agreement did not result in that level of revenue to Sanford.

17.    Admit that during the first year of the Agreement, BioSafe referred no cholesterol determinations to Sanford.

18.    Admit that, on October 27, 2005, Sanford, through the letter attached as Exhibit B hereto, requested BioSafe to pay the $22,500.00 that BioSafe owed for the first year of the contract.

19.    Admit that BioSafe has failed to pay the amount owed for the first year of the contract.

20.    Admit that, after the first year of the contract, BioSafe was responsible to ensure a revenue stream of at least $27,000.00 per quarter to Sanford under Addendum I to the Agreement.

21.    Admit that on February 6, 2006, Sanford notified BioSafe that it had received no referrals for determination from BioSafe during the one quarter period of September 1, 2005, through November 30, 2005, as set forth in the letter from Sanford to BioSafe dated February 6, 2006, and attached as Exhibit C hereto.

22.    Admit that in the quarter beginning March of 2006, some samples for cholesterol testing were referred from BioSafe to Sanford, but the volume of testing referred to Sanford, however, was far below the volumes anticipated and revenue guaranteed by BioSafe at the time of the contract under Addendum I to the Agreement.

23.    Admit that, on October 19, 2007, Sanford notified BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreements.

24.    Admit that a true and correct copy of the letter dated October 18, 2007 and enclosed accounting is Exhibit D hereto.

25.    Admit that as of September 1, 2007, BioSafe owed to Sanford a total of $214,938.99 for shortfalls on the guaranteed contract revenue.

26.    Admit that BioSafe's responses to the Sanford letters were to pledge repeatedly to make up for the shortfalls, to promise to refer additional cholesterol testing to Sanford in the future, and to blame the absence of payment on BioSafe's own cash flow difficulties.

27.    Admit that Sanford has continued until January 25, 2008, to pay the "license fees" under section nine of the Agreement with BioSafe, notwithstanding BioSafe's failure to ever pay the contractual guaranteed sum under Addendum I.

28.    Admit that as of January 31, 2008, BioSafe owed a total of $259,938.99 (plus interest) to Sanford, as set forth in the spreadsheet attached as Exhibit E hereto and incorporated by reference herein.

29.    Admit that BioSafe has breached the Agreement by failing to pay monies that it owes under the Agreement to Sanford.

4

30.    Admit that Sanford has suffered loss and injury as a result of BioSafe's breach of contract, including the past due and owing amount of $259,938.99 as of January 31, 2008, plus interest, costs and attorneys fees recoverable under Section 10.11 against BioSafe.

31.    Admit that Sanford has paid the license fees under Section 9 of the Agreement to First Commercial and then to Delphi Energy through January 31, 2008.

32.    Admit that the obligation to pay the license fees arises under section nine of the Agreement.

33.    Admit that the license fees, although sometimes referred to as equipment leases by the Defendants, are not for the lease of any equipment whatsoever, because Sanford uses equipment that it owns to perform the cholesterol testing for BioSafe.

34.    Admit that the license fees are to compensate BioSafe and for processes and methods prescribed by BioSafe on the cholesterol testing that Sanford does for BioSafe.

35.    Admit that Sanford does not owe any further license fees to BioSafe or any other entity.

Dated at Sioux Falls, South Dakota, this  29ᵗᴴ day of July, 2008.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.


_____
ROBERTO A. LANGE
206 West 14ᵗʰ Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and

correct copy of the foregoing "*Plaintiff's Requests For Admissions to Defendant BioSafe*

*Medical Technologies, Inc. (First Set)* " was served by mail upon:

> Jon C. Sogn
> LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
> P. O. Box 2700
> Sioux Falls, SD  57101-27000

on this  29th  day of July, 2008.

_____

*overnite delivery 8/29*
*wd*

# AGREEMENT

*30th day of August* X BM

This Agreement is made and entered into as of the ~~1st day of January~~, 2004 ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, IL 60045, and its Affiliates, (collectively, "BioSafe") and Company, whose name and address is set forth on the signature page hereof, and its Affiliates (collectively, "Company").

WHEREAS, BioSafe is in the business of developing and selling diagnostic screens and tests using micro-samples of human blood, including its Cholesterol Panel;

WHEREAS, on the terms and conditions hereinafter set forth, Company desires (i) to market and sell in the Territory a cholesterol screening kit containing the same components as the BioSafe Cholesterol Panel and (ii) to perform in its laboratory the analysis of such test using BioSafe's proprietary methods, techniques and processes under a non-transferable and non-assignable revocable license; and,

WHEREAS, on the terms and conditions hereinafter set forth, BioSafe is willing to grant Company a non-transferable and non-assignable revocable right to use BioSafe's proprietary methods, techniques and processes to perform the laboratory analysis of such test.

NOW, THEREFORE, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived herefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1. **Definitions.** The following terms when used in this Agreement, including the preamble and recitals, shall have the following meanings:

1.1 "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

1.2 "Agreement" means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

1.3 "BioSafe" is defined in the preamble to this Agreement.

1.4 "BioSafe Indemnified Parties" is defined in Section 8.

1.5 "BioSafe Marks" means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the term of this Agreement, by or on behalf of BioSafe.

1.6 "BioSafe Patent Rights" means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

1.7 "BioSafe Technology" means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

1.8 "BioSafe Technology Rights" means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including (i) medical, chemical and other scientific data and (ii) processes and methodology used in the development, testing and analysis of the Cholesterol Panel.

1.9 "Cholesterol Panel" means BioSafe's kit containing all of the components required for an individual to participate in the capillary collection of blood using BioSafe's collection kit which, through laboratory analysis using BioSafe's proprietary methods, techniques and processes, measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.10 "Collection Card" means the BioSafe proprietary self-collection card on which specimens of blood are deposited and from which the laboratory analysis is performed to measure the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.11 "Company" is defined in the preamble to this Agreement.

1.12 "Company Test" means a self-collection blood screen kit, the components of which are the same as those contained in the Cholesterol Panel (although such components, except for the Collection Card, may be purchased from sources other than those used by BioSafe), which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.



EXHIBIT

A

1.13 "Determination" means the result obtained from the analysis of human blood and its components.

1.14 "Effective Date" is defined in the preamble to this Agreement.

1.15 "Field" means the collection, transportation, testing and analysis of human blood and its components, and the reporting of the results thereof.

1.16 "Governmental Body" means any court, government (federal, state, local or foreign), department, commission, board, agency, official or other regulatory, administrative or governmental authority.

1.17 "HDL" means high density lipoprotein.

1.18 "LDL" means low density lipoprotein.

1.19 "Party" means BioSafe or Company; "Parties" means BioSafe and Company.

1.20 "Person" means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

1.21 "Territory" means the United States.

2.    License.

2.1  Grant.  BioSafe hereby grants to Company, and Company hereby unconditionally and irrevocably accepts, a non-exclusive, non-transferable and non-assignable revocable license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology solely in the Field exclusively in the Territory for the purpose of processing, and making Determinations from, the Company Test.  The grant of the license is subject to Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do analysis of total cholesterol, HDL, LDL and triglycerides screens using BioSafe's proprietary methods, techniques and processes, and to the continued fulfillment of all of the other terms and conditions of this Agreement.  In addition, the license has been granted solely, and is valid only, for the number of Determinations set forth in Section 9.  Determinations in excess of such annual number shall be in violation of the license and shall be subject to additional charges in accordance with BioSafe's policies and procedures.  In consideration of the license granted herein to Company, beginning with the Effective Date, Company shall pay to BioSafe the monthly license fee set forth in Section 9.  Such license fee shall be due and payable by the Company on the first day of each month.  If the Effective Date does not fall on the first day of the month, the first payment shall be a pro-rata portion of the monthly license fee, calculated on a 30-day basis, due and payable on the Effective Date.  In connection with the license, BioSafe: (i) will provide training to Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes; (ii) will provide Company with a list of all components used in the Cholesterol Panel to enable Company to assemble a self-collection blood screen kit substantially identical to the Cholesterol Panel; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Cholesterol Panel, and (iv) will make Collection Cards available for purchase at an initial cost of $1.25 each, subject to change upon 90 days prior written notice.

2.2  Non-exclusive.  Company understands and acknowledges that, since the license herein granted is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses or the right to distribute or manufacturer the Cholesterol Panel or any similar type product during the term of this Agreement; in each case without breaching this Agreement; provided, however, that notwithstanding the foregoing to the contrary; during the term of this Agreement, Company shall be the exclusive licensee within the State of South Dakota of BioSafe Technology for the Company Test.

2.3  Sale Outside the Territory.  C ompany s hall n ot m arket, s ell o r o ffer f or s ale t he C ompany T est o utside o f t he Territory.  Accordingly, Company shall limit its sales activities with respect to the Company Test to customers located in the Territory.  Company shall refer to BioSafe all orders and inquiries relating to a cholesterol screen originating from within or outside the Territory to the extent such orders or inquiries relate to such screens destined for use outside the Territory.

2.4  Competing Activities.  During the term of this Agreement and for a period of one year following its termination, Company will not, without BioSafe's prior written consent: (i) make, use, license, sublicense, assign, sell, offer to sell or otherwise transfer the Company Test for or to, or enter any agreement or authorize any third party to do any of the foregoing with, (a) any Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides, (b) any Affiliates or agents of a Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides or (c) any Person that Company, its Affiliates or agents knows or believes will manufacture, distribute, sell or otherwise transfer, or has manufactured, distributed, sold or otherwise transferred, the Company Test or the Cholesterol Panel to, on behalf of, or under any agreement with, a party identified in the immediately preceding clauses (a) and (b); or (ii) sell or distribute the

2

Company Test or the Cholesterol Panel as a consumer product through mass merchandisers, drug stores or other retail stores.

2.5 Non-assignable. Neither the license granted to Company, nor any of the rights, technology and trademarks included in the license, are assignable or transferable in any manner or way whatsoever by Company, including the right of Company to grant any sub-licenses.

2.6 Reverse Engineering. Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

2.7 Advertising and Publications. Company will not use on a web site or in any other manner or way any material of any kind or nature in any form or medium that refers, in any manner or way, to the BioSafe Technology, the BioSafe Patent Rights, the BioSafe Technology Rights, the Cholesterol Panel, BioSafe or any other BioSafe intellectual property without BioSafe having first reviewed the proposed use and approved it in writing. Company will not publish outcome or evidence-based data obtained using the Company Test without BioSafe's prior written approval.

2.8 No Challenge. At no time, either during or following the expiration of the term of this Agreement, will Company challenge or assist any other Person in challenging the BioSafe Marks, the BioSafe Patents Rights or the registration thereof.

2.9 No Registration of Similar Marks. At no time, either during or following the expiration of the term of this Agreement, will Company attempt to register any trademarks, service marks, marks, names or trade names confusingly similar to or closely resembling any of the BioSafe Marks.

2.10 No Similar Methods. At no time, either during or following the expiration of the term of this Agreement, will Company use or attempt to use any method, technique or process similar to the BioSafe Technology to analyze or make Determinations which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

2.11 Proprietary Rights. Title and full ownership of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to Company any right of ownership or any other right of any kind or nature whatsoever in or to such rights, technology, marks and other BioSafe intellectual property, other than the right to use such rights, technology and marks in accordance with the terms and provisions of this Agreement.

2.12 Cessation of Use. At the expiration of the term, or the termination of Company's right to use the license granted herein, any and all rights and licenses that Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's intellectual property shall immediately terminate and Company shall immediately cease using them in any manner or way whatsoever. Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of its other intellectual property. Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other intellectual property subsequent to the expiration or termination of this Agreement and the termination of the license granted hereby.

2.13 Independent Contractor Status. The relationship of BioSafe and Company established by this Agreement is that of independent contractors, and no other relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner which expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between Company and its customers are Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3.   Company's Obligations. During the Term of this Agreement, Company will: (i) pay to BioSafe, its agent or assignee a monthly license fee in accordance with the terms of this Agreement; (ii) assemble the Company Test only with the components set forth on the list of components provided by BioSafe (including the Collection Card), or those deemed by BioSafe to be substantially identical, purchase from BioSafe all Collection Cards included in the Company Test, and procure from BioSafe or independently from BioSafe all other components in the Company Test; (iii) sell the Company Test in accordance with all applicable laws, rules and regulations, including the Health Insurance Portability

and Accountability Act of 1996, and the privacy regulations created as a result of such act, and all of the terms and provisions of this Agreement; (iv) conduct its business of selling the Company Test solely in its name, at its sole cost and expense; (v) avoid deceptive, misleading or unethical practices or making any false or misleading representations with respect to the Company Test; (vi) maintain competent, well-trained personnel of its own selection who shall engage in the sale and the laboratory analysis of the Company Test; (vii) obtain all licenses, permits, registrations and approvals, governmental or otherwise, and pay all duties, taxes, excises and payments, that are required for Company to sell the Company Test and to perform the laboratory analysis; (viii) be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Company Test in the Territory; (ix) be solely responsible for all costs and expenses of any kind or nature related in any manner or way to the assembling, sale and analysis of the Company Test, including any required translations; (x) maintain its certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the term of this Agreement; (xi) ensure appropriate hazardous and non-hazardous waste disposal in accordance with all applicable rules and regulations; (xii) ensure it has adequate and legally compliant laboratory information systems and laboratory report-generating systems, including security of the data base related to patient confidentiality, accuracy of laboratory reports and transmission of related data, appearance of laboratory reports and secured back-up storage of relevant records; (xiii) maintain at its cost and expense the laboratory facility and equipment, including a Roche P-Modular analyzer and/or any other equipment specified by BioSafe, to test, analyze and make Determinations from the Company Test using BioSafe proprietary methods, techniques and processes; (xiv) be responsible for all of its own expenses, including providing such office space, facilities and personnel as are required to perform its obligations under this Agreement and all costs and expenses related to the advertising, marketing, promotion and sale of the Company Test, and the analysis thereof, in the Territory; (xv) not incur any expense chargeable to BioSafe except as may specifically be authorized in advance in writing by BioSafe; (xvi) maintain in effect during the term of this Agreement and for a period of five years thereafter appropriate liability insurance policies, copies of which shall be delivered to BioSafe, covering the sale and laboratory analysis of the Company Test with a recognized insurance carrier on such terms as are acceptable to BioSafe, which must include BioSafe as an additional named insured for the same limits of liability as are provided for Company, but in no event less than two million dollars, a waiver of subrogation rights against BioSafe and the requirement that BioSafe receive not less than sixty days prior written notice of any modification or termination of coverage; (xvii) observe and adhere to the provisions of any confidentiality agreement between BioSafe and Company; (xviii) indemnify BioSafe in accordance with the provisions of this Agreement; and (xix) prominently display on the front of the packaging of the Company Test, in a place approved by BioSafe, the BioSafe logo, "Science by BioSafe", the form of which will be furnished by BioSafe to Company.

4.   Term. S ubject to e arlier t ermination o f C ompany's r ight t o u se the l icense, u pon the o ccurrence o f a ny e vent specified below, the term of this Agreement shall be for a 60-month period commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such 60-month period.

4.1   BioSafe's Right to Terminate. Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate Company's license and the use of all rights, technology and processes related thereto prior to the expiration of the term immediately upon the occurrence of any of the following events: (i) any law, rule or regulation is adopted or is in effect in the Territory, or elsewhere, that would restrict any of BioSafe's rights hereunder, otherwise invalidates any provision hereof or materially affects BioSafe's or Company's ability to perform its obligations under this Agreement; (ii) if Company makes any false or untrue statement or representation herein or in the performance of its obligations hereunder; (iii) if Company, in BioSafe's sole opinion, engages in any fraudulent or dishonest activity; (iv) if Company breaches any of the provisions of Sections 2.3 through 2.10, Section 6 or Company attempts to assign this Agreement, or any of its rights and obligations herein.; (v) if Company fails to become accredited or fails any BioSafe laboratory proficiency testing or fails to correct deficiencies within the specified period to maintain its certification to use BioSafe's proprietary methods, techniques and processes; (vi) as set forth in Section 5;  (vii) Company exceeds the annual number of Determinations for which the license has been granted; (viii) Company fails to make timely payment of any monthly license fee due hereunder; (ix) Company breaches or is in default of a material obligation under this Agreement (other than the p ayment o f the m onthly l icense fee) and the d efault o r b reach is n ot c ured to B ioSafe's satisfaction within ten days after Company's receipt of written notice stating the nature of the default; (x) Company becomes i nsolvent, m akes a g eneral a ssignment f or the benefit o f creditors, s uffers or p ermits the appointment o f a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up, liquidated its business, stopped doing business as a going concern, merges or consolidates its business or transfers all or substantially of its assets, voluntarily or otherwise; or (xi) an order

or notice shall be published by any government or Governmental Body requiring the cessation of activities by Company or BioSafe.

4.2  Rights Upon Termination or Expiration.  Upon expiration of the term of this Agreement, or termination of Company's right to use the license prior thereto, in accordance with the provisions of this Agreement, all rights, privileges and licenses granted in this Agreement to Company shall immediately cease and terminate. Accordingly: (i) Company shall immediately cease using any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of BioSafe's intellectual property, and shall certify in writing to BioSafe that it has completely terminated its use thereof; (ii) Company shall immediately cease all sales and other activities with respect to the Company Test, and Company shall take all action required to terminate Company's registration, if any was required, as a seller of the Company Test and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required; (iii) Company shall immediately cease using and return to BioSafe all of BioSafe's confidential information; (iv) all indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived; and (v) BioSafe shall not have any obligation to repurchase or to credit Company for its inventory of Collection Cards or Company Tests at the time of termination of Company's right to use the license, or expiration of the term, of this Agreement.

4.3  Survival of Prior Obligations.  Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the term or otherwise: (i) shall not relieve Company of any obligation incurred prior to such termination; and (ii) the obligation of Company under the provisions of any confidentiality agreement between BioSafe and Company with respect to the protection and non-disclosure of Confidential Information, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

5.  Patents.  Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third party of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks.  BioSafe shall have the right, but not the obligation, (and Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of Company, if necessary, anywhere in the world against a third party at its own expense. Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BioSafe's expense. If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without Company's prior consent. BioSafe shall not be liable to Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for a lleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other intellectual property of BioSafe infringes any patent, copyright or trademark or other intellectual property right of such third party.  BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding.  BioSafe will pay any final judgment entered against Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, BioSafe shall be relieved of any obligation to defend or pay for such defense unless Company notifies BioSafe in writing of such claim, suit, action or proceeding within five business days after becoming aware of it and Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding.  If it is finally determined by a court of competent jurisdiction, or if BioSafe in its sole discretion determines, that any of BioSafe's intellectual property infringes any copyright, trademark or any other intellectual right of a third party, then BioSafe may, in its sole discretion and expense, take any action. Notwithstanding any other provision herein contained to the contrary, BioSafe shall not have any liability for any infringement which results from any act of Company, including Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other intellectual property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, method or process or Company's modifications of BioSafe's rights, technology or property.

5

6.    Company's Representations and Warranties. Company represents and warrants that each of the following shall survive the execution and delivery of this Agreement, are true and correct now and will be throughout the entire term of Agreement: (i) Company is an entity duly organized, existing and in good standing under the laws of the state of its incorporation or organization set forth on the signature page hereof, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities and to incur the obligations herein contained; (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, does not require the approval or consent of any third Person, does not and will not conflict with, violate or breach Company's articles of incorporation or organization, any agreement to which it is a party or any law, rule or regulation or court decree or order; (iii) this Agreement is the legal, valid and binding obligation of Company, enforceable in accordance with its terms at all times; (iv) Company will comply with all applicable laws, consent decrees and regulations of any federal, state or Governmental Body wherever located; (v) Company owns, holds or possesses all Governmental Body and private licenses, franchises, permits, privileges, approvals and other authorizations which are necessary for it to carry on and conduct its business, to sell the Company Test and to make Determinations; (vi) there is no action, suit or proceeding pending or, to the best knowledge of Company, threatened, which questions the legality or propriety of the transaction contemplated by this Agreement or which, if decided adversely against Company, would prevent Company from fulfilling all of its obligations under this Agreement; and (vii) Company has no expectation and has received no assurance or guarantee of any kind or nature it will obtain any anticipated amount of profits or revenue as a result of Company selling the Company Test or making Determinations.

7.    Disclaimer of Warrant and Limitation of Liability.

7.1    Disclaimer of Warranty. Section 7.1 has been deleted in its entirety. There is no Section 7.1 of the Agreement.

7.2    Limitation of Liability. **In no event shall BioSafe be liable under any legal or equitable theory, and Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential or punitive damages of any kind or nature whatsoever, however caused, suffered by Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.**

8.    Indemnification. Company shall indemnify and hold BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a BioSafe Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any BioSafe Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by Company of, or any failure by Company to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by Company.

BioSafe shall indemnify and hold Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a Company Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any Company Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by BioSafe.

9.    Determinations and Monthly License Fee. In consideration of the license granted herein to Company, beginning with the Effective Date and until ~~December~~ 31, ~~2004~~ Company will pay to BioSafe a monthly license fee of one thousand two hundred and fifty dollars ($1,250) per month and commencing ~~January~~ 1, 2005 and for the remainder of the Term, Company will pay a monthly license fee of six thousand two hundred and fifty dollars ($6,250) for the right to process up to sixty thousand (60,000) Determinations per year. Each such payment shall be due and payable by the Company on the first day of each month. If the Effective Date does not fall on the first day of the month, the first and last payment shall be a pro-rata portion of the amount payable.

During normal business hours and upon reasonable notice, BioSafe shall have the right to inspect and audit Company's books and records to confirm the number of annual Determinations performed by Company. All costs and expenses of such inspection and audit shall be paid by BioSafe unless it is determined that the number of annual Determinations performed by Company exceeded the annual number of Determinations indicated above, in which case Company shall be responsible for such costs and expenses.

10. Miscellaneous Provisions.

10.1 Amendments And Waiver. The Parties, by mutual agreement in writing, may amend, modify or supplement this Agreement. Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof. The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof. Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

10.2 Assignment. This Agreement is personal to Company; therefore, Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe. No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of Company. BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company or notice.

10.3 Benefit of Agreement. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties. Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims Company may have against BioSafe. Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto and their successors and permitted assigns and the BioSafe Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

10.4 Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the original or the same counterpart. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterparts.

10.5 Governing Law. The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States. EACH OF THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION.

10.6 Headings. The Section headings contained in this Agreement are for convenience only and shall not serve to modify, interpret or affect the meaning of the Sections at the beginning of which they appear.

10.7 Section 10.7 has been deleted in its entirety. There is no section 10.7 of the Agreement.

10.8 No Drafting Presumption. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

10.9 Severability. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement. The Parties shall endeavor in good faith negotiations to replace the invalid, inoperative, illegal or unenforceable provision with a valid and enforceable one, the economic effect of which comes as close as possible to that of the invalid provision.

10.10 Notices. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (i) when delivered, if delivered personally, (ii) four days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid, (iii) the next business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service, and (iv) on the date of delivery if delivered by facsimile transmission, receipt confirmed, provided that a confirmation copy is sent on the next business day by registered or certified mail, return receipt requested and postage prepaid, in each case addressed as follows:

If to BioSafe, to:

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, Illinois USA 60045
Attention: President
Facsimile: 847.234.8222
Confirmation Phone No.: 847.234.8111

If to Company, to the address set forth on the signature page hereof,
or to such other address as the recipient Party may indicate by a notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such notice).

10.11    Attorneys' Fees and Costs. In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

10.12    Announcements. N either Party s hall i ssue a ny p ress r elease o r o ther p ublicity m aterials w ith r espect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party. This restriction shall not apply to disclosures required by law or regulation.

10.13    Cumulative Remedies. If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

10.14    Extension of Term. Upon sixty (60) days written notice given prior to the end of the term of this Agreement, Company shall have the right to extend this Agreement for an additional five (5) year period provided that BioSafe and the Company can agree to terms and conditions acceptable to both of the Parties for such additional five (5) year term.

10.15    Further Assurances. Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonable deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

10.16    Interpretation. Whenever used in this Agreement, (i) the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders, and (ii) "including" shall be deemed to mean "including not limited to".

10.17    Interest. Any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.

10.18    Entire Agreement. This Agreement constitutes t he e ntire a greements a nd understandings b etween the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

THE REMAINDER OF THIS PAGE HAS INTENTIONALL BEEN LEFT BLANK. THE NEXT PAGE IS THE SIGNATURE PAGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE MEDICAL TECHNOLOGIES, INC.

By: *David C. Fleisner* (signature)

David C. Fleisner, President

COMPANY

Sioux Valley Hospital USD Medical Center
(Print Company name and state of incorporation or organization)

By: *Rosemary Bour* (signature)
(Signature of authorized party)

Rosemary Bour  VP ER/Trauma/Surgery
(Print name and title of person signing)

1305 W 18th St, Sioux Falls, SD 57105
(Print address of Company)

605 - 333 - 6422
(Print Company telephone number)

605 - 333 - 1531
(Print Company facsimile number)

Addendum I

*BM* *PB September* ~~June~~ *August 2005* *PB BM*

X

For the one-year period from ~~January~~ 1, 2004 through ~~December~~ 31, ~~2004~~, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 Cholesterol Determinations for such year at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Company for such calendar year provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

*PB*    *September*

For each calendar quarter from and after ~~January~~ 1, 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 Cholesterol Determinations per quarter at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Company for such calendar quarter provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

*PB X BM*

~~Notwithstanding~~ anything in this Agreement to the contrary, Company shall have the right to suspend this ~~Agreement~~ upon written notice to BioSafe given within the sixty (60) ~~day period~~ following the end of any ~~calendar year~~ in the term of this Agreement ~~with respect~~ to which the Company's annual gross revenue in such ~~calendar year~~ from ~~Cholesterol~~ Determinations referred to it by BioSafe or from any other source, including ~~but not limited to Cholesterol~~ Determinations performed on tests sold by Company, is less than the amount set forth below ~~for the Anticipated~~ Gross Revenue for such year ~~(provided that Company furnishes BioSafe with documentary evidence,~~ satisfactory to ~~BioSafe~~ and attested to by Company's chief financial officer or its president, ~~supporting~~ Company's claim).

For purposes of this Agreement, Anticipated Gross Revenue for the first calendar year in the term of this Agreement is twenty-two thousand five hundred dollars ($22,500), and the Anticipated Gross Revenue for each of the second, third, fourth and fifth calendar years in the term of this Agreement is one hundred eight thousand dollars ($108,000).

Notwithstanding the foregoing provisions to the contrary, if any year in the term of this Agreement is less than a full calendar year, Anticipated Gross Revenue for such period shall be determined by multiplying the Anticipated Gross Revenue for such year (set forth above) by a fraction, the numerator of which shall be the actual number of days in the year in question, and the denominator of which shall be three hundred and sixty-five (365).

Dated: _6/1/04_

BioSafe Medical Technologies, Inc.

By: _____

COMPANY

By: _Rosemary Bour_

05/05/2004 10:36 FAX 605 328 5434          CLM CLIENT SUPPORT                           002
   05/05/2004  09:52      847-234-8222          BIO SAFE                            PAGE  02

ADDENDUM II

      Notwithstanding anything to the contrary contained in this Agreement, at any time during the term of this Agreement, BioSafe may grant licenses of the BioSafe Technology for the Company Test for use within the State of South Dakota to laboratories with facilities in more than one state, including South Dakota, and such grant shall not be deemed to be a breach of this Agreement.

Dated: 6/6/04

BioSafe Medical Technologies, Inc.                    Company

By: _____                    By: _____

                                          Kay W Reinartz
                                      General Manager

C: Kay Reinartz





1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.siouxvalley.org

October 27, 2005

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Since Sioux Valley Hospital has been referred zero (ø) determinations from Biosafe or any other source pursuant to this agreement and zero (ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of September 1, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by November 10, 2005.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

EXHIBIT
B

Accredited by the Joint Commission or Accreditation of Healthcare Organizations





## Sioux Valley Hospital
## USD Medical Center

1305 W. 18th Street
PO Box 5039
Sioux Falls, South Dakota 57117-5039
(605) 333-1000
www.siouxvalley.org

February 6, 2006

COPY

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The one-quarter period (September 1, 2005 through November 30, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

Since Sioux Valley Hospital has been referred zero (∅) determinations from Biosafe or any other source pursuant to this agreement and zero (∅) revenue, Sioux Valley Hospital is claiming that a payment of twenty-seven thousand dollars ($27,000) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of November 30, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by February 20, 2006.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital



EXHIBIT
C

*Accredited by the Joint Commission on Accreditation of Healthcare Organizations*



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD  57117-5039
Phone: (605) 333-1000
www.sanfordhealth.org

October 18, 2007

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) and eight (8) subsequent
calendar quarters (September 2005 through August 31, 2007) of the agreement between Biosafe
Medical Technologies, Inc and Sioux Valley Hospital have been completed.

According to Addendum I of the agreement;  for the one-year period from September 1, 2004
through August 31, 2005, if Sioux Valley Hospital's gross revenue from cholesterol
determinations referred to it by Biosafe or from any other source is less than twenty-two
thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for
such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital
the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross
revenue received by Sioux Valley Hospital for such calendar year.

Furthermore, according to Addendum I of the agreement; for each calendar quarter from and
after September 1, 2005, if Sioux Valley Hospital's gross revenue from cholesterol
determinations referred to it by Biosafe or from any other source is less than twenty-seven
thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at
$9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the
difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue
received by Sioux Valley Hospital for such calendar quarter.

In the first one-year period, Sioux Valley Hospital has been referred zero (Ø) determinations
from Biosafe or any other source and zero (Ø) revenue. Pursuant to the agreement, Sioux Valley
Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is
due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the first one-year
period of the agreement.

In the subsequent eight (8) calendar quarters, Sioux Valley Hospital has been referred
Three thousand eight hundred twenty one (3,821) determinations from Biosafe or any other
source pursuant to this agreement and thirty-four thousand three hundred eighty-nine dollars
($34,389) billed revenue ($23,561.01 paid on account as of 9/30/2007). Pursuant to the
agreement, Sioux Valley Hospital is claiming that a payment of one hundred ninety-two

*Accredited by the Joint Commission on Accreditation of Healthcare Organizations*



EXHIBIT

D

thousand four hundred thirty eight dollars and ninety-nine cents ($192,438.99) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the eight calendar quarter periods from September 1, 2005 through August 31, 2007 of the agreement.

This letter is to inform you that total payment of two hundred fourteen thousand nine hundred thirty eight dollars and ninety-nine cents ($214,938.99) is due and payment is expected by November 16. A worksheet summary of charges, payments received, and balance due is attached to this letter.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

## BioSafe Contract: Contract vs Actual

Term of Contract: September 1, 2004 thru August 31, 2009
5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| | | | | | | |
| Total To Date | 26,500 | $238,500.00 | 3,821 | $ 34,389 | (22,679) | $(204,111.00) |
| Payments Received | | $(23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $214,938.99 | | | | |

## BioSafe Contract: Contract vs Actual

**Term of Contract: September 1, 2004 thru August 31, 2009**
**5 Years**

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| Q9: 9/07-11/07 | 3,000 | $ 27,000 | 99 | $ 891 | (2,901) | $ (26,109) |
| 12/07-01/08 pro rated partial quarter | 2,000 | $ 18,000 | 227 | $ 2,043 | (1,773) | $ (15,957) |
| | | | | | | |
| Total To Date | 31,500 | $ 283,500.00 | 4,147 | $ 37,323 | (27,353) | $(246,177.00) |
| Payments received as of 2-11-08 | | $ (23,561.01) | | | | |
| GRAND TOTAL of amount past due | | $ 259,938.99 | | | | |

| Payments Made by Biosafe | | |
|---|---|---|
| Date | Amount | |
| 5/23/2007 | $13,976.01 | |
| 6/14/2007 | $6,165.00 | |
| 9/21/2007 | $3,420.00 | |
| | Total | $23,561.01 |



EXHIBIT

E

STATE OF SOUTH DAKOTA   )             IN CIRCUIT COURT
                        : SS
COUNTY OF MINNEHAHA   )          SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| SANFORD USD MEDICAL CENTER formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, | * * * * * | CIV. 08-825 |
| Plaintiff, | * * | |
| vs. | * * | **PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS** |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., DELPHI ENERGY FUND, INC., and FIRST COMMERCIAL CAPITAL CORP., | * * * * | **TO DEFENDANT BIOSAFE MEDICAL TECHNOLOGIES, INC. (FIRST SET)** |
| Defendants. | * * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center, formerly known as Sioux Valley Hospital and USD Medical Center ("Sanford"), under SDCL 15-6-34, request Defendant BioSafe Medical Technologies, Inc. ("BioSafe") to produce and permit counsel for Plaintiff to inspect and copy each of the following documents.

"You," "your" or "BioSafe" as used in this Request For Production of Documents is defined to mean Defendant BioSafe Medical Technologies, Inc. and any of its employees, agents and representatives.

1.     All writings, letters, notes, e-mail messages, reports, sketches, diagrams, materials and documents that you have ever received from or sent to Sanford or any of its employees, officers, directors, representatives, or agents.

2.     All writings, letters, notes, e-mail messages, reports, sketches, diagrams, materials and documents that you have ever received from or sent to First Commercial Capital Corp.,

Delphi Energy Fund, Inc., Brian Linehan, or Allen & Company, L.L.C., or any of their employees, officers, directors, representatives, or agents.

3.    All contracts entered into between you and Sanford.

4.    All contracts entered into between you and First Commercial Capital Corp., Delphi Energy Fund, Inc., Brian Linehan or Allen & Company, L.L.C.

5.    All contracts that BioSafe has entered into with laboratories or medical facilities for referral of cholesterol testing.

6.    All records showing cholesterol testing referred by BioSafe to Sanford and to any other entity that does cholesterol testing.

7.    All business records concerning factoring of accounts receivables or assignments of rights to payment from BioSafe to First Commercial Capital Corp., Delphi Energy Fund, Inc., Brian Linehan and/or Allen & Company, L.L.C.

8.    All financial statements, balance sheets, income statements of BioSafe from 2002, through the date of trial herein.

9.    All writings, letters, notes, e-mail messages, reports, sketches, diagrams, materials and documents that you have ever received from or sent to any person or entity (other than your own counsel) concerning in any way Sanford.

10.    All documents to be used by you or your attorney as exhibits at hearing or trial.

11.    All writings, letters, notes, e-mail messages, reports, sketches, diagrams, materials and documents relied upon by you or referred to by you or anyone assisting you in answering the interrogatories served with this set of Requests For Production of Documents.

12.     All writings, letters, notes, e-mail messages, reports, sketches, diagrams, materials and documents regarding in any way any conversation that you have had with Sanford or any of its employees, representatives, officers, directors, or agents.

13.     All writings, letters, notes, e-mail messages, reports, sketches, diagrams, materials and documents regarding in any way any conversation that you have had concerning Sanford.

14.     All documents showing the identity, purchase, shipping, delivery, installation and value of any equipment purportedly leased by BioSafe to Sanford.

15.     All minutes of BioSafe board of director's meetings relating to Sanford.

16.     All pleadings and deposition transcripts from any lawsuit related to BioSafe's alleged breach of any contract to refer cholesterol testing.

17.     The document retention policy, if any, of BioSafe.

18.     Any and all charts showing the corporate structure, employment structure or ownership structure of BioSafe.

19.     All documents sent to or received from any expert, if any, retained by BioSafe to testify at trial.

20.     All documents concerning the relationship of BioSafe with First Commercial Capital Corp., Delphi Energy Fund, Inc., Brian Linehan or Allen & Company, L.L.C.

21.     Any document or material referred to by BioSafe in responding to the Requests For Admissions served herewith.

22.     Any document relating to the business plan of BioSafe for cholesterol testing and referrals of cholesterol testing.

23.     The declarations page and contract of insurance for any coverage that may be implicated by the allegations of the Complaint and Amended Complaint.

3

Dated at Sioux Falls, South Dakota, this 29ℓℓ day of July, 2008.

> DAVENPORT, EVANS, HURWITZ &
> SMITH, L.L.P.
>
> _____
> ROBERTO A. LANGE
> 206 West 14th Street
> P. O. Box 1030
> Sioux Falls, SD 57101-1030
> Telephone (605)336-2880
> Fax No.: (605)335-3639
> *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and

correct copy of the foregoing "*Plaintiffs' Request For Production of Documents  to Defendant

BioSafe Medical Technologies, Inc. (First Set)*" was served by mail upon:

> Jon C. Sogn
> LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
> P. O. Box 2700
> Sioux Falls, SD  57101-27000

on this 29ℓℓ day of July, 2008.

_____

4

STATE OF SOUTH DAKOTA ) IN CIRCUIT COURT
                         : SS
COUNTY OF MINNEHAHA ) SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| SANFORD USD MEDICAL CENTER<br>formerly known as SIOUX VALLEY<br>HOSPITAL and USD MEDICAL CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSAFE MEDICAL TECHNOLOGIES, INC.,<br>DELPHI ENERGY FUND, INC., and<br>FIRST COMMERCIAL CAPITAL CORP.,<br><br>Defendants. | \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* | CIV. 08-825<br><br><br>**PLAINTIFFS' INTERROGATORIES<br>TO DEFENDANT BIOSAFE<br>MEDICAL TECHNOLOGIES, INC.<br>(FIRST SET)** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center, formerly known as Sioux Valley Hospital and USD Medical Center ("Sanford"), under SDCL 15-6-33, propounds the following written Interrogatories to the above-named Defendant BioSafe Medical Technologies, Inc. ("BioSafe") for answer under oath within thirty (30) days of the service hereof. These Interrogatories are continuing in nature, requiring BioSafe to file supplemental or additional answers to these Interrogatories when BioSafe, its agents, or attorneys obtain information in addition to or different from any information provided in these original answers to these Interrogatories.

"You" or "your" as used in these Interrogatories is defined to mean Defendant BioSafe Medical Technologies, Inc., and any of its employees, representatives or agents.

    1.    State the name, home address and business address of each person answering these Interrogatories.

2.     State the name and address of each and every person providing or furnishing any information used by you in preparing answers to these Interrogatories, and state which interrogatories said person assisted in answering.

3.     State the name, home address, business address, phone number and relationship to you of all persons who have knowledge or information relating to the claims and defenses made herein who are known to you, or your counsel, associates, investigators, employees, or agents, whether obtained in the course of investigation, preparation of trial, or otherwise.

4.     For each person listed in response to Interrogatory 3, describe in detail the information you believe each such person to possess relevant to the claims and defenses in this action.

5.     State the name, home address, business address, and phone number of each person you expect to call as a witness at trial on your behalf.

6.     Provide a list of each and every exhibit you intend to introduce at trial, including the date, author, recipients and description of each document.

7.     If you are going to call any expert at trial, state:

    a.     The name and address of each person whom you or your attorney expects to call as an expert at trial;

    b.     The qualifications of each expert;

    c.     The subject matter about which each expert is expected to testify;

    d.     The substance of the facts and opinions to which each expert is expected to testify;

    e.     A summary of the grounds for each such opinion;

    f.     A bibliography of all literature, treatises, papers or other publications supporting the opinion of each expert; and

       g.     A list of all cases in which each expert has given testimony in deposition or trial in the previous five years.

8.     For each and every admission against interest that you claim was made by an employee, officer, owner, or representative of Sanford, state the following with respect to each alleged admission against interest:

       a.     The date, time and place of the alleged admission against interest;

       b.     The name, address, and phone number of each and every person who was present at the time the alleged admission against interest was made;

       c.     The name, position, and address of the representative of Sanford who made the alleged admission against interest;

       d.     What precisely was said which you claim to be an admission against interest; and

       e.     Whether and what documents or materials exist concerning the alleged admission against interest.

9.     Describe in detail each and every relationship, contract, or business dealing that you have had with First Commercial Capital Corp., Delphi Energy Fund, Inc., Brian Linehan, or Allen & Company, L.L.C.

10.     With respect to any contract you entered into with Sanford, state the following:

       a.     The name or title of each contract;

       b.     The date of each and every such contract; and

       c.     Describe in detail each such contract by stating the date, parties, and core terms.

11.     With respect to each, every and any contract you entered into with First Commercial Capital Corp., Delphi Energy Fund, Inc., Brian Linehan, or Allen & Company, L.L.C., state the following:

       a.     The name or title of each contract;

      b.      The date of each and every such contract; and

      c.      Describe in detail each such contract by stating the date, parties, and core terms.

12.      For each communication that BioSafe has had with any employee or representative of Sanford, state the following:

      a.      The date, time, and length of the conversation or communication;

      b.      Whether the conversation or communication was by telephone or in person and, if in person, the place where the communication or conversation occurred;

      c.      The name of each and every employee, owner, officer or representative of Sanford involved in each such conversation;

      d.      The names and addresses of each and every person involved in each such conversation or communication listed;

      e.      A complete description of what was said and by whom; and

      f.      A description of each and every document, note, or material of any nature concerning each such communication or conversation.

13.      For each communication that BioSafe has had with any employee, officer, owner, or representative of First Commercial Capital Corp., concerning Sanford or cholesterol testing equipment, state the following:

      a.      The date, time, and length of the conversation or communication;

      b.      Whether the conversation or communication was by telephone or in person and, if in person, the place where the communication or conversation occurred;

      c.      The name of each and every employee, owner, officer or representative of First Commercial Capital Corp., involved in each such conversation;

      d.      The names and addresses of each and every person involved in each such conversation or communication listed;

      e.      A complete description of what was said and by whom; and

f.      A description of each and every document, note, or material of any nature concerning each such communication or conversation.

14.     For each communication that BioSafe has had with any employee, officer, owner, or representative of Delphi Energy Fund, Inc., including but not limited to Brian Linehan, concerning Sanford or cholesterol testing equipment, state the following:

a.      The date, time, and length of the conversation or communication;

b.      Whether the conversation or communication was by telephone or in person and, if in person, the place where the communication or conversation occurred;

c.      The name of each and every employee, owner, officer or representative of Delphi Energy Fund, Inc. involved in each such conversation;

d.      The names and addresses of each and every person involved in each such conversation or communication listed;

e.      A complete description of what was said and by whom; and

f.      A description of each and every document, note, or material of any nature concerning each such communication or conversation.

15.     For each communication that BioSafe has had with any employee, officer, owner, or representative of Allen & Company, L.L.C., state the following:

a.      The date, time, and length of the conversation or communication;

b.      Whether the conversation or communication was by telephone or in person and, if in person, the place where the communication or conversation occurred;

c.      The name of each and every employee, owner, officer or representative of Allen & Company, L.L.C. involved in each such conversation;

d.      The names and addresses of each and every person involved in each such conversation or communication listed;

e.      A complete description of what was said and by whom; and

f.      A description of each and every document, note, or material of any nature concerning each such communication or conversation.

16.    Describe in detail what, if any, equipment you claim you leased to Sanford,

including the following:

      a.    The name of each piece of equipment and serial number thereon;

      b.    When, from what entity and at what price BioSafe acquired the equipment;

      c.    When you delivered the equipment to Sanford, where you delivered the equipment, who signed for the equipment; and

      d.    The current fair market value for each such piece of equipment.

17.    If you entered into any other Agreement to refer cholesterol testing, state:

      a.    The date of the Agreement;

      b.    The entity with which you made the Agreement;

      c.    Whether you entered into any agreement regarding monthly payments back to you for lease of equipment;

      d.    What volume of cholesterol testing you guaranteed under each agreement;

      e.    What volume of cholesterol testing you referred per month;

      f.    Whether the agreements are still in place, terminated, or subject to litigation;

      g.    Whether the other party to the agreement makes monthly payments under the agreement and, if not, when that party ceased the monthly payments and why.

18.    For each and every lawsuit in which BioSafe has ever been involved as a party,

state the following:

      a.    The caption of the lawsuit;

      b.    Whether BioSafe was/is a Plaintiff, Defendant, or other party in the lawsuit;

      c.    The place where the lawsuit was venued or filed and the case number assigned to the lawsuit;

d.    A description of the facts and causes of action involved in the lawsuit; and

e.    A description of the outcome of the lawsuit.

19.    If you responded to any of the Requests For Admissions served by Sanford with any response other than an unqualified admission, describe in detail all reasons why you did not provide an unqualified admission and all evidence that you have to support any denial or partial denial of each such request.

20.    If you are raising any affirmative defenses in your answer, describe in detail the factual basis of any alleged affirmative defenses and the names and addresses of any person with knowledge of facts supporting the affirmative defense.

21.    State the name, address and percent of ownership for each and every person or entity that owns any part of BioSafe.

22.    State whether any policy of insurance provides coverage for the claims in the Complaint or Amended Complaint and, if so, the name of your carrier, the type of coverage, and the appropriate liability limit

Dated at Sioux Falls, South Dakota, this __29th__ day of July, 2008.

<div style="text-align:right">

DAVENPORT, EVANS, HURWITZ &
SMITH, L.L.P.


_____
ROBERTO A. LANGE
206 West 14th Street
P. O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605)336-2880
Fax No.: (605)335-3639
*Attorneys for Plaintiff*

</div>

## **CERTIFICATE OF SERVICE**

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and

correct copy of the foregoing "*Plaintiffs' Interrogatories to Defendant BioSafe Medical

Technologies, Inc. (First Set)*" was served by mail upon:

>Jon C. Sogn
>LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
>P. O. Box 2700
>Sioux Falls, SD  57101-27000

on this __24th__ day of July, 2008.

_____

# EXHIBIT 6

P. DANIEL DONOHUE
DAVID L. KNUDSON
EDWIN E. EVANS
ROBERT E. HAYES
CHARLES D. GULLICKSON
SARAH RICHARDSON LARSON
MONTE R. WALZ
THOMAS M. FRANKMAN
RICK W. ORR
TIMOTHY M. GEBHART
JONATHAN P. BROWN
SUSAN BRUNICK SIMONS
CATHERINE A. TANCK
ROBERTO A. LANGE
CHERYLE WIEDMEIER GERING
SCOTT B. ANDERSON
MARK W. HAIGH
DIXIE K. HIEB
SANDRA K. HOGLUND HANSON
KEITH A. GAUER
KRISTI GEISLER HOLM
MELISSA C. HINTON
DOUGLAS J. HAJEK

**DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.**
LAWYERS

206 WEST 14TH STREET
P.O. BOX 1030
SIOUX FALLS, SOUTH DAKOTA 57101-1030

TELEPHONE (605) 336-2880
FAX (605) 335-3639
www.dehs.com

August 18, 2008

ROBERT L. THOMAS
MARK F. MARSHALL
BRENDAN W. REILLY
ERIC C. SCHULTE
MATTHEW W. McNAMEE
MITCHELL A. PETERSON
ERIC R. JOHNSON
ROCHELLE R. CUNDY
TIFFANY M. MILLER
DAVID L. REZAC

OF COUNSEL
LOUIS R. HURWITZ
JEAN H. BENDER

HOLTON DAVENPORT
1892-1966
ELLSWORTH E. EVANS
1903-1996
DEMING SMITH
1920-1996

Writer's Direct Dial Number: 357-1232
e-mail: rlange@dehs.com

Honorable Stuart L. Tiede
Circuit Court Judge
425 N. Dakota Avenue
Sioux Falls, SD 57104

    RE:   *Sanford USD Medical Center, et al. vs. BioSafe Medical Technologies, et al.*
           *Civ. 08-825*

Dear Judge Tiede:

On behalf of Plaintiff Sanford USD Medical Center, I have set a hearing in the above-captioned matter before you on Monday, September 8, at 9:00 A.M. At that hearing, I will be presenting Plaintiff's previously filed *Motion For Amended Complaint* (which has attached to it the proposed *Amended Complaint*), as well as *Plaintiff's Motion for Summary Judgment Against Defendant BioSafe Medical Technologies, Inc.* A copy of the latter motion, along with *Plaintiff's Statement of Undisputed Material Facts* and *Plaintiff's Memorandum In Support,* are enclosed.

I am copying Jon Sogn on this letter, as counsel for Defendant BioSafe.

Respectfully yours,

ROBERTO A. LANGE
For the Firm

RAL: dq
Enclosures
CC:   Jon C. Sogn

STATE OF SOUTH DAKOTA   )              IN CIRCUIT COURT
                          : SS
COUNTY OF MINNEHAHA   )       SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| SANFORD USD MEDICAL CENTER<br>formerly known as SIOUX VALLEY<br>HOSPITAL and USD MEDICAL CENTER,<br><br>         Plaintiff,<br><br>    vs.<br><br>BIOSAFE MEDICAL TECHNOLOGIES, INC.,<br>DELPHI ENERGY FUND, INC., and<br>FIRST COMMERCIAL CAPITAL CORP.,<br><br>         Defendants. | CIV. 08-825<br><br><br>**PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AGAINST<br>BIOSAFE MEDICAL<br>TECHNOLOGIES, INC.** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pursuant to SDCL 15-6-56, Plaintiff Sanford USD Medical Center ("Sanford") hereby files this Motion For Summary Judgment on Count I of its Complaint against Defendant BioSafe Medical Technologies, Inc. ("BioSafe"). In support of this Motion For Summary Judgment, Plaintiff submits its Brief In Support, its Statement of Undisputed Facts and the Affidavits of Jeff Sandene and Bill Hofer.

Sanford is entitled to summary judgment based on the undisputed facts that: (a) Sanford did not reach the clear and unambiguous revenue guarantees from cholesterol testing (sometimes called "cholesterol determinations") set forth in the parties' August 30, 2004 Agreement (the August 30, 2004 Agreement, together with the Addenda thereto, are hereinafter referred to as the "Agreement"); and (b) BioSafe did not make the payments to Sanford that it was required to make in the event that Sanford did not reach the above-described revenue guarantees, thus breaching the Agreement.

WHEREFORE, Plaintiff Sanford USD Medical Center respectfully requests that the Court grant its Motion for Summary Judgment Against Defendant BioSafe Technologies, Inc., and grant it such other and further relief as is just and proper.

Dated this 18th day of August, 2008.

DAVENPORT, EVANS, HURWITZ & SMITH, L.L.P.

Roberto A. Lange
206 W. 14th Street
P.O. Box 1030
Sioux Falls, SD 57101-1030
Telephone (605) 336-2880
Facsimile (605) 335-3639
*Attorneys for Plaintiff*

## NOTICE OF HEARING

**TO DEFENDANT BIOSAFE MEDICAL TECHNOLOGIES, INC.:**

You will hereby take notice that the above and foregoing Motion will be brought on for hearing before this Court, the Honorable Stuart Tiede presiding, in the Chambers of the Court located in the Minnehaha County Courthouse, Sioux Falls, South Dakota, on Monday, the 8th of September, at 9:00 a.m. of said day, or as soon thereafter as the convenience of the Court will permit.

Dated at Sioux Falls, South Dakota, this 18th day of August, 2008.

2

## CERTIFICATE OF SERVICE

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and correct copy of the foregoing "Plaintiff's Motion For Summary Judgment Against BioSafe Medical Technologies, Inc." was served by mail upon:

> Jon C. Sogn
> LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
> P. O. Box 2700
> Sioux Falls, SD  57101-27000

on this 18th day of August, 2008.

_____

3

| | | |
|---|---|---|
| STATE OF SOUTH DAKOTA ) | | IN CIRCUIT COURT |
| : SS | | |
| COUNTY OF MINNEHAHA ) | | SECOND JUDICIAL CIRCUIT |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| SANFORD USD MEDICAL CENTER<br>formerly known as SIOUX VALLEY<br>HOSPITAL and USD MEDICAL CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSAFE MEDICAL TECHNOLOGIES, INC.,<br>DELPHI ENERGY FUND, INC., and<br>FIRST COMMERCIAL CAPITAL CORP.,<br><br>Defendants. | CIV. 08-825<br><br><br>**PLAINTIFF'S BRIEF<br>IN SUPPORT OF ITS MOTION FOR<br>SUMMARY JUDGMENT AGAINST<br>BIOSAFE MEDICAL<br>TECHNOLOGIES, INC.** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center ("Sanford") hereby submits this Brief in support

of its Motion for Summary Judgment Against Defendant BioSafe Medical Technologies, Inc.

("BioSafe").

## INTRODUCTION

This action arises out of BioSafe's material breach of the parties' August 30, 2004

Agreement (together with the Addenda thereto, the "Agreement"). Sanford's Motion For

Summary Judgment is based on the undisputed facts that: (a) Sanford did not reach the clear and

unambiguous revenue guarantees from cholesterol testing (sometimes called " cholesterol

determinations") set forth in the Agreement; and (b) BioSafe did not make the payments to

Sanford that it was required to make in the event that Sanford did not reach the above-described

revenue guarantees, thus breaching the Agreement.

## FACTS

The undisputed material facts that support Sanford's Motion and entitle it to summary judgment against BioSafe are set forth in Plaintiff's Statement of Undisputed Material Facts, which was served contemporaneously herewith. Those facts are not repeated here.

## SUMMARY JUDGMENT STANDARD

"Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Julson v. Federated Mut. Ins. Co.*, 562 N.W.2d 117, 119 (S.D. 1997) (*quoting* SDCL 15-6-56(c)).

## ARGUMENT

The elements of breach of contract are: (i) an enforceable promise; (ii) a breach of that promise; and (iii) resulting damages. *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006) (citations omitted). Here, the undisputed material facts establish all of these elements in Sanford's favor.

The Agreement guaranteed Sanford revenues from cholesterol determinations of $22,500 in the first year of the Agreement and $27,000 in revenues for each calendar quarter from and after September 1, 2005. *See* Stanford's Statement of Undisputed Material Facts ¶ 10. In the event that Sanford failed to achieve these revenue guarantees, the Agreement required BioSafe to pay Sanford the sum of the difference between the revenue guarantees and Sanford's actual revenues from cholesterol determinations. *Id.* ¶ 11.

Sanford, however, came nowhere close to reaching the revenue guarantees for cholesterol determinations during the first year of the Agreement, nor during any of the calendar quarters

2

beginning and subsequent to September 1, 2005. *Id.* ¶¶ 23 – 24. Specifically, from September 1,

2004 through July 31, 2008, Sanford was guaranteed revenues under the Agreement of $337,500.

*Id.* ¶ 23. However, during that period, Sanford received revenues from cholesterol

determinations of only $23,561.01. *Id.* ¶ 24. Accordingly, as of July 31, 2008, Sanford is

entitled to a payment from BioSafe in the amount of $313,938.99, plus interest, attorneys' fees,

costs and expenses as provided for by the Agreement. BioSafe has failed to pay that amount to

Sanford. *Id.* ¶ 25. Thus, BioSafe is in breach of the Agreement, and Sanford is entitled to

recover its damages as a result. *See Weitzel*, 714 N.W.2d at 894.

## CONCLUSION

Based on the undisputed facts and the clear and unambiguous terms of the Agreement,

Sanford is entitled to summary judgment as a matter of law against BioSafe on Count I of its

Complaint in the amount of $313,938.99 as of July 31, 2008, plus interest, expenses, costs and

attorneys fees as provided by the Agreement, and the Court should grant Sanford's Motion for

Summary Judgment and enter an order accordingly.

Dated this 18th day of August, 2008.


DAVENPORT, EVANS, HURWITZ &
SMITH, L.L.P.


*[signature: Roberto A. Lange]*

Roberto A. Lange
206 W. 14th Street
P.O. Box 1030
Sioux Falls, SD  57101-1030
Telephone (605) 336-2880
Facsimile (605) 335-3639
*Attorneys for Plaintiff*


3

## CERTIFICATE OF SERVICE

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and

correct copy of the foregoing "Plaintiff's Brief In Support Of Motion For Summary Judgment

Against BioSafe Medical Technologies, Inc." was served by mail upon:

> Jon C. Sogn
> LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
> P. O. Box 2700
> Sioux Falls, SD  57101-27000

on this 18th day of August, 2008.

_____

4

STATE OF SOUTH DAKOTA   )           IN CIRCUIT COURT
                        : SS
COUNTY OF MINNEHAHA   )     SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| SANFORD USD MEDICAL CENTER formerly known as SIOUX VALLEY HOSPITAL and USD MEDICAL CENTER, | \* \* \* CIV. 08-825 \* |
| Plaintiff, | \* \* |
| vs. | \* **PLAINTIFF'S STATEMENT OF** |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., DELPHI ENERGY FUND, INC., and FIRST COMMERCIAL CAPITAL CORP., | \* **UNDISPUTED MATERIAL FACTS** \* \* |
| Defendants. | \* \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff Sanford USD Medical Center ("Sanford") hereby submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment Against Defendant BioSafe Medical Technologies, Inc. ("BioSafe").

## I.    THE PARTIES AND CLAIM PLEADED

1.     Sanford is a not-for-profit charitable organization that is headquartered and provides, among other things, medical services, in Sioux Falls, South Dakota. *See* Affidavit of Jeff Sandene (hereinafter "Sandene Aff."; attached hereto as Exhibit 1) ¶ 2.

2.     Defendant BioSafe is an Illinois corporation with its corporate offices at 100 Field Drive, Suite 240, Lake Forest, Illinois. *See* Ex. A to the Affidavit of Bill Hofer (hereinafter "Hofer Aff."; attached hereto as Exhibit 2.)

3.     Count I of Sanford's Complaint asserts a claim against BioSafe for breach of the parties' August 30, 2004 Agreement (the August 30, 2004 Agreement, together with the Addenda thereto, are hereinafter collectively referred to as the "Agreement"). *See* Compl., Count I.

## II.    THE AGREEMENT

4.    BioSafe initiated contact with Sanford after Sanford acquired certain cholesterol testing equipment as part of its acquisition of Central Plains Clinic, Ltd.  Hofer Aff. ¶ 3.

5.    BioSafe was seeking an agreement to refer to Sanford in Sioux Falls certain blood and other samples for cholesterol testing (sometimes called "determinations").  Hofer Aff. ¶ 4.

6.    Sanford and BioSafe executed the Agreement, including Addendum I and Addendum II thereto, on June 1, 2004.  *See* Agreement.  (A true and correct copy of the Agreement (plus Addenda) is Exhibit A to the Hofer Aff.)

7.    The Agreement was effective as of August 30, 2004.  *Id.*

8.    The Agreement is for a term of 60 months (*i.e.,* August 30, 2004 through August 31, 2009).  *Id.*

9.     BioSafe, not Sanford, drafted the Agreement.  Hofer Aff. ¶ 6.

10.    Under Addendum I of the Agreement, BioSafe guaranteed revenue to Sanford from cholesterol determinations of $22,500 in the first year of the Agreement, and of $27,000 for each calendar quarter from and after September 1, 2005.  *See* Agreement, Addendum I.

11.    If these revenue guarantees were not met, BioSafe agreed to pay Sanford the sum of the difference between the revenue guarantees and Sanford's actual revenues from cholesterol determinations.  *Id.*

12.    As a means of compensating BioSafe for the cholesterol testing sent to Sanford and the revenue guarantees under the Agreement, Sanford agreed to pay BioSafe a monthly fee under Section 9 of the Agreement that BioSafe characterized as a "license fee."  Agreement § 9.

13.    Under Section 9 of the Agreement, Sanford agreed to a monthly license fee of $1,250 per month for the first year of the Agreement, and a monthly license fee of $6,250 per month for the remaining term.  *Id.*

14.    Section 10.11 of the Agreement entitles the prevailing party in any action arising out of the Agreement to its reasonable attorneys' fees, costs and expenses.  *Id.* § 10.11.

15.    Section 10.17 of the Agreement provides that any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.  *Id.* § 10.17.

### III.    BIOSAFE BREACHES THE AGREEMENT

16.    During the first year of the Agreement, BioSafe referred no cholesterol determinations to Sanford.  Hofer Aff. ¶ 7.

17.    On October 27, 2005, Sanford sent a letter to BioSafe requesting that BioSafe pay the $22,500 it owed for the first year of the Agreement on account of Sanford's failure to reach the $22,500 guarantee, but BioSafe failed to do so.  Sandene Aff. ¶ 3.

18.    During the quarter from September 1, 2005 through November 30, 2005, BioSafe again referred no cholesterol determinations to Sanford.  Hofer Aff. ¶ 8.

19.    On February 6, 2006, Sanford sent a letter to BioSafe requesting that BioSafe pay the $27,000 it owed for the quarter from September 1, 2005 through November 30, 2005, but BioSafe again failed to do so.  Sandene Aff. ¶ 4.

20.    In the quarter from December 1, 2005 through February 28, 2006, BioSafe again referred no cholesterol determinations to Sanford.  Hofer Aff. ¶ 9.

3

21.     In the quarter beginning March 1, 2006, BioSafe began to refer some cholesterol determinations to Sanford. Hofer Aff. ¶ 10. The volume of referrals, however, has been far below the volumes anticipated and revenue guaranteed by BioSafe in the Agreement. *Id.*

22.     On October 18, 2007, Sanford sent a letter notifying BioSafe of the amount of cholesterol testing that Sanford had performed under the Agreement and the amounts that BioSafe owed to Sanford under the Agreement as a result of failures to meet the revenue guarantees. Sandene Aff. ¶ 5.

23.     As of July 31, 2008, Sanford's total revenue guaranteed under the Agreement was $337,500. *See* Addendum I.

24.     As of July 31, 2008, Sanford has received revenues of only $23,561.01 from performing cholesterol testing under the Agreement. Hofer Aff. ¶ 11.

25.     As of July 31, 2008, the difference between the $337,500 revenue guarantee under the Agreement and the amount actually received by Sanford from cholesterol testing was $313,938.99. Hofer Aff. ¶ 13. BioSafe has failed to pay this amount to Sanford. *Id.*

        Dated this 18th day of August, 2008.


                                DAVENPORT, EVANS, HURWITZ &
                                SMITH, L.L.P.


                                _____
                                Roberto A. Lange
                                206 W. 14th Street
                                P.O. Box 1030
                                Sioux Falls, SD  57101-1030
                                Telephone (605) 336-2880
                                Facsimile (605) 335-3639
                                *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

Roberto A. Lange  one of the attorneys for Plaintiff, hereby certifies that a true and

correct copy of the foregoing "Plaintiff's Statement of Undisputed Material Facts" was served by

mail upon:

> Jon C. Sogn
> LYNN, JACKSON, SHULTZ & LEBRUN, P.C.
> P. O. Box 2700
> Sioux Falls, SD  57101-27000

on this 18th day of August, 2008.

_____

5

# EXHIBIT 1

STATE OF SOUTH DAKOTA   )           IN CIRCUIT COURT
                           : SS
COUNTY OF MINNEHAHA    )       SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |  |
|---|---|---|
| SANFORD USD MEDICAL CENTER | \* | |
| formerly known as SIOUX VALLEY | \* | |
| HOSPITAL and USD MEDICAL CENTER, | \* | CIV. 08-825 |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| vs. | \* | **AFFIDAVIT OF JEFF SANDENE** |
| | \* | |
| BIOSAFE MEDICAL TECHNOLOGIES, INC., | \* | |
| DELPHI ENERGY FUND, INC., and | \* | |
| FIRST COMMERCIAL CAPITAL CORP., | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATE OF SOUTH DAKOTA   )
                          : ss.
COUNTY OF MINNEHAHA    )

Jeff Sandene, being first duly sworn upon oath, states and alleges as follows:

1.    I am the Chief Financial Officer for Sanford USD Medical Center ("Sanford").

2.    I am familiar with the August 30, 2004 Agreement ("Agreement") between BioSafe

Medical Technologies, Inc. ("BioSafe") and Sanford.

3.    On October 27, 2005, I sent a letter to BioSafe requesting that BioSafe pay Sanford

$22,500 under the Agreement on account of Sanford's failure to realize the revenues guaranteed

for the first year of the Agreement.  A true and correct copy of my October 27, 2005 letter to

BioSafe is Exhibit A hereto.

4.    On February 6, 2006, I sent a letter to BioSafe requesting that BioSafe pay Sanford

$27,000 under the Agreement on account of Sanford's failure to realize the revenues guaranteed

for the period from September 1, 2005 through November 30, 2005. A true and correct copy of my February 6, 2006 letter is Exhibit B hereto.

5.     On October 18, 2007, I sent a letter to BioSafe requesting that BioSafe pay all amounts owed as of that date on account of Sanford's failure to realize the revenues guaranteed to Sanford as of that date. A copy of my October 18, 2007 letter and the enclosure thereto is Exhibit C hereto.

Further affiant sayeth not.

Dated at Sioux Falls, South Dakota, this 18th day of August, 2008.

_____
Jeff Sandene

Subscribed and sworn to before me this 18th day of August, 2008.

_____

LISA M. SORUM
NOTARY PUBLIC
SOUTH DAKOTA
SEAL     SEAL

Notary Public, South Dakota
My commission expires: 12-28-2013

2

# EXHIBIT A



# Sioux Valley Hospital
## USD Medical Center



c: Kay Reinartz

1305 W 18H St
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.siouxvalley.org

October 27, 2005

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Since Sioux Valley Hospital has been referred zero (ø) determinations from Biosafe or any other source pursuant to this agreement and zero (ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of September 1, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by November 10, 2005.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

*Accredited by the Joint Commission on Accreditation of Healthcare Organizations*

# EXHIBIT B





1305 W. 18th Street
PO Box 5039
Sioux Falls, South Dakota 57117-5039
(605) 333-1000
www.siouxvalley.org

## Sioux Valley Hospital
## USD Medical Center

February 6, 2006



David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The one-quarter period (September 1, 2005 through November 30, 2005) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital has been completed.

According to Addendum I of the agreement, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

Since Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any other source pursuant to this agreement and zero (Ø) revenue, Sioux Valley Hospital is claiming that a payment of twenty-seven thousand dollars ($27,000) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. as of November 30, 2005.

Sioux Valley Hospital respectfully requests that payment be made payable to Sioux Valley Hospital by February 20, 2006.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

*Accredited by the Joint Commission on Accreditation of Healthcare Organizations*

# EXHIBIT C



1305 W 18TH ST
PO BOX 5039
SIOUX FALLS SD 57117-5039
Phone: (605) 333-1000
www.sanfordhealth.org

October 18, 2007

David C. Fleisner, President
Biosafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, IL 60045

Dear Mr. Fleisner:

The first one-year period (September 1, 2004 through August 31, 2005) and eight (8) subsequent calendar quarters (September 2005 through August 31, 2007) of the agreement between Biosafe Medical Technologies, Inc and Sioux Valley Hospital have been completed.

According to Addendum I of the agreement; for the one-year period from September 1, 2004 through August 31, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 cholesterol determinations for such year at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Sioux Valley Hospital for such calendar year.

Furthermore, according to Addendum I of the agreement; for each calendar quarter from and after September 1, 2005, if Sioux Valley Hospital's gross revenue from cholesterol determinations referred to it by Biosafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 cholesterol determinations for such quarter at $9.00 each) then and only in such event, Biosafe shall pay to Sioux Valley Hospital the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Sioux Valley Hospital for such calendar quarter.

In the first one-year period, Sioux Valley Hospital has been referred zero (Ø) determinations from Biosafe or any other source and zero (Ø) revenue. Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of twenty-two thousand five hundred dollars ($22,500) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the first one-year period of the agreement.

In the subsequent eight (8) calendar quarters, Sioux Valley Hospital has been referred Three thousand eight hundred twenty one (3,821) determinations from Biosafe or any other source pursuant to this agreement and thirty-four thousand three hundred eighty-nine dollars ($34,389) billed revenue ($23,561.01 paid on account as of 9/30/2007). Pursuant to the agreement, Sioux Valley Hospital is claiming that a payment of one hundred ninety-two

81287792 rev. 3/07

thousand four hundred thirty eight dollars and ninety-nine cents ($192,438.99) is due to Sioux Valley Hospital from Biosafe Medical Technologies, Inc. for the eight calendar quarter periods from September 1, 2005 through August 31, 2007 of the agreement.

This letter is to inform you that total payment of two hundred fourteen thousand nine hundred thirty eight dollars and ninety-nine cents ($214,938.99) is due and payment is expected by November 16. A worksheet summary of charges, payments received, and balance due is attached to this letter.

Thank you for your prompt attention to our claim.

Sincerely,

Jeff Sandene
Chief Financial Officer
Sioux Valley Hospital

## BioSafe Contract: Contract vs Actual

Term of Contract: September 1, 2004 thru August 31, 2009
5 Years

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Actual Lipid Panels | Actual Billed Revenue | delta Panels | delta billed Revenue |
|---|---|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | - | $ - | (2,500) | $ (22,500) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | - | $ - | (3,000) | $ (27,000) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | 612 | $ 5,508 | (2,388) | $ (21,492) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | 941 | $ 8,469 | (2,059) | $ (18,531) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | 685 | $ 6,165 | (2,315) | $ (20,835) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | 702 | $ 6,318 | (2,298) | $ (20,682) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | 457 | $ 4,113 | (2,543) | $ (22,887) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | 424 | $ 3,816 | (2,576) | $ (23,184) |
| | | | | | | |
| Total To Date | 26,500 | $238,500.00 | 3,821 | $ 34,389 | (22,679) | $(204,111.00) |

| Payments Received | $(23,561.01) |
|---|---|

| GRAND TOTAL of amount past due | $214,938.99 |
|---|---|

# EXHIBIT 2

STATE OF SOUTH DAKOTA    )               IN CIRCUIT COURT
                              : SS
COUNTY OF MINNEHAHA    )        SECOND JUDICIAL CIRCUIT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| SANFORD USD MEDICAL CENTER<br>formerly known as SIOUX VALLEY<br>HOSPITAL and USD MEDICAL CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>BIOSAFE MEDICAL TECHNOLOGIES, INC.,<br>DELPHI ENERGY FUND, INC., and<br>FIRST COMMERCIAL CAPITAL CORP.,<br><br>Defendants. | CIV. 08-825<br><br>**AFFIDAVIT OF BILL HOFER** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STATE OF SOUTH DAKOTA   )
                         : ss.
COUNTY OF MINNEHAHA   )

Bill Hofer, being first duly sworn upon oath, states and alleges as follows:

1.    I am the Director of Business Development for Sanford USD Medical Center ("Sanford").

2.    I am familiar with the August 30, 2004 Agreement ("Agreement") between BioSafe Medical Technologies, Inc. ("BioSafe") and Sanford. A true and correct copy of the Agreement, together with Addendum I and Addendum II thereto, is Exhibit A hereto.

3.    BioSafe initiated contact with Sanford after Sanford acquired certain cholesterol testing equipment in connection with its acquisition of Central Plains Clinic, Ltd.

4.    At that time, BioSafe was interested in entering into an agreement with Sanford whereby it would refer certain blood and other samples to Sanford for cholesterol testing. Cholesterol tests are sometimes referred to as cholesterol determinations.

5.      After some negotiations, Sanford and BioSafe executed the Agreement on June 1, 2004.

6.      BioSafe was in charge of drafting the Agreement.

7.      During the first year of the Agreement (*i.e.*, August 31, 2004 through August 31, 2005), BioSafe referred no cholesterol determinations to Sanford.

8.      During the quarter from September 1, 2005 through November 30, 2005, BioSafe referred no cholesterol determinations to Sanford.

9.      During the quarter from December 1, 2005 through February 28, 2006, BioSafe referred no cholesterol determinations to Sanford.

10.     In the quarter beginning March 1, 2006 and the quarters thereafter, BioSafe referred some cholesterol determinations to Sanford, but those referrals were not sufficient to allow Sanford to reach the revenue guaranteed by Addendum I of the Agreement.

11.     As of July 31, 2008, Sanford's total revenue received from performing cholesterol determinations under the Agreement was $23,561.01.

12.     Attached hereto as Exhibit B is a spreadsheet prepared by me comparing the revenues guaranteed to Sanford under Addendum I to the Agreement and revenues actually received by Sanford from performing cholesterol determinations under the Agreement as of July 31, 2008.

13.     The difference between the revenues guaranteed to Sanford under Addendum I to the Agreement and the revenues actually received by Sanford from performing cholesterol determinations under the Agreement is $313,938.99. BioSafe has failed to pay this amount to Sanford.

        Further affiant sayeth not.

2

Dated at Sioux Falls, South Dakota, this _18th_ day of August, 2008.

_Bill Hofer_
Bill Hofer

Subscribed and sworn to before me this _18th_ day of August, 2008.

LISA M. SORUM
NOTARY PUBLIC
SEAL    SOUTH DAKOTA    SEAL

_Lisa M. Sorum_
Notary Public, South Dakota
My commission expires: _12-28-2013_

3

# EXHIBIT A

*overnite delivery 1.8/30/6*
*wth*

# AGREEMENT

This Agreement is made and entered into as of the ~~1st day of January~~, 2004 ("Effective Date") by and between BioSafe Medical Technologies, Inc., an Illinois corporation, with corporate offices at 100 Field Drive, Suite 240, Lake Forest, IL 60045, and its Affiliates, (collectively, "BioSafe") and Company, whose name and address is set forth on the signature page hereof, and its Affiliates (collectively, "Company").

WHEREAS, BioSafe is in the business of developing and selling diagnostic screens and tests using micro-samples of human blood, including its Cholesterol Panel;

WHEREAS, on the terms and conditions hereinafter set forth, Company desires (i) to market and sell in the Territory a cholesterol screening kit containing the same components as the BioSafe Cholesterol Panel and (ii) to perform in its laboratory the analysis of such test using BioSafe's proprietary methods, techniques and processes under a non-transferable and non-assignable revocable license; and,

WHEREAS, on the terms and conditions hereinafter set forth, BioSafe is willing to grant Company a non-transferable and non-assignable revocable right to use BioSafe's proprietary methods, techniques and processes to perform the laboratory analysis of such test.

NOW, THEREFORE, in consideration of the premises and of the terms, covenants and conditions herein contained, and the mutual benefits to be derived herefrom, and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1.    Definitions.  The following terms when used in this Agreement, including the preamble and recitals, shall have the following meanings:

1.1    "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.  The term "control" means possession of the power to direct, or cause the direction of, the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

1.2    "Agreement" means this Agreement and any exhibit, attachment, schedule, amendment or modification thereto.

1.3    "BioSafe" is defined in the preamble to this Agreement.

1.4    "BioSafe Indemnified Parties" is defined in Section 8.

1.5    "BioSafe Marks" means all trademarks, trade names, logos and service marks, registered or not, and trademark applications now owned or licensed, or hereafter acquired or licensed during the term of this Agreement, by or on behalf of BioSafe.

1.6    "BioSafe Patent Rights" means all patents and patent applications (which for purposes of this Agreement shall be deemed to include certificates of invention, applications for certificates of invention and utility models) throughout the world, covering or relating to the BioSafe Technology, including any substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations or continuations-in-part, which BioSafe owns or controls.

1.7    "BioSafe Technology" means any technology, method or process owned or licensed by BioSafe relating to blood specimen analysis, testing, storage and transport, and compositions of reagents or solutions used in testing, analyzing, storing or transporting blood and its components.

1.8    "BioSafe Technology Rights" means all technical information, know-how, trade secrets, inventions, data and other information now owned or licensed by BioSafe, or hereafter acquired or licensed by BioSafe during the term of this Agreement, whether patentable or not, relating to the BioSafe Technology, including (i) medical, chemical and other scientific data and (ii) processes and methodology used in the development, testing and analysis of the Cholesterol Panel.

1.9    "Cholesterol Panel" means BioSafe's kit containing all of the components required for an individual to participate in the capillary collection of blood using BioSafe's collection kit which, through laboratory analysis using BioSafe's proprietary methods, techniques and processes, measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.10    "Collection Card" means the BioSafe proprietary self-collection card on which specimens of blood are deposited and from which the laboratory analysis is performed to measure the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.11    "Company" is defined in the preamble to this Agreement.

1.12    "Company Test" means a self-collection blood screen kit, the components of which are the same as those contained in the Cholesterol Panel (although such components, except for the Collection Card, may be purchased from sources other than those used by BioSafe), which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

1.13 "Determination" means the result obtained from the analysis of human blood and its components.

1.14 "Effective Date" is defined in the preamble to this Agreement.

1.15 "Field" means the collection, transportation, testing and analysis of human blood and its components, and the reporting of the results thereof.

1.16 "Governmental Body" means any court, government (federal, state, local or foreign); department, commission, board, agency, official or other regulatory, administrative or governmental authority.

1.17 "HDL" means high density lipoprotein.

1.18 "LDL" means low density lipoprotein.

1.19 "Party" means BioSafe or Company; "Parties" means BioSafe and Company.

1.20 "Person" means an individual, a partnership, a corporation, a trust, a joint venture, a limited liability company or partnership, an unincorporated organization, any other legal entity and any Governmental Body, self-regulatory agency or authority or other private agency or authority.

1.21 "Territory" means the United States.

2.     License.

2.1    Grant.  BioSafe hereby grants to Company, and Company hereby unconditionally and irrevocably accepts, a non-exclusive, non-transferable and non-assignable revocable license, without the right of sublicense, of the BioSafe Patent Rights and the BioSafe Technology Rights to use the BioSafe Technology solely in the Field exclusively in the Territory for the purpose of processing, and making Determinations from, the Company Test.  The grant of the license is subject to Company being certified by BioSafe, and its continued use is subject to maintaining such certification by passing BioSafe proficiency tests, as a laboratory qualified to do analysis of total cholesterol, HDL, LDL and triglycerides screens using BioSafe's proprietary methods, techniques and processes, and to the continued fulfillment of all of the other terms and conditions of this Agreement.  In addition, the license has been granted solely, and is valid only, for the number of Determinations set forth in Section 9.  Determinations in excess of such annual number shall be in violation of the license and shall be subject to additional charges in accordance with BioSafe's policies and procedures.  In consideration of the license granted herein to Company, beginning with the Effective Date, Company shall pay to BioSafe the monthly license fee set forth in Section 9.  Such license fee shall be due and payable by the Company on the first day of each month.  If the Effective Date does not fall on the first day of the month, the first payment shall be a pro-rata portion of the monthly license fee, calculated on a 30-day basis, due and payable on the Effective Date.  In connection with the license, BioSafe: (i) will provide training to Company and conduct certification and proficiency examinations in the use of BioSafe's proprietary methods, techniques and processes; (ii) will provide Company with a list of all components used in the Cholesterol Panel to enable Company to assemble a self-collection blood screen kit substantially identical to the Cholesterol Panel; (iii) will provide Company with copies of all relevant printed collateral materials, including instructions used by BioSafe in its Cholesterol Panel, and (iv) will make Collection Cards available for purchase at an initial cost of $1.25 each, subject to change upon 90 days prior written notice.

2.2    Non-exclusive.  Company understands and acknowledges that, since the license herein granted is non-exclusive, BioSafe reserves the right, at any time and from time to time, to grant to other Persons identical or similar licenses or the right to distribute or manufacturer the Cholesterol Panel or any similar type product during the term of this Agreement, in each case without breaching this Agreement; provided, however, that notwithstanding the foregoing to the contrary, during the term of this Agreement, Company shall be the exclusive licensee within the State of South Dakota of BioSafe Technology for the Company Test.

2.3    Sale Outside the Territory.  C ompany s hall n ot market, s ell o r o ffer f or s ale t he C ompany T est o utside o f t he Territory.  Accordingly, Company shall limit its sales activities with respect to the Company Test to customers located in the Territory.  Company shall refer to BioSafe all orders and inquiries relating to a cholesterol screen originating from within or outside the Territory to the extent such orders or inquiries relate to such screens destined for use outside the Territory.

2.4    Competing Activities.  During the term of this Agreement and for a period of one year following its termination, Company will not, without BioSafe's prior written consent: (i) make, use, license, sublicense, assign, sell, offer to sell or otherwise transfer the Company Test for or to, or enter any agreement or authorize any third party to do any of the foregoing with, (a) any Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides, (b) any Affiliates or agents of a Person that develops, manufactures, sells or licenses a pharmaceutical product or biologic to treat total cholesterol, HDL, LDL or triglycerides or (c) any Person that Company, its Affiliates or agents knows or believes will manufacture, distribute, sell or otherwise transfer, or has manufactured, distributed, sold or otherwise transferred, the Company Test or the Cholesterol Panel to, on behalf of, or under any agreement with, a party identified in the immediately preceding clauses (a) and (b); or (ii) sell or distribute the

2

Company Test or the Cholesterol Panel as a consumer product through mass merchandisers, drug stores or other retail stores.

2.5  Non-assignable.  Neither the license granted to Company, nor any of the rights, technology and trademarks included in the license, are assignable or transferable in any manner or way whatsoever by Company, including the right of Company to grant any sub-licenses.

2.6  Reverse Engineering.  Company will not, nor will it make any attempt to, reverse engineer or to analyze in any manner or way whatsoever the BioSafe Technology, the BioSafe Technology Rights or the BioSafe Patent Rights.

2.7  Advertising and Publications.  Company will not use on a web site or in any other manner or way any material of any kind or nature in any form or medium that refers, in any manner or way, to the BioSafe Technology, the BioSafe Patent Rights, the BioSafe Technology Rights, the Cholesterol Panel, BioSafe or any other BioSafe intellectual property without BioSafe having first reviewed the proposed use and approved it in writing. Company will not publish outcome or evidence-based data obtained using the Company Test without BioSafe's prior written approval.

2.8  No Challenge.  At no time, either during or following the expiration of the term of this Agreement, will Company challenge or assist any other Person in challenging the BioSafe Marks, the BioSafe Patents Rights or the registration thereof.

2.9  No Registration of Similar Marks.  At no time, either during or following the expiration of the term of this Agreement, will Company attempt to register any trademarks, service marks, marks, names or trade names confusingly similar to or closely resembling any of the BioSafe Marks.

2.10 No Similar Methods.  At no time, either during or following the expiration of the term of this Agreement, will Company use or attempt to use any method, technique or process similar to the BioSafe Technology to analyze or make Determinations which measures the level of total cholesterol, HDL, LDL and triglycerides in the blood.

2.11 Proprietary Rights.  Title and full ownership of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks shall at all times remain with BioSafe. No term or provision of this Agreement or elsewhere grants to Company any right of ownership or any other right of any kind or nature whatsoever in or to such rights, technology, marks and other BioSafe intellectual property, other than the right to use such rights, technology and marks in accordance with the terms and provisions of this Agreement.

2.12 Cessation of Use.  At the expiration of the term, or the termination of Company's right to use the license granted herein, any and all rights and licenses that Company has under this Agreement or otherwise to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any other of BioSafe's intellectual property shall immediately terminate and Company shall immediately cease using them in any manner or way whatsoever. Company shall immediately return to BioSafe any and all materials relating to the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or any of its other intellectual property. Company expressly waives the benefit or protection of any law, rule or regulation which purports to grant any right of any kind or nature to Company to allow it to use any of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology, the BioSafe Marks or BioSafe's other intellectual property subsequent to the expiration or termination of this Agreement and the termination of the license granted hereby.

2.13 Independent Contractor Status.  The relationship of BioSafe and Company established by this Agreement is that of independent contractors, and no other relationship is intended. This Agreement does not constitute and shall not be construed as constituting a partnership, joint venture, franchise, agency, employer-employee, fiduciary or relationship other than independent contractors between BioSafe and Company. Neither Party is any employee, agent, partner, joint venturer or legal representative of the other. Accordingly, nothing contained herein shall authorize or empower either Party to assume or create any obligation or responsibility of any kind or nature whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner, or to make any representation, warranty or commitment on behalf of the other Party. Neither Party shall act in a manner which expresses or implies a relationship between them other than that of independent contractors. All agreements of any kind or nature (including a sales agreement) between Company and its customers are Company's sole responsibility and will have no effect on any right or obligation of the Parties under this Agreement.

3.  Company's Obligations.  During the Term of this Agreement, Company will: (i) pay to BioSafe, its agent or assignee a monthly license fee in accordance with the terms of this Agreement; (ii) assemble the Company Test only with the components set forth on the list of components provided by BioSafe (including the Collection Card), or those deemed by BioSafe to be substantially identical, purchase from BioSafe all Collection Cards included in the Company Test, and procure from BioSafe or independently from BioSafe all other components in the Company Test; (iii) sell the Company Test in accordance with all applicable laws, rules and regulations, including the Health Insurance Portability

3

and Accountability Act of 1996, and the privacy regulations created as a result of such act, and all of the terms and provisions of this Agreement; (iv) conduct its business of selling the Company Test solely in its name, at its sole cost and expense; (v) avoid deceptive, misleading or unethical practices or making any false or misleading representations with respect to the Company Test; (vi) maintain competent, well-trained personnel of its own selection who shall engage in the sale and the laboratory analysis of the Company Test; (vii) obtain all licenses, permits, registrations and approvals, governmental or otherwise, and pay all duties, taxes, excises and payments, that are required for Company to sell the Company Test and to perform the laboratory analysis; (viii) be solely responsible for ensuring that all required packaging requirements, instructions, warnings, labels, phrases, language or markings that are required by applicable laws, rules, regulations and practices are satisfied for sale of the Company Test in the Territory; (ix) be solely responsible for all costs and expenses of any kind or nature related in any manner or way to the assembling, sale and analysis of the Company Test, including any required translations; (x) maintain its certification from BioSafe to use BioSafe's proprietary methods, procedures and techniques throughout the term of this Agreement; (xi) ensure appropriate hazardous and non-hazardous waste disposal in accordance with all applicable rules and regulations; (xii) ensure it has adequate and legally compliant laboratory information systems and laboratory report-generating systems, including security of the data base related to patient confidentiality, accuracy of laboratory reports and transmission of related data, appearance of laboratory reports and secured back-up storage of relevant records; (xiii) maintain at its cost and expense the laboratory facility and equipment, including a Roche P-Modular analyzer and/or any other equipment specified by BioSafe, to test, analyze and make Determinations from the Company Test using BioSafe proprietary methods, techniques and processes; (xiv) be responsible for all of its own expenses, including providing such office space, facilities and personnel as are required to perform its obligations under this Agreement and all costs and expenses related to the advertising, marketing, promotion and sale of the Company Test, and the analysis thereof, in the Territory; (xv) not incur any expense chargeable to BioSafe except as may specifically be authorized in advance in writing by BioSafe; (xvi) maintain in effect during the term of this Agreement and for a period of five years thereafter appropriate liability insurance policies, copies of which shall be delivered to BioSafe, covering the sale and laboratory analysis of the Company Test with a recognized insurance carrier on such terms as are acceptable to BioSafe, which must include BioSafe as an additional ~~named~~ insured for the same limits of liability as are provided for Company, but in no event less than two million dollars, a waiver of subrogation rights against BioSafe and the requirement that BioSafe receive not less than sixty days prior written notice of any modification or termination of coverage; (xvii) observe and adhere to the provisions of any confidentiality agreement between BioSafe and Company; (xviii) indemnify BioSafe in accordance with the provisions of this Agreement; and (xix) prominently display on the front of the packaging of the Company Test, in a place approved by BioSafe, the BioSafe logo, "Science by BioSafe", the form of which will be furnished by BioSafe to Company.

4.    Term. Subject to earlier termination of Company's right to use the license, upon the occurrence of any event specified below, the term of this Agreement shall be for a 60-month period commencing on the Effective Date and expiring at 5:00 p.m. central time, on the last day of such 60-month period.

4.1    BioSafe's Right to Terminate. Notwithstanding any other provision herein contained to the contrary, BioSafe has the right to terminate Company's license and the use of all rights, technology and processes related thereto prior to the expiration of the term immediately upon the occurrence of any of the following events: (i) any law, rule or regulation is adopted or is in effect in the Territory, or elsewhere, that would restrict any of BioSafe's rights hereunder, otherwise invalidates any provision hereof or materially affects BioSafe's or Company's ability to perform its obligations under this Agreement; (ii) if Company makes any false or untrue statement or representation herein or in the performance of its obligations hereunder; (iii) if Company, in BioSafe's sole opinion, engages in any fraudulent or dishonest activity; (iv) if Company breaches any of the provisions of Sections 2.3 through 2.10, Section 6 or Company attempts to assign this Agreement, or any of its rights and obligations herein.; (v) if Company fails to become accredited or fails any BioSafe laboratory proficiency testing or fails to correct deficiencies within the specified period to maintain its certification to use BioSafe's proprietary methods, techniques and processes; (vi) as set forth in Section 5;  (vii) Company exceeds the annual number of Determinations for which the license has been granted; (viii) Company fails to make timely payment of any monthly license fee due hereunder; (ix) Company breaches or is in default of a material obligation under this Agreement (other than the payment of the monthly license fee) and the default or breach is not cured to BioSafe's satisfaction within ten days after Company's receipt of written notice stating the nature of the default; (x) Company becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy, insolvency or debtor's relief law, whether domestic or foreign, or has wound up, liquidated its business, stopped doing business as a going concern, merges or consolidates its business or transfers all or substantially of its assets, voluntarily or otherwise; or (xi) an order

4

or notice shall be published by any government or Governmental Body requiring the cessation of activities by Company or BioSafe.

4.2 Rights Upon Termination or Expiration.  Upon expiration of the term of this Agreement, or termination of Company's right to use the license prior thereto, in accordance with the provisions of this Agreement, all rights, privileges and licenses granted in this Agreement to Company shall immediately cease and terminate. Accordingly: (i) Company shall immediately cease, using any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks and any other of BioSafe's intellectual property, and shall certify in writing to BioSafe that it has completely terminated its use thereof; (ii) Company shall immediately cease all sales and other activities with respect to the Company Test, and Company shall take all action required to terminate Company's registration, if any was required, as a seller of the Company Test and shall furnish BioSafe with proof of such termination or a statement warranting that such registration was not required; (iii) Company shall immediately cease using and return to BioSafe all of BioSafe's confidential information; (iv) all indebtedness of Company to BioSafe shall become immediately due and payable without further notice or demand, which is hereby expressly waived; and (v) BioSafe shall not have any obligation to repurchase or to credit Company for its inventory of Collection Cards or Company Tests at the time of termination of Company's right to use the license, or expiration of the term, of this Agreement.

4.3 Survival of Prior Obligations.  Notwithstanding any thing herein contained to the contrary, termination of this Agreement, whether by expiration of the term or otherwise: (i) shall not relieve Company of any obligation incurred prior to such termination; and (ii) the obligation of Company under the provisions of any confidentiality agreement between BioSafe and Company with respect to the protection and non-disclosure of Confidential Information, as well as any other provisions which by their nature are intended to survive any such termination, shall survive and continue to be enforceable.

5.   Patents.   Company shall promptly notify BioSafe of any actual or suspected infringements, imitations or unauthorized use of which it becomes aware by a third party of the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks. BioSafe shall have the right, but not the obligation, (and Company shall not have any right) to initiate an infringement action or other appropriate suit in its name, or in the name of Company, if necessary, anywhere in the world against a third party at its own expense. Company agrees to being joined as a party plaintiff and to cooperate in the prosecution thereof as is reasonably necessary, at BioSafe's expense. If BioSafe decides to undertake such suit, then BioSafe shall have the sole right to select counsel, to control the prosecution, and the right to settle and compromise such action without Company's prior consent. BioSafe shall not be liable to Company for any lost profits, damages or other amounts of any kind or nature whatsoever if BioSafe decides not to initiate any action against a third party for alleged infringement. Any and all amounts of any kind or nature whatsoever received by BioSafe in connection with any claim or action of infringement, imitation or unauthorized use of BioSafe's intellectual property, including the BioSafe Patent Rights, the BioSafe Technology Rights, the BioSafe Technology and the BioSafe Marks, shall belong solely to BioSafe, and Company shall not have, and irrevocably waives, any claim, right or interest of any kind or nature whatsoever to any portion thereof.

BioSafe, at its own expense, has the right to defend, and at its option, to settle any third party claim, suit, action or proceeding brought against Company alleging that any of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any other intellectual property of BioSafe infringes any patent, copyright or trademark or other intellectual property right of such third party. BioSafe shall have sole control of the defense and settlement of any such claim, suit, action or proceeding. BioSafe will pay any final judgment entered against Company in such claim, suit, action or proceeding defended by BioSafe; provided, however, notwithstanding the foregoing provisions to the contrary, BioSafe shall be relieved of any obligation to defend or pay for such defense unless Company notifies BioSafe in writing of such claim, suit, action or proceeding within five business days after becoming aware of it and Company provides BioSafe with full and proper information and assistance, as BioSafe may request, to defend or settle such claim, suit, action or proceeding. If it is finally determined by a court of competent jurisdiction, or if BioSafe in its sole discretion determines, that any of BioSafe's intellectual property infringes any copyright, trademark or any other intellectual right of a third party, then BioSafe may, in its sole discretion and expense, take any action. Notwithstanding any other provision herein contained to the contrary, BioSafe shall not have any liability for any infringement which results from any act of Company, including Company's use of the BioSafe Patent Rights, the BioSafe Technology, the BioSafe Technology Rights, the BioSafe Marks or any of BioSafe's other intellectual property in combination with some other technology, method or process not supplied by BioSafe, where BioSafe's rights, technology or property itself would not be infringing without the addition of such other technology, method or process or Company's modifications of BioSafe's rights, technology or property.

5

6. <u>Company's Representations and Warranties</u>. Company represents and warrants that each of the following shall survive the execution and delivery of this Agreement, are true and correct now and will be throughout the entire term of Agreement: (i) Company is an entity duly organized, existing and in good standing under the laws of the state of its incorporation or organization set forth on the signature page hereof, with full right, power and authority to enter into and perform this Agreement and to grant all of the rights, powers and authorities and to incur the obligations herein contained; (ii) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action, does not require the approval or consent of any third Person, does not and will not conflict with, violate or breach Company's articles of incorporation or organization, any agreement to which it is a party or any law, rule or regulation or court decree or order; (iii) this Agreement is the legal, valid and binding obligation of Company, enforceable in accordance with its terms at all times; (iv) Company will comply with all applicable laws, consent decrees and regulations of any federal, state or Governmental Body wherever located; (v) Company owns, holds or possesses all Governmental Body and private licenses, franchises, permits, privileges, approvals and other authorizations which are necessary for it to carry on and conduct its business, to sell the Company Test and to make Determinations; (vi) there is no action, suit or proceeding pending or, to the best knowledge of Company, threatened, which questions the legality or propriety of the transaction contemplated by this Agreement or which, if decided adversely against Company, would prevent Company from fulfilling all of its obligations under this Agreement; and (vii) Company has no expectation and has received no assurance or guarantee of any kind or nature it will obtain any anticipated amount of profits or revenue as a result of Company selling the Company Test or making Determinations.

7. <u>Disclaimer of Warrant and Limitation of Liability</u>.

7.1. <u>Disclaimer of Warranty</u>. Section 7.1 has been deleted in its entirety. There is no Section 7.1 of the Agreement.

7.2. <u>Limitation of Liability</u>. In no event shall BioSafe be liable under any legal or equitable theory, and Company waives any right to or recovery, for lost profits or anticipated income, loss of goodwill, cost of procurement of substitute goods, or any other direct, indirect, special, reliance, incidental, consequential or punitive damages of any kind or nature whatsoever, however caused, suffered by Company, its customers or others for all causes of action or claims of any kind or nature whatsoever.

8. <u>Indemnification</u>. Company shall indemnify and hold BioSafe, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "BioSafe Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a BioSafe Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any BioSafe Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by Company of, or any failure by Company to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by Company. BioSafe shall indemnify and hold Company, its Affiliates, each of their respective directors, officers, employees and agents, and each of the heirs, executors, administrators, successors and assigns of each of the foregoing (collectively, the "Company Indemnified Parties") free and harmless from and against any and all actions, suits, claims, losses, damages, and expenses of any kind or nature, including attorneys' fees and costs of investigation (irrespective of whether a Company Indemnified Party is a party to the action for which indemnification is being sought hereunder) incurred by any Company Indemnified Party in connection with, resulting from, arising out of or relating to, directly or indirectly (i) any breach by BioSafe of, or any failure by BioSafe to perform, any of its covenants, agreements or obligations in the Agreement, or (ii) any negligent act or omission to act by BioSafe.

9. <u>Determinations and Monthly License Fee</u>. In consideration of the license granted herein to Company, beginning with the Effective Date and until ~~December~~ 31, ~~2004~~ Company will pay to BioSafe a monthly license fee of one thousand two hundred and fifty dollars ($1,250) per month and commencing ~~January~~ 1, ~~2005~~ and for the remainder of the Term, Company will pay a monthly license fee of six thousand two hundred and fifty dollars ($6,250) for the right to process up to sixty thousand (60,000) Determinations per year. Each such payment shall be due and payable by the Company on the first day of each month. If the Effective Date does not fall on the first day of the month, the first and last payment shall be a pro-rata portion of the amount payable.

During normal business hours and upon reasonable notice, BioSafe shall have the right to inspect and audit Company's books and records to confirm the number of annual Determinations performed by Company. All costs and expenses of such inspection and audit shall be paid by BioSafe unless it is determined that the number of annual Determinations performed by Company exceeded the annual number of Determinations indicated above, in which case Company shall be responsible for such costs and expenses.

6

10. **Miscellaneous Provisions.**

10.1 *Amendments And Waiver.* The Parties, by mutual agreement in writing, may amend, modify or supplement this Agreement. Any term or provision of this Agreement may be waived solely by a writing signed by the Party entitled to the benefit thereof. The failure of a Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement, or any part hereof, or the right of a Party thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No custom or practice of a Party in variance with the terms hereof shall constitute a waiver by such Party to demand exact compliance with the terms hereof. Any waiver or consent may be given subject to satisfaction of the conditions stated therein.

10.2 *Assignment.* This Agreement is personal to Company; therefore, Company's rights and obligations under this Agreement may not be sold, transferred or assigned without the prior written consent of BioSafe. No rights under this Agreement shall devolve by operation law or otherwise to any receiver, liquidator or trustee of Company. BioSafe may assign this Agreement and any or all of its rights and obligations hereunder without the consent of Company or notice.

10.3 *Benefit of Agreement.* This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and to their respective successors, permitted assigns and to the benefit of the BioSafe Indemnified Parties. Any assignee of BioSafe shall have the same rights and remedies as BioSafe and the rights of such assignee will not be subject to any claims Company may have against BioSafe. Nothing contained in this Agreement, expressed or implied, is intended, and shall not be construed, to confer upon or create in any Person (other than the Parties hereto and their successors and permitted assigns and the BioSafe Indemnified Parties) any rights or remedies under or by reason of this Agreement, including any rights of any kind or nature to enforce this Agreement.

10.4 *Counterparts.* This Agreement may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, binding upon both of the Parties, notwithstanding that both the Parties are not signatories to the original or the same counterpart. In pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one such counterparts.

10.5 *Governing Law.* The validity, interpretation, construction and performance of this Agreement shall be governed by the applicable laws of the United States. EACH OF THE PARTIES HERETO EXPRESSLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JURISDICTION.

10.6 *Headings.* The Section headings contained in this Agreement are for convenience only and shall not serve to modify, interpret or affect the meaning of the Sections at the beginning of which they appear.

10.7 Section 10.7 has been deleted in its entirety. There is no section 10.7 of the Agreement.

10.8 *No Drafting Presumption.* This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

10.9 *Severability.* Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement. The Parties shall endeavor in good faith negotiations to replace the invalid, inoperative, illegal or unenforceable provision with a valid and enforceable one, the economic effect of which comes as close as possible to that of the invalid provision.

10.10 *Notices.* All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given, delivered and received (i) when delivered, if delivered personally, (ii) four days after mailing, when sent by registered or certified mail, return receipt requested and postage prepaid, (iii) the next business day after delivery to a private courier service, when delivered to a private courier service providing documented overnight service, and (iv) on the date of delivery if delivered by facsimile transmission, receipt confirmed, provided that a confirmation copy is sent on the next business day by registered or certified mail, return receipt requested and postage prepaid, in each case addressed as follows:

   If to BioSafe, to:

BioSafe Medical Technologies, Inc.
100 Field Drive, Suite 240
Lake Forest, Illinois USA 60045
Attention: President
Facsimile: 847.234.8222
Confirmation Phone No.: 847.234.8111

7

If to Company, to the address set forth on the signature page hereof,
or to such other address as the recipient Party may indicate by a notice delivered to the sending Party (such change of address notice to be deemed given, delivered and received only upon actual receipt thereof by the recipient of such notice).

10.11   Attorneys' Fees and Costs.  In addition to any other relief awarded, the prevailing Party in any action arising out of this Agreement is entitled to reasonable attorneys' fees and costs and expenses.

10.12   Announcements.  N either Party s hall i ssue a ny p ress r elease o r o ther p ublicity m aterials w ith r espect to the existence of this Agreement or the terms and conditions hereof without the prior written consent of the other Party.  This restriction shall not apply to disclosures required by law or regulation.

10.13   Cumulative Remedies.  If either Party breaches this Agreement, the non-breaching Party shall have the right to assert all legal and equitable remedies available, with no remedy being exclusive.

10.14   Extension of Term.  Upon sixty (60) days written notice given prior to the end of the term of this Agreement, Company shall have the right to extend this Agreement for an additional five (5) year period provided that BioSafe and the Company can agree to terms and conditions acceptable to both of the Parties for such additional five (5) year term.

10.15   Further Assurances.  Each of the Parties agrees that at any time, and from time to time, before and after the termination of this Agreement for any reason whatsoever, it will do all such things and execute and deliver all such agreements, assignments, instruments, other documents and assurances as the other Party or its counsel reasonable deems necessary or desirable in order to carry out the terms and conditions of this Agreement.

10.16   Interpretation.  Whenever used in this Agreement, (i) the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders, and (ii) "including" shall be deemed to mean "including not limited to".

10.17   Interest.  Any amount not paid when due shall bear interest at the rate of the lesser of the maximum rate allowable under applicable law and one and one-half percent per month until payment is received.

10.18   Entire Agreement.  This Agreement constitutes t he e ntire a greements a nd understandings b etween the Parties hereto with respect to the subject matter hereof and supercedes all prior negotiations, representations, agreements, letters of intent, commitments, contracts, arrangements, covenants, promises, conditions, understandings, inducements and negotiations, expressed or implied, written or oral, between them as to such subject matter. Neither Party to this Agreement shall be bound by or charged with any matter not specifically set forth in this Agreement.

THE REMAINDER OF THIS PAGE HAS INTENTIONALL BEEN LEFT BLANK.  THE NEXT PAGE IS THE SIGNATURE PAGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year first above written.

BIOSAFE MEDICAL TECHNOLOGIES, INC.

By: _David C. Fleisner_ _(signature)_

David C. Fleisner, President

COMPANY

_Sioux Valley Hospital USD Medical Center_
(Print Company name and state of incorporation or organization)

By: _Rosemary Bour_ _(signature)_
(Signature of authorized party)

_Rosemary Bour  VP ER/Trauma/Surgery_
(Print name and title of person signing)

_1305 W 18th St, Sioux Falls, SD 57105_
(Print address of Company)

_(605 - 333 - 6422_
(Print Company telephone number)

_(605 - 333 - 1531_
(Print Company facsimile number)

BMT-mydocs-License Agreement for Labs-Cholesterol-v3.4-rev'd  8-28-03-Sioux Valley

*BM*
*LB September Addendum I*     *LB BM*
~~June~~                      *August  2005*

For the one-year period from ~~January~~ 1, 2004 through ~~December~~ 31, ~~2004~~, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-two thousand five hundred dollars ($22,500) (the equivalent of 2,500 Cholesterol Determinations for such year at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-two thousand five hundred dollars ($22,500) and the actual gross revenue received by Company for such calendar year provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

*September*

*LB*   For each calendar quarter from and after ~~January~~ 1, 2005, if the Company's gross revenue from Cholesterol Determinations referred to it by BioSafe or from any other source is less than twenty-seven thousand dollars ($27,000) (the equivalent of 3,000 Cholesterol Determinations per quarter at $9.00 each), then and only in such event, BioSafe shall pay to Company the difference between twenty-seven thousand dollars ($27,000) and the actual gross revenue received by Company for such calendar quarter provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim that such payment is due it from BioSafe.

~~Notwithstanding anything in this Agreement to the contrary, Company shall have the right to suspend this Agreement upon written notice to BioSafe given within the sixty (60) day period following the end of any calendar year in the term of this Agreement with respect to which the Company's annual gross revenue in such calendar year from Cholesterol Determinations referred to it by BioSafe or from any other source, including but not limited to Cholesterol Determinations performed on tests sold by Company, is less than the amount set forth below for the Anticipated Gross Revenue for such year (provided that Company furnishes BioSafe with documentary evidence, satisfactory to BioSafe and attested to by Company's chief financial officer or its president, supporting Company's claim).~~
*LB X BM*

For purposes of this Agreement, Anticipated Gross Revenue for the first calendar year in the term of this Agreement is twenty-two thousand five hundred dollars ($22,500), and the Anticipated Gross Revenue for each of the second, third, fourth and fifth calendar years in the term of this Agreement is one hundred eight thousand dollars ($108,000).

Notwithstanding the foregoing provisions to the contrary, if any year in the term of this Agreement is less than a full calendar year, Anticipated Gross Revenue for such period shall be determined by multiplying the Anticipated Gross Revenue for such year (set forth above) by a fraction, the numerator of which shall be the actual number of days in the year in question, and the denominator of which shall be three hundred and sixty-five (365).

Dated: _____6/1/0?_____

BioSafe Medical Technologies, Inc.          COMPANY

By: _____          By: __Rosemary Bova__

05/05/2004 10:36 FAX 605 328 5434          CLM CLIENT SUPPORT                          ☎002
  05/05/2004  09:52     847-234-8222              BIO SAFE                             PAGE  02

ADDENDUM II

Notwithstanding anything to the contrary contained in this Agreement, at any time during the term of this Agreement, BioSafe may grant licenses of the BioSafe Technology for the Company Test for use within the State of South Dakota to laboratories with facilities in more than one state, including South Dakota, and such grant shall not be deemed to be a breach of this Agreement.

Dated: 6/1/04

BioSafe Medical Technologies, Inc.                Company

By: _____                       By: _____

                                                 Kay W. Reinarte
                                                 General Manager

# EXHIBIT B

# BioSafe Contract: Contract vs Actual

**Term of Contract: September 1, 2004 thru August 31, 2009**
**5 Years**

Updated 8/14/2008

| Period | Contract Guarantee Lipid panels | Contract Guarantee Revenue | Payments Received | Difference between contract guarantee and payments received |
|---|---|---|---|---|
| Yr 1: 9/04-8/05 | 2,500 | $ 22,500 | $ - | $ (22,500.00) |
| Q1: 9/05-11/05 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q2: 12/05-2/06 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q3: 3/06-5/06 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q4: 6/06-8/06 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q5: 9/06-11/06 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q6: 12/06-2/07 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q7: 3/07-5/07 | 3,000 | $ 27,000 | $ 13,976.01 | $ (13,023.99) |
| Q8: 6/07-8/07 | 3,000 | $ 27,000 | $ 6,165.00 | $ (20,835.00) |
| Q9: 9/07-11/07 | 3,000 | $ 27,000 | $ 3,420.00 | $ (23,580.00) |
| Q10: 12/07-2/08 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| Q11:3/08-5/08 | 3,000 | $ 27,000 | $ - | $ (27,000.00) |
| *Q12: 6/08-8/08 | 2,000 | $ 18,000 | $ - | $ (18,000.00) |
| | | | | |
| Total To Date | 37,500 | $ 337,500.00 | $ 23,561.01 | $ (313,938.99) |
| | | | | Past due |

*Partial quarter: 2 months